Nos. 22-50080, 22-50081, 22-50082, 22-50103

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/Cross-Appellant,*

*v.*

SCUDERIA DEVELOPMENT LLC ET AL.,

*Defendants-Appellants/Cross-Appellees.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 19-282-RGK*

## SECOND BRIEF ON CROSS APPEAL

E. MARTIN ESTRADA
United States Attorney

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

ROGER A. HSIEH
Assistant United States Attorney
Major Frauds Section

PATRICK R. FITZGERALD
Assistant United States Attorney
Criminal Appeals Section

1100 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-0600
Emails: Roger.Hsieh@usdoj.gov
Patrick.Fitzgerald@usdoj.gov

Attorneys for Plaintiff-Appellee-
Cross-Appellant
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                                              **PAGE**

I.    INTRODUCTION ..................................................................... 1

II.    ISSUES PRESENTED ............................................................ 3

III.   STATEMENT OF THE CASE ............................................... 5

    A.    Jurisdiction, Timeliness, and Bail Status ............................. 5

    B.    Statement of Facts and Procedural History .......................... 5

        1.    Defendants carry out a massive international
             conspiracy ........................................................................ 5

        2.    Indictment and defendants' failure to appear ............ 20

        3.    Trial ................................................................................. 21

        4.    The initial PSRs for the Warehouse defendants ........ 21

        5.    The government's initial sentencing position .............. 24

        6.    The Warehouse defendants' objections to the
             PSRs ................................................................................ 25

        7.    The government's further argument ............................. 27

        8.    The revised PSRs .......................................................... 27

        9.    The sentencing hearing ................................................ 29

        10.   The government's Rule 35 motion ................................ 32

IV.   SUMMARY OF ARGUMENT ................................................. 33

V.    ARGUMENT ............................................................................. 37

## TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                         **PAGE**

A.     The District Court Did Not Err in Denying Defendants' Motion to Dismiss ................................................................... 37

        1.     Standard of review ......................................................... 37

        2.     The wire fraud counts were domestic applications of the statute ................................................................. 37

        3.     The indictment properly alleged customs fraud .......... 41

B.     The District Court Permissibly Exercised Its Discretion in Conducting Voir Dire ......................................................... 43

        1.     Procedural and factual background ............................. 43

        2.     Standard of review ......................................................... 45

        3.     The district court was not required to ask additional voir dire questions ....................................... 46

C.     The District Court Did Not Err, Plainly Err, or Abuse Its Discretion In Instructing the Jury ................................... 51

        1.     Standard of review ......................................................... 51

        2.     The district court did not err in declining an "entrapment-by-estoppel" instruction .......................... 51

        3.     The district court did not plainly err in declining a "mere-presence" instruction ..................................... 55

        4.     The district court did not err or abuse its discretion in instructing on the scope of the AD/CVD Orders ............................................................. 57

        5.     The district court did not abuse its discretion in its conspiracy instructions ........................................... 61

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                               **PAGE**

D.    The District Court Did Not Abuse its Discretion or Plainly Err in Admitting Co-Conspirator Statements .........63

     1.    Standard of review........................................................63

     2.    Defendants did not preserve many of their hearsay objections........................................................64

     3.    The district court correctly admitted evidence under the co-conspirator hearsay exclusion ...............65

     4.    Alternatively, the challenged emails were admissible as business records....................................72

     5.    Any alleged error was harmless...................................75

E.    There Was Sufficient Evidence to Support the Customs and Wire Fraud Convictions.................................................77

     1.    Standard of review........................................................77

     2.    There was sufficient evidence of customs fraud..........77

     3.    There was sufficient evidence of wire fraud ...............81

F.    There Was No Plain Constructive Amendment or Fatal Variance Between the Indictment and the Trial Evidence .................................................................................84

     1.    Standard of review........................................................84

     2.    There was no constructive amendment or variance ........................................................................85

G.    There Was No Cumulative Error ..........................................90

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                      **PAGE**

H. The District Court Did Not Err or Abuse Its Discretion in Imposing and Calculating Restitution ............................. 90

    1. Standard of review ........................................................ 90

    2. The MVRA mandated restitution ................................. 91

    3. CBP did not waive any right to unpaid duties ............ 93

    4. The district court did not abuse its discretion in calculating the amount of restitution .......................... 96

    5. The district court did not abuse its discretion in ordering defendants jointly liable ................................ 98

I. The District Court Procedurally and Substantively Erred in Imposing a Restitution Payment Schedule That Requires Only Nominal Payments ............................ 102

    1. Standard of review ...................................................... 102

    2. The district court procedurally erred by failing to rule on the parties' dispute regarding the Warehouse defendants' assets .................................... 103

    3. The district court procedurally erred by imposing a payment schedule without holding defendants to their burden at an evidentiary hearing ................. 106

    4. The district court clearly erred in finding that the Warehouse defendants could afford only nominal payments .................................................................... 108

VI. CONCLUSION ............................................................. 110

# TABLE OF AUTHORITIES

**DESCRIPTION** **PAGE(S)**

## Federal Cases

*ABS Ent., Inc. v. CBS Corp.,*
908 F.3d 405 (9th Cir. 2018) ............................................... 74

*Bascuñán v. Elsaca,*
927 F.3d 108 (2d Cir. 2019) ............................................... 39

*Cleveland v. United States,*
531 U.S. 12 (2000) ............................................................ 92

*Donnelly v. DeChristoforo,*
416 U.S. 637 (1974) .......................................................... 49

*Greenwood v. FAA,*
28 F.3d 971 (9th Cir. 1994) .............................................. 108

*In re ChinaCast Educ. Corp. Secs. Litig.,*
809 F.3d 471 (9th Cir. 2015) ............................................. 68

*Paroline v. United States,*
572 U.S. 434 (2014) ................................................... 100, 101

*Pasquantino v. United States,*
544 U.S. 349 (2005) .......................................................... 92

*Perfectus Aluminum Inc. v. U.S. Aluminum Extrusions Fair Trade
Comm.,*
836 F. App'x 883 (Fed. Cir. 2020) ...................................... 58

*Perfectus Aluminum, Inc. v. United States,*
391 F. Supp. 3d 1341 (C.I.T. 2019) ............................... passim

*Ristaino v. Ross,*
424 U.S. 589 (1976) .......................................................... 47

*RJR Nabisco, Inc. v. European Cmty.,*
579 U.S. 325 (2016) .......................................................... 37

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                              **PAGE(S)**

*Rosemond v. United States*,
    572 U.S. 65 (2014) ................................................................ 57

*Sea-Land Serv., Inc. v. Lozen Int'l, LLC*,
    285 F.3d 808 (9th Cir. 2002) .............................................. 71

*United States v. Adamson*,
    291 F.3d 606 (9th Cir. 2002) ...................................... 85, 86

*United States v. Aegis Sec., Inc. Co.*,
    422 F. Supp. 3d 1328 (C.I.T. 2019) ................................. 94

*United States v. Ali*,
    620 F.3d 1062 (9th Cir. 2010) ........................................... 93

*United States v. Amparo*,
    68 F.3d 1222 (9th Cir. 1995) ............................................. 60

*United States v. Anekwu*,
    695 F.3d 967 (9th Cir. 2012) .................................. 45, 46, 48

*United States v. Anieze-Smith*,
    923 F.3d 565 (9th Cir. 2019) ............................................. 90

*United States v. Anguiano*,
    873 F.2d 1314 (9th Cir. 1989) ........................................... 62

*United States v. Backman*,
    817 F.3d 662 (9th Cir. 2016) ............................................. 51

*United States v. Banks*,
    514 F.3d 959 (9th Cir. 2008) ...................................... 63, 65

*United States v. Bengis*,
    631 F.3d 33 (2d. Cir. 2011) .............................................. 93

*United States v. Berger*,
    574 F.3d 1202 (9th Cir. 2009) ......................................... 103

vi

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                      **PAGE(S)**

*United States v. Bhagat,*
    436 F.3d 1140 (9th Cir. 2006) ................................................. 84

*United States v. Blosvern,*
    514 F.2d 387 (9th Cir. 1975) ........................................... 45, 48

*United States v. Booth,*
    309 F.3d 566 (9th Cir. 2002) ................................................. 99

*United States v. Bowman,*
    215 F.3d 951 (9th Cir. 2000) ........................................... 63, 65

*United States v. Brebner,*
    951 F.2d 1017 (9th Cir. 1991) ......................................... 52, 55

*United States v. Castaneda,*
    16 F.3d 1504 (9th Cir. 1994) ................................................. 63

*United States v. Castro,*
    887 F.2d 988 (9th Cir. 1989) ................................................. 62

*United States v. Catabran,*
    836 F.2d 453 (9th Cir. 1988) ................................................. 73

*United States v. Cloud,*
    872 F.2d 846 (9th Cir. 1989) ................................................. 95

*United States v. Crawford,*
    239 F.3d 1086 (9th Cir. 2001) ............................................... 65

*United States v. Crespo de Llano,*
    838 F.2d 1006 (9th Cir. 1987) ............................................... 66

*United States v. Davis,*
    597 F.2d 1237 (9th Cir. 1979) ............................................... 42

*United States v. Doe,*
    705 F.3d 1134 (9th Cir. 2013) ............................................. 105

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Edwards*,
595 F.3d 1004 (9th Cir. 2010)................................................................95

*United States v. Flucas*,
22 F.4th 1149 (9th Cir. 2022) ...............................................................51

*United States v. Gagarin*,
950 F.3d 596 (9th Cir. 2020)................................................................99

*United States v. Gamma Tech Indus., Inc.*,
265 F.3d 917 (9th Cir. 2001).......................................................100, 101

*United States v. Gomez*,
2021 WL 3204461 (9th Cir. 2021) .......................................................45

*United States v. Gonzalez-Aguilar*,
718 F.3d 1185 (9th Cir. 2013)..............................................................83

*United States v. Gonzalez-Flores*,
418 F.3d 1093 (9th Cir. 2005).........................................................63, 75

*United States v. Hall*,
559 F.2d 1160 (9th Cir. 1977).........................................................42, 43

*United States v. Hartz*,
458 F.3d 1011 (9th Cir. 2006)..............................................................86

*United States v. Hofus*,
598 F.3d 1171 (9th Cir. 2010).........................................................51, 55

*United States v. Holden*,
908 F.3d 395 (9th Cir. 2018)..............................................................102

*United States v. Hugs*,
384 F.3d 762 (9th Cir. 2004)................................................................84

*United States v. Hussain*,
972 F.3d 1138 (9th Cir. 2020).....................................................38, 39, 40

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                   **PAGE(S)**

*United States v. Inouye,*
821 F.3d 1152 (9th Cir. 2016) ............................................................ 106

*United States v. Jones,*
722 F.2d 528 (9th Cir. 1983) ............................................................... 46

*United States v. Kimbrew,*
944 F.3d 810 (9th Cir. 2019) ............................................................... 77

*United States v. Lazarenko,*
564 F.3d 1026 (9th Cir. 2009) ............................................................. 41

*United States v. Lehman,*
756 F.2d 725 (9th Cir. 1985) ............................................................... 95

*United States v. Lillard,*
57 F.4th 729 (9th Cir. 2023) ............................................................. 104

*United States v. Lindell,*
766 F. App'x 525 (9th Cir. 2019) ........................................................ 73

*United States v. Linehan,*
56 F.4th 693 (9th Cir. 2022) ............................................................... 37

*United States v. Liquidators of Eur. Fed. Credit Bank,*
630 F.3d 1139 (9th Cir. 2011) ............................................................. 95

*United States v. Lischewski,*
860 F. App'x 512 (9th Cir. 2021) ........................................................ 73

*United States v. Loya,*
807 F.2d 1483 (9th Cir. 1987) ............................................................. 66

*United States v. Lynch,*
903 F.3d 1061 (9th Cir. 2018) ............................................................. 53

*United States v. Macias,*
789 F.3d 1011 (9th Cir. 2015) ............................................................. 90

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                      **PAGE(S)**

*United States v. Maddux,*
   917 F.3d 437 (6th Cir. 2019)................................................................. 93

*United States v. Martinez-Lopez,*
   864 F.3d 1034 (9th Cir. 2017)........................................................... 103

*United States v. McLellan,*
   959 F.3d 442 (1st Cir. 2020) ............................................................... 39

*United States v. Medina Casteneda,*
   511 F.3d 1246 (9th Cir. 2008)..................................................... 46, 50

*United States v. Medrano,*
   5 F.3d 1214 (9th Cir. 1993).................................................................. 56

*United States v. Meredith,*
   685 F.3d 814 (9th Cir. 2012)......................................................... 91, 98

*United States v. Mickey,*
   897 F.3d 1173 (9th Cir. 2018)............................................................. 85

*United States v. Miller,*
   771 F.2d 1219 (9th Cir. 1985)............................................................. 74

*United States v. Nash,*
   115 F.3d 1431 (9th Cir. 1997)................................................. 106, 107

*United States v. Necoechea,*
   986 F.2d 1273 (9th Cir. 1993)............................................................. 90

*United States v. Negrete-Gonzales,*
   966 F.2d 1277 (9th Cir. 1992)............................................................. 56

*United States v. Nevils,*
   598 F.3d 1158 (9th Cir. 2010)............................................................. 77

*United States v. Nichols,*
   464 F.3d 1117 (9th Cir. 2006)..................................................... 37, 63

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**  **PAGE(S)**

*United States v. Novak,*
   476 F.3d 1041 (9th Cir. 2007)...................................................... 103, 104

*United States v. Pang,*
   362 F.3d 1187 (9th Cir. 2004)............................................................. 85

*United States v. Pennsylvania Indus. Chemical Corp.,*
   (*PICCO*), 411 U.S. 655 (1973)...................................................... 53, 54

*United States v. Perez-Silvan,*
   861 F.3d 935 (9th Cir. 2017)............................................................... 97

*United States v. Prevezon Holdings, Ltd.,*
   122 F. Supp. 3d 57 (S.D.N.Y. 2015)................................................... 41

*United States v. Reed,*
   80 F.3d 1419 (9th Cir. 1996)............................................................... 97

*United States v. Reed,*
   147 F.3d 1178 (9th Cir. 1998)............................................................. 62

*United States v. Richardson,*
   588 F.2d 1235 (9th Cir. 1978)............................................................. 78

*United States v. Robinson,*
   147 F.3d 851 (9th Cir. 1998)............................................................... 43

*United States v. Rubio-Villareal,*
   967 F.2d 294 (9th Cir. 1992)............................................................... 77

*United States v. Schafer,*
   625 F.3d 629 (9th Cir. 2010)......................................................... 51, 52

*United States v. Scholl,*
   166 F.3d 964 (9th Cir. 1999)............................................................... 73

*United States v. Shields,*
   844 F.3d 819 (9th Cir. 2016)......................................................... 82, 83

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Smith,*
  282 F.3d 758 (9th Cir. 2002) ................................................................. 60

*United States v. Soto-Barraza,*
  947 F.3d 1111 (9th Cir. 2020) .............................................................. 85

*United States v. Standard,*
  207 F.3d 1136 (9th Cir. 2000) ............................................................ 105

*United States v. Swor,*
  728 F.3d 971 (9th Cir. 2013) .................................................... 100, 101

*United States v. Toomey,*
  764 F.2d 678 (9th Cir. 1985) ................................................................. 46

*United States v. Torres,*
  911 F.3d 1253 (9th Cir. 2019) .............................................................. 64

*United States v. Tsosie,*
  639 F.3d 1213 (9th Cir. 2011) ............................................................ 105

*United States v. Tyler,*
  767 F.2d 1350 (9th Cir. 1985) .................................................... 101, 102

*United States v. Van Alstyne,*
  584 F.3d 803 (9th Cir. 2009) ............................................................. 108

*United States v. Vandewater Int'l Inc.,*
  2020 WL 4372115 (C.D. Cal. June 23, 2023) ...................................... 94

*United States v. Waknine,*
  543 F.3d 546 (9th Cir. 2008) ............................................................. 104

*United States v. Wilkes,*
  662 F.3d 524 (9th Cir. 2011) ............................................................... 90

*Walgreen Co. v. United States,*
  620 F.3d 1350 (Fed. Cir. 2010) ........................................................... 59

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**            **PAGE(S)**

**Federal Statutes**

18 U.S.C. § 371................................................................................20, 91, 97

18 U.S.C. § 545........................................................................20, 41, 77, 91

18 U.S.C. § 1343.......................................................................................20

18 U.S.C. § 1956(a)(2)(A).........................................................................20

18 U.S.C. § 3231.........................................................................................5

18 U.S.C. § 3572.........................................................................104, 106, 109

18 U.S.C. § 3663A(a)(2).......................................................................91, 97

18 U.S.C. § 3664................................................................................ passim

18 U.S.C. § 3742.........................................................................................5

28 U.S.C. § 1291.........................................................................................5

**Federal Rules**

Fed. R. App. P. 4(b)(1).................................................................................5

Fed. R. App. P. 28(a)(8)(A).......................................................................84

Fed. R. Crim. P. 7(c)(1).............................................................................41

Fed. R. Crim. P. 30........................................................................51, 55, 56

Fed. R. Crim. P. 32(i)(3)(B).....................................................................105

Fed. R. Crim. P. 35(a)...........................................................................32, 33

Fed. R. Evid. 801..........................................................................65, 70, 71

Fed. R. Evid. 803(6)...................................................................................72

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                  **PAGE(S)**

**United States Sentencing Guidelines**

U.S.S.G. § 8C1.1 ........................................................................ 104

No. 22-50080, 22-50081, 22-50082, 22-50103

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/Cross-Appellant*,

*v.*

SCUDERIA DEVELOPMENT LLC ET AL.,

*Defendants-Appellants/Cross-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 19-00282-RGK

## SECOND BRIEF ON CROSS APPEAL

## I

## INTRODUCTION

Defendants-appellants are six corporations that carried out an international conspiracy to defraud the United States out of $1.83 billion in customs duties, swindle investors in a publicly traded company, and launder hundreds of millions of dollars around the world.

The mastermind of the conspiracy, fugitive Zhongtian Liu, operated China Zhongwang Holdings Limited ("CZW"), a publicly listed

company and the largest aluminum extrusion manufacturer in Asia. The defendants in this appeal purchased and stored CZW aluminum in the United States, with funds provided by CZW itself, as part of a scheme to deceive U.S. and international investors into believing CZW had substantial U.S. sales. Beginning in 2010, the Department of Commerce issued orders imposing customs duties of 400% on certain aluminum extrusions, including CZW's. The orders excluded "finished merchandise," defined as products that were fully and permanently assembled at the time of entry.

To evade the duties, defendants and others agreed to disguise CZW's aluminum extrusions as aluminum "pallets" and lied to Customs and Border Protection, describing the pallets as finished merchandise. In fact, no market or customer existed for the pallets and none were sold. Instead, defendants stockpiled the pallets in their warehouses, intending to later melt them back to raw aluminum. During the course of the scheme, defendants imported 2.2 million pallets and evaded more than $1.83 billion in customs duties.

A jury delivered across-the-board guilty verdicts, convicting defendants of conspiracy, wire fraud, smuggling goods through customs,

and money laundering. The district court ordered defendants to pay $1.83 billion in restitution but then imposed a restitution payment schedule that requires only nominal payments, even though four of the defendants own warehouses in California with a collective valuation of approximately $1 billion.

Defendants' convictions and restitution amount were supported by overwhelming evidence, and their convictions and restitution amount should be affirmed. The restitution payment schedule, however, was error. The district court failed to rule on the parties' dispute regarding the value of the warehouses, relieved defendants of their burden to show an inability to pay, did not hold the evidentiary hearing defendants requested, and had no basis to order a schedule that affords defendants over 375,000 years to pay for their crimes. The restitution payment schedule should be vacated and remanded.

## II

### ISSUES PRESENTED

A.   Whether the district court erred in denying defendants' motion to dismiss the indictment.

B.    Whether the district court abused its discretion in declining to ask voir dire questions for which defendants offered no rationale.

C.    Whether the district court erred, plainly erred, or abused its direction in its jury instructions.

D.    Whether the district court abused its direction or plainly erred in admitting co-conspirator statements.

E.    Whether sufficient evidence supported defendants' wire and customs fraud convictions.

F.    Whether there was a constructive amendment of the indictment or impermissible variance at trial.

G.    Whether cumulative error warrants reversal.

H.    Whether the district court erred or abused its discretion in imposing and calculating restitution.

I.    Whether, on cross-appeal, the district court procedurally or substantively erred in its restitution payment schedule.

# III

# STATEMENT OF THE CASE

## A. Jurisdiction, Timeliness, and Bail Status

The district court's jurisdiction rested on 18 U.S.C. § 3231. This Court's jurisdiction rests on 18 U.S.C. § 3742 and 28 U.S.C. § 1291. The district court entered judgment on April 13, 2022, and defendants timely appealed on April 21, 2022. (1-ER-15-48; 19-ER-5048-64.)[1] *See* Fed. R. App. P. 4(b)(1)(A)(i). The government timely cross-appealed on May 13, 2022. (19-ER-5065.) *See* Fed. R. App. P. 4(b)(1)(B)(ii). Defendants are all corporations and thus not in custody.

## B. Statement of Facts and Procedural History

### 1. Defendants carry out a massive international conspiracy

Defendants Zhongtian Liu, Zhaohua Chen, and Xiang Chun "Johnson" Shao, along with unindicted co-conspirator Eric Shen and others, executed a massive conspiracy to (1) defraud shareholders in

---

[1] "ER" refers to defendants' Excerpts of Record, and "SER" refers to the government's Supplemental Excerpts of Record. "AFB" refers to Appellants' First Brief on Cross-Appeal. "Presentence Reports" refers to the pleading defendants filed with that title; such references are followed by page numbers and, in some instances, paragraph numbers.

defendant China Zhongwang Holdings Limited ("CZW") by lying about the demand for aluminum in the United States through a wire fraud scheme; (2) defraud the United States by evading over $1.83 billion in duties through a customs fraud scheme; and (3) launder hundreds of millions of dollars through accounts in the United States to promote the investor and customs frauds. (6-ER-1337-90.)

The defendants executed this scheme through a series of U.S. companies, including the six defendants in this case, which are split into groups of two and four:

- The "Perfectus defendants": Perfectus Aluminium Incorporated ("Perfectus") and Perfectus Aluminum Acquisitions LLC; and

- The "Warehouse defendants": Scuderia Development LLC ("Scuderia"), 1001 Doubleday LLC ("Doubleday"), Von-Karman-Main Street LLC ("Von Karman"), and 10681 Production Avenue LLC ("Production Avenue").

(*Id.*) All six defendants were located in the Central District of California and owned and controlled by Liu. (*See id.*)

As established at trial and recounted in the subsections below, each group of defendants performed a key role in the conspiracy. The Perfectus defendants, acting at Liu's direction, pretended to be genuine purchasers of CZW's aluminum products and, between 2011 and 2014, imported aluminum extrusions welded into the form of 2.2 million pallets in order to criminally evade the customs duties. The Warehouse defendants, acting at Liu's direction, used their four warehouses to store enormous quantities of aluminum for which there were no legitimate buyers.

### a. Defendants commit wire fraud to inflate CZW's value and deceive investors

Liu was the chairman and majority shareholder of CZW, the largest aluminum extrusion company in Asia. (13-ER-3303–05; 15-ER-3917.) In May 2009, CZW became publicly listed on the Hong Kong Stock Exchange following one of that year's largest initial public offerings, which raised $1.26 billion. (6-ER-1339, 1361.)

The scheme to fraudulently inflate CZW's value began even before the company went public. In 2008, in advance of the IPO, Liu, CZW, and Chen caused $200 million to be wired to a bank account in the United States controlled by a co-conspirator through Scuderia. (6-ER-

1360-61; 9-ER-2159-65; 1-SER-134-37, 155.) Scuderia was a corporation secretly controlled by Liu, and several days after receiving the $200 million, Scuderia returned the entire sum to CZW in the form of a bogus loan that CZW never intended to repay. (9-ER-2159-84; 1-SER-134-37, 284-85.) Then, in CZW's IPO prospectus, Liu and CZW misrepresented the transaction as a legitimate loan from an independent third party. (13-ER-3298-99.)

After the IPO, Liu and CZW expanded the scheme to inflate CZW's value. They began selling an enormous number of aluminum extrusions to purported customers in the United States that Liu secretly controlled: Peng Cheng Aluminum and other companies in the Central District of California that later merged into Perfectus.[2] (7-ER-1570-76; 8-ER-1890-91, 1981-86; 2-SER-326-30.) As a result, CZW publicly reported that its U.S. revenue rose from only 1.8% of overall

---

[2] Prior to the creation of Perfectus, there were seven "Perfectus predecessor entities" that imported aluminum from CZW. (6-ER-1340-41.) These predecessor entities merged into Perfectus in late 2014. (6-ER-1341-42; 8-ER-1726-30; 1-SER-138.) "Perfectus defendants" is used to encompass both Perfectus and its predecessor entities.

revenue in 2008 to 40.8% and 29.1% of overall revenue in 2009 and 2010, respectively.  (13-ER-3327, 3448.)

The transactions, however, were fake.  Emails and wire-transfer records showed that CZW, through Liu (1) directed Perfectus to make the aluminum purchases and (2) supplied the purchase funds by wiring hundreds of millions of dollars through Hong Kong shell companies to the Perfectus defendants' California bank accounts.  (*See, e.g.*, 6-ER-1347, 1352-54, 1369-74; 8-ER-1891-1938; 19-ER-5014-19, 5021-22, 5024, 5032-34, 5038; 1-SER-286-89; 2-SER-296-303, 333-57.)  CZW employees emailed Perfectus CEO Shao not only purchase instructions but exact language that Shao copied and pasted to make the purchases.  (8-ER-1809-10, 1813-30, 1842, 1855-60, 1869, 1890; 19-ER-5014-19.)  Shao, in turn, instructed Perfectus' accounting manager and successor CEO Mark Li to categorize the incoming wires from the Hong Kong shell companies as "loans," even though Li never saw a single loan agreement and Perfectus never made any payments on more than $1.28 billion in "loans."  (8-ER-1890-91, 1894-95, 1963, 1974; 2-SER-331.)

To conceal his connection with the aluminum straw-buyers, Liu and his coconspirators directed individuals with no experience in the

aluminum industry to establish the potential straw-buyers. (*See* 8-ER-1758, 1762-63 (seamstress/casino dealer established aluminum company at direction of Liu's brother); 8-ER-1778-83 (restaurant owner's wife created an aluminum company at Liu's direction).) And to create the appearance that CZW's U.S. aluminum sales were legitimate, Liu used the Warehouse defendants to purchase warehouses in the Central District of California, where they stockpiled the aluminum in over 2 million square feet of warehouse space. (6-ER-1342-43, 1347, 1351-52, 1357, 1360-61, 1373.) Meanwhile, Liu and CZW publicly represented the bogus aluminum sales as arms-length transactions. (6-ER-1340, 1346-47, 1349-52, 1355; 9-ER-2198-99, 2224; 11-ER-2791-2831; 13-ER-3407-16, 3524-31.) That was the wire fraud scheme.

### b. Defendants commit customs fraud to avoid $1.83 billion in import duties

In 2010 and 2011, the Department of Commerce ("Commerce") issued orders imposing anti-dumping and countervailing duties ("AD/CVD") of approximately 400% on imports of aluminum extrusions from certain Chinese aluminum manufacturers, including CZW. (9-ER-2025-43; 17-ER-4512-20; 1-SER-249-82); *see* 76 Fed. Reg. 30650-01. Commerce issued the AD/CVD Orders to ensure fair competition

10

between American companies and foreign industry and to counter international price discrimination that had injured domestic industries. (6-ER-1344.) Senior Director Alex Villanueva of the Department of Commerce, an expert witness at trial, explained that the aluminum extrusion duties took effect when preliminary orders were issued in September and November 2010, importers were expected to pay the duties "at the time of entry of the product," and authority to collect the duties fell "solely within the responsibility of the Department of Commerce." (9-ER-2022-23, 2041; *see* 1-SER-249-69 (first preliminary order).)

The AD/CVD Orders excluded from their scope "finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time entry." (17-ER-4514, 4519.) The final orders in 2011 provided examples of such "finished merchandise," all of which contained parts other than aluminum extrusions: "finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels." (*Id.*) The preliminary orders in 2010 contained the same definition of "finished merchandise" and provided similar examples

11

without making clear that all such examples contained non-aluminum parts.  (1-SER-250, 271.)  Both the preliminary notices and final orders were published through the Federal Register and online.  (9-ER-2017-18.)  Defendants could have requested scope rulings to clarify whether their products qualified as finished merchandise, but did not.  (9-ER-2020, 2023-24, 2105.)

The AD/CVD Orders made it prohibitively expensive for defendants and their co-conspirators to import aluminum extrusions into the United States.  Liu, in consultation with Eric Shen, determined that creating actual finished merchandise containing non-aluminum parts, such as ladders, would be too expensive.  (9-ER-2216-19.)  So, they came up with another plan.  To criminally evade the AD/CVD duties, they tack-welded aluminum extrusions into the shape of pallets and lied to Customs and Border Protection ("CBP") on Forms 7501 by reporting the "pallets" as "finished merchandise" not subject to the AD/CVD duties.  (9-ER-2216-19; 10-ER-2341-57; 1-SER-104.)  The pallets were basic, hollow aluminum blocks with slats:



(13-ER-3245.)

Defendants and their co-conspirators knew that the pallets were not actual finished merchandise and that there was no market for them: they were too heavy, too expensive, built to unusual dimensions, poorly constructed, and had openings for mice and rats to build nests. (7-ER-1566-67; 8-ER-1984-86; 10-ER-2535, 2540-41.) The plan, however, was to fraudulently exploit the finished-merchandise exclusion by importing unsellable pallets and later melting them back down into raw aluminum that could be reprocessed into useable products. (6-ER-1358-59; 7-ER-1572; 9-ER-2199-2200, 2221-28, 2234-38; 10-ER-2540-41.) CZW constructed the pallets using 6000-series alloy, the type most similar to pure aluminum, which would make it easier for defendants to melt the pallets into raw "feed stock" aluminum for future use. (9-ER-2198-99, 2221-22, 2224, 2236.)

The conspiracy implemented its plan in 2011, when Liu prepared a test shipment of pallets, falsely declared it as "finished merchandise" on CBP Form 7501, and sent it through the Port of Los Angeles. (9-ER-2222-24.) As that was the busiest U.S. port of entry, CBP could only inspect about 2% of arriving imports and relied on information in the CBP Forms 7501. (11-ER-2650, 2652-53.) Liu's test shipment successfully evaded the duties imposed by the AD/CVD Orders, and he instructed Shen to save, not sell, the pallets so they could be melted for feed stock. (6-ER-2222-24, 2228.) Later, Liu and Shao acquired Aluminum Shapes, a factory in New Jersey that they used to melt 100,000 pounds of CZW's pallets in a cast house. (11-ER-2593-2602; 1-SER-290 (email to Perfectus CEO that defendant Liu's goal at Aluminum Shapes was to build an "entirely new cast house").) And thereafter, defendants attempted to construct a $1.5 billion secondary aluminum facility in Barstow, California that would melt and process one million metric tons of aluminum per year, using the CZW aluminum stockpiled in the four warehouses as feed stock. (9-ER-2199-2200, 2205-06, 2210-36; 2-SER-304-07.)

Between 2011 and 2014, the conspiracy imported 2.2 million pallets into the United States without actually selling a single one. (7-ER-1576-79; 8-ER-1984-86.) Instead, as noted above, they orchestrated fictitious sales in which Liu and CZW directed the Perfectus defendants to purchase the pallets and the Warehouse defendants to store them. The warehouses stockpiled pallets on a monumental scale:



(13-ER-3246 (Fontana Warehouse); *see also* 13-ER-3247-71.) By the end of 2014, Perfectus had more than $1.5 billion of CZW's aluminum stockpiled in the four warehouses, even though between 2011 and 2014, the average annual sales Perfectus reported on its tax returns was a mere $4.2 million. (1-SER-140.)

By claiming to import finished merchandise, between 2011 and 2014, defendants and their co-conspirators evaded more than $1.83 billion in AD/CVD duties.  (1-SER-106-07.)

Thereafter, multiple sources confirmed that defendants' pallets fell within the scope of the AD/CVD Orders.  Commerce confirmed that fact in scope rulings sought by the aluminum industry in 2016 and 2017.  (9-ER-2034-39; 17-ER-4521-52; 1-SER-177-203.)  Senior Director Villanueva explained that the scope rulings meant that defendants' aluminum pallets "were always within the scope of the order[s]."  (9-ER-2026, 2029, 2036, 2040-41.)  The Court of International trade reached the same conclusion in a 2019 opinion that defendants introduced at trial.  (9-ER-2092-93, 2100-01); *see Perfectus Aluminum, Inc. v. United States*, 391 F. Supp. 3d 1341 (C.I.T. 2019).  The opinion explained that "the plain meaning of the unambiguous language of the [AD/CVD] Orders" included the Perfectus defendants' aluminum pallets and that the pallets did not qualify for the "finished merchandise" exclusion because the pallets "consist entirely of aluminum extrusions."  (9-ER-2100-01.)  Defendants committed customs fraud by fraudulently claiming the exclusion.

16

### c. Defendants continue to commit fraud and launder money in service of their schemes

CZW claimed in its annual reports that there was a substantial U.S. demand for aluminum pallets, when, in fact, there were no legitimate customers. (2-ER-307-12; 6-ER-1354, 1357-59; 13-ER-3311, 3327.) CZW reported that its pallet exports "grew significantly" and that the company had "intensified efforts in developing overseas markets" that led to an "increasing demand for these products in the US." (*See, e.g.*, 15-ER-3792, 3807; *see also* 7-ER-1581-82 (CZW employee describing aluminum pallets as CZW's "biggest selling item").)

For the years 2011 through 2014, Liu and CZW reported to shareholders that 3.9%, 8.32%, 11.8%, and 11.67% of CZW's sales, respectively, were to customers in the United States. (14-ER-3570 (2011); 14-ER-3684 (2012); 15-ER-3806 (2013); 15-ER-3945 (2014).) During those years, CZW continued to falsely report virtually no sales to related parties and never once told shareholders that CZW's exports were to the Perfectus defendants, that the Warehouse defendants were stockpiling the commercially useless aluminum, that there was no real market for the pallets, or that Liu exercised absolute control over the Perfectus and Warehouse defendants. (*See, e.g.*, 14-ER-3646; 14-ER-

17

3740-70; 15-ER-3874-3908; 15-ER-4008-47 (CZW 2011 through 2014 related-party transaction disclosures).)  Nor did CZW disclose that Perfectus was purchasing aluminum from CZW at Liu and CZW's direction, and that CZW was funding those purchases.  (*Id.*)  Thus, between 2009 and 2014, CZW reported immense U.S. revenue that, unknown to shareholders, consisted of the fraudulent aluminum sales to Perfectus.  (1-SER-140.)  Meanwhile, Perfectus, whose only supplier was CZW, spent an extraordinary amount of money on CZW's pallets, all while its own revenue dwindled to near zero.  (*Id.*; 8-ER-1982-87; 9-ER-1989-91.)

Without sales of its own, and with no ability to sell CZW's aluminum, Perfectus needed money to keep the wire and customs fraud schemes going.  Liu and Chen laundered hundreds of millions of dollars through Hong Kong shell companies to Perfectus, which used that money to make fraudulent aluminum purchases from CZW, smuggle pallets into the United States, and maintain the warehouses.  (11-ER-2710-71; 1-SER-139, 286-89; 2-SER-296-97, 299-303, 319-25.)

Starting in 2015, allegations began to surface in the investor community that CZW's aluminum pallet sales in the United States were

18

to companies that Liu controlled and that Liu was concealing the aluminum pallets in large warehouses in the U.S. and Mexico. (7-ER-1587-88; 1-SER-156-70.) Following those allegations, Liu and CZW made "clarification announcements" to shareholders, again falsely stating that the aluminum sales to Perfectus were arms-length transactions and that Liu had no connection to Perfectus. (1-SER-156-76.) In fact, however, Liu controlled and owned Perfectus, visited 30-35 times in three years, and appointed a new Perfectus CEO. (7-ER-1571-72; 8-ER-1890-91.) That CEO understood that Liu owned Perfectus. (8-ER-1891.) Later, to conceal their stockpiling, Liu ordered the pallets in the warehouses and Aluminum Shapes to be exported to a factory in Vietnam called Global Vietnam Aluminum, which Liu also beneficially owned and hid from investors. (11-ER-2601-02 (Otterbein); 12-ER-2845-50 (Loh); 1-SER-171 (CZW clarification announcement falsely asserting that "GVA is a third party independent of Chairman Liu and the Company").)

In September 2017, federal agents executed a search warrant on Perfectus in Ontario, California, which was also the location of Doubleday. (8-ER-1794-95.) In the days following the search warrant,

19

Liu's wife Zhijie Wang, who had been the CEO of all four Warehouse

defendants since 2013, ordered employees to shred documents and

withhold information from the government; she then filed a series of

false declarations in federal court. (11-ER-2862-63 (Chen); 11-ER-2867-

74 (Li); 12-ER-2929-42; 1-SER-225-40; 13-ER-3181-84.)

### 2. *Indictment and defendants' failure to appear*

In May 2019, a grand jury indicted defendants under 18 U.S.C.

§ 371 for conspiring to commit: wire fraud, customs fraud, and

promotional money laundering. (6-ER-1337-77.) The indictment also

charged substantive wire fraud, 18 U.S.C. § 1343; customs fraud, 18

U.S.C. § 545; and money laundering, 18 U.S.C. § 1956(a)(2)(A). (6-ER-

1378-84.) There were 24 counts total. (6-ER-1337-84.)

Defendants were summonsed to appear in August 2019 but

ignored the summonses while actively litigating related forfeiture

matters. (1-SER-2-14.) Accordingly, the district court issued a $5.8

million contempt judgment against them. (1-SER-15-21; Presentence

Reports 16.) Defendants still did not appear until nearly eight months

later. (Presentence Reports 16.)

### 3. *Trial*

Trial began on August 10, 2021 and spanned nine days. Through the testimony of 28 witnesses and the introduction of hundreds of exhibits (*see* 1-SER-40-97), the government proved the facts recounted in the preceding subsections. The jury convicted defendants of all counts. (1-ER-111-52.)

### 4. *The initial PSRs for the Warehouse defendants*

The Probation Office ("Probation") issued initial presentence investigation reports for the Warehouse defendants in January 2022. The PSRs were all nearly identical. (*See* Presentence Reports 52-72 (Scuderia), 73-93 (Doubleday), 94-114 (Von Karman), 115-35 (Production Avenue).) Probation found that the Mandatory Victim Restitution Act (MVRA) applied and that defendants conspired to evade, and evaded, $1,836,244,745.03 in customs duties. (Presentence Reports 15 ¶¶ 53, 55; *id.* 63-64 ¶¶ 53, 55; *id.* 105-06 ¶¶ 53, 55; *id.* 126-27 ¶¶ 53, 55.)

Probation also reported that Liu owned and controlled all four warehouses. (Presentence Reports 66 ¶ 68; *id.* 81 ¶ 38; *id.* 85-86 ¶ 57.) Liu used his agents—first Shen and later Wang—to exercise control.

(*Id.*)  Nominally, Scuderia Capital Partners, Inc., a Delaware corporation, was the owner of the four Warehouse defendants. (Presentence Reports 66 ¶ 73; *id.* 88 ¶ 73; *id.* 108 ¶ 72; *id.* 130 ¶ 77.) The government provided Scuderia Capital's tax returns for 2014 through 2016.  (Presentence Reports 67 ¶ 79.)  The 2014 return valued the warehouses with ending amounts of:

- $43,561,433 for the 600,000-square-foot Scuderia Warehouse (located at 14660 Innovation Drive in Riverside, California) (*id.* 67 ¶¶ 74, 79);

- $33,676,597 for the 400,000-square-foot Doubleday Warehouse (*id.* 88 ¶¶ 74, 79);

- $32,757,155 for the 260,000-square-foot Von Karman Warehouse (*id.* 109 ¶¶ 73, 78); and

- $52,055,531 for the Production Avenue Warehouse (*id.* 130 ¶ 78).

None of the returns, however, showed any income from operation of the warehouses.  Defense counsel claimed that each warehouse had tenants but that each defendant was not involved in managing the property or its occupants.  (Presentence Reports 67 ¶ 75; *id.* 88 ¶ 75; *id.* 109 ¶ 74;

*id.* 130 ¶ 74.) Defense counsel further asserted that each defendant had no assets apart from its warehouse. (Presentence Reports 69 ¶ 87; *id.* 90 ¶ 87; *id.* 111 ¶ 86; *id.* 132 ¶ 86.)

Probation used public tax assessment records to estimate the value of each warehouse as:

- $44,934,988 for the Scuderia Warehouse (Presentence Reports 67-68 ¶ 80);

- $36,521,176.74 for the Doubleday Warehouse (*id.* 89 ¶ 80);

- $23,518,695.52 for the Von Karman Warehouse (*id.* 109-10 ¶ 79); and

- $56,239,560.35 for the Production Avenue Warehouse (*id.* 131 ¶ 79).

Those valuations were premised largely on (and nearly matched) defendants' own valuations, as documented in their tax returns.

Probation recommended that each Warehouse defendant pay the taxable value of its warehouse toward restitution within 90 days of sentencing and then continue to pay restitution at 10% of the defendant's gross revenue but not less than $100 a month. (Presentence Reports 68 ¶¶ 80-81; *id.* 89 ¶¶ 81-82; *id.* 110 ¶¶ 80-81; *id.*

131 ¶¶ 80-81.)  Thus, Probation recommended that the collective amount of restitution to be paid by the Warehouse defendants within 90 days of sentencing was over $161 million.

Probation also found that all of the Warehouse defendants operated primarily for criminal purposes and primarily by criminal means.  (Presentence Reports 67-68 ¶ 86; *id.* 89-90 ¶ 86; *id.* 110-11 ¶ 85; *id.* 131-32 ¶ 85.)

### 5. *The government's initial sentencing position*

The government agreed with Probation that the total amount of restitution owed to CBP for the evasion of customs duties was $1,836,244,745 and that each Warehouse defendant should be jointly and severally liable for the full amount.  (3-ER-507.)  The government also agreed that each Warehouse defendant should be ordered to pay the tax-assessed value of its warehouse within 90 days of sentencing.  (3-ER-508-09.)  The government argued, however, that the four warehouses were worth far more than their tax-assessed values and that any sale proceeds in excess of those amounts should be applied to restitution.  (3-ER-508.)

The government further argued that restitution for the entire $1,836,244,745 should be due and payable immediately, which would ensure that any additional proceeds be applied to restitution. (3-ER-508 & n.4.) One reason the government believed the defendants collectively could pay the full amount of restitution was its position that the Perfectus defendants had over $1.5 billion in assets that they had not reported. (3-ER-509-10.) Furthermore, the government agreed with the PSR that the Warehouse defendants were criminal-purpose organization. (3-ER-508-09.) The government therefore requested that the district court impose a fine sufficient to divest each defendant of its assets. (*Id.*)

### 6. *The Warehouse defendants' objections to the PSRs*

The Warehouse defendants filed various objections to the PSRs. (*See* 3-ER-575-614.)[3] They argued against restitution generally (3-ER-585-96), "respectfully ask[ed]" the district court "to exercise its discretion and apportion liability for any restitution owed" (3-ER-608),

---

[3] Each Warehouse defendant filed objections, but their briefs were nearly identical. (4-ER-616-735.) The government cites to the Production Avenue objections as the exemplar.

objected to statements that they were criminal-purpose organizations (3-ER-609-12) and "non-operational (3-ER-613), asserted that Probation's proposed payment schedule "would divest them of all their assets within 90 days of sentencing" (3-ER-609), and requested that if restitution were ordered, the court should "require payments based on a reasonable and periodic payment plan" after an "evidentiary hearing" (3-ER-584-85). The Warehouse defendants did not, however, address the tax-assessed value of the warehouses or the amount of any rent or income they were receiving, explain why they did not have sufficient assets or income to pay a significant amount of restitution, or propose a specific payment plan.

Thereafter, the Warehouse defendants filed responses to the government's sentencing position. (3-ER-445-80.) Therein, they disputed the government's proffer that their four warehouses were worth far more than their tax-assessed value (3-ER-476) and suggested that if the court did impose restitution or a fine, "a reasonable payment schedule be ordered" (3-ER-479 n.2). Once again, they did not propose any specific payment schedule, arguing instead that the district court

should hold "an evidentiary hearing" to determine "the appropriate payment schedule for each defendant."  (3-ER-479.)

### 7.  *The government's further argument*

The government filed a supplementary brief that addressed defendants' arguments against restitution and joint liability and reiterated that defendants had available assets, including the four warehouses, and that the entire restitution amount should be due immediately.  (3-ER-403-24.)

Thereafter, the government filed two independent assessments of the actual market value of each warehouse.  (3-ER-387-402.)  The assessments were produced by commercial real estate companies and were based on the size of the warehouses, their locations, and other market data.  The estimates were consistent.  (3-ER-389-90.)  Voit Real Estate Services estimated the combined value of the warehouses to be $909 million to $1.027 billion.  (*Id.*)  Colliers's combined estimate was $994.028 million.  (*Id.*)

### 8.  *The revised PSRs*

In April 2022, Probation issued Revised Presentence Reports and Addenda for the Warehouse defendants.  (Presentence Reports 136-63.)

27

Probation addressed one government objection at issue in this appeal,[4] acknowledging that its use of tax assessments was "not the best measure of the [w]arehouses' fair market value as it provides a very low estimate." (Presentence Reports 242.) Probation admitted it did not have the tools to evaluate the government's valuations and suggested that the "Court may want to consider an evidentiary hearing as to this issue." (*Id.*)

Probation also addressed ten objections by the Warehouse defendants and rejected nearly all of them. (Presentence Reports 243-47.) Probation revised the PSRs to clarify that the Warehouse defendants still held title to their respective warehouses and that "non-operational" meant the warehouses were no longer housing the aluminum pallets or engaged in other business operations. (Presentence Reports 247.)

---

[4] The government's other objections related to the amount of restitution owed to CZW's institutional investors based on the wire fraud scheme. The district court did not order any restitution for those investors, and the government does not appeal that ruling.

### 9.    *The sentencing hearing*

The district court sentenced all six defendants on April 11, 2022 at a hearing that lasted little more than an hour.  (1-ER-49-98.)

### a.    *Defendants' arguments*

At sentencing, the Perfectus defendants again argued against restitution generally and asserted that if any restitution were owed, it should be limited to the $38,742,686.10 in unpaid customs duties listed in counts 11-17.  (1-ER-53-58.)  They also claimed that they lacked the ability to pay because they ceased operations in 2015, their only asset was the aluminum pallets that the government had seized, and the $60 million value of the seized pallets should count toward any fine or restitution.  (1-ER-58-61.)

The Warehouse defendants did not address the amount of their assets or income or their ability to pay restitution.  They echoed the arguments that no restitution should be awarded (1-ER-62-63), argued that the amount of any restitution under the substantive counts was limited to about $34 million (1-ER-65), and asserted that the actual amount of restitution should be even less because the pallets were "scrap" (1-ER-66).  They further argued that they played a smaller role

in the scheme and therefore proposed to apportion restitution so that the Perfectus defendants would owe almost all of it. (1-ER-66-73.) The Warehouse defendants also claimed that they were not "criminal purpose" organizations and therefore should not be divested of all of their assets. (1-ER-74-75.)

### b. *The government's arguments*

The government argued that the court should order all six defendants to pay $1.84 billion in restitution immediately or within 90 days. (1-ER-76.) The government addressed the defense arguments against restitution generally (1-ER-77-80) and then argued that the court should order joint and several liability for the Warehouse defendants because Liu was the architect of the entire scheme and all the corporate defendants played an integral part in it (1-ER-80-81). The government further noted that the court could order non-MVRA restitution or a fine if for any reason the court did not order restitution under the MVRA. (1-ER-82-83.)

The government concluded its argument by pointing to "the new valuation of the warehouses of 900 million to 1 billion" and reiterated that "all six defendants should be ordered to pay 1.84 billion in

restitution immediately or within 90 days to give them sufficient time to start a sale of those properties." (1-ER-83.)

### c. *The district court's order*

The district court agreed with the government that the amount of restitution owed to CBP was $1,836,244,745 based on the loss of duties it should have received. (1-ER-85-86, 92.) The court found all defendants jointly and severally liable for that amount. (*Id.*) The court did not award restitution to the foreign investors resulting from defendants' wire fraud. (1-ER-85.)

Then, without prompting, the district court announced that each corporate defendant need only "make nominal monthly payments of at least ten percent of the defendant[] organization's gross revenue, but not less than $100, whichever is greater." (1-ER-92-93; *see also* 1-ER-86 (same order for Perfectus defendants).) The court stated that it "f[ound] that the defendant organizations' economic circumstances do not allow for either immediate of future payment of the amount ordered." (1-ER-93; *see also* 1-ER-86-87 (same explanation for Perfectus defendants).) The court also waived interest on the restitution and all criminal fines. (1-ER-93-94.) Although the court ordered a partial immediate

restitution payment of $60,141,984.29, it then clarified that that was the value of the pallets the government already had seized. (1-ER-87, 91.) At no point during the hearing did the court mention the Warehouse defendants' assets, address the parties' dispute regarding the value of the warehouses, or explain why the Warehouse defendants' economic circumstances only permitted nominal payments. (*See* 1-ER-49-98.)

At the end of the hearing, the lead prosecutor stated the government's understanding that it would "be able to enforce the immediate payment barring some other order of the Court." (1-ER-97.) The court responded that the prosecutor "was making a statement for the record" and that the court "didn't make any order on it." (1-ER-98.)

### 10. *The government's Rule 35 motion*

Eleven days after sentencing, the government moved to correct the sentence under Federal Rule of Criminal Procedure 35(a), arguing that the district court's restitution schedule for the Warehouse defendants was "clear error." (1-SER-100.) Specifically, the court clearly erred in finding that the Warehouse defendants' economic circumstances did not allow for either immediate or future payment of

full restitution. (*Id.*) The government asked the court to correct its sentence by ordering a total immediate partial payment by the four Warehouse defendants of $894.436 million (*id.*)—i.e, the low-end market value of the four warehouses.

The district court denied the motion, stating that the government had not afforded it sufficient time to rule within the 14-day period to correct a sentence under Rule 35. (1-SER-104-05.)

## IV

## SUMMARY OF ARGUMENT

Defendants engaged in an international conspiracy to swindle the United States out of more than $1.83 billion. Defendants' claims are meritless, and any error was harmless in light of the overwhelming evidence.

*First*, the district court correctly denied defendants' motion to dismiss the indictment because the government charged domestic applications of the wire fraud statute originating or terminating in the Central District of California. Furthermore, while not required, the charged wires were central to defendants' scheme. The indictment also

properly stated the elements of customs fraud and did not need to add an extra element regarding the statute's purpose.

*Second*, the district court permissibly exercised its broad discretion by declining to ask the dozens of extra voir dire questions defendants proposed. Defendants provided no explanation or argument for those questions, and there was no need for them when the voir dire and instructions adequately safeguarded against prejudice and there was no significant likelihood that prejudice might infect the trial of six corporate entities.

*Third*, the district court did not err, plainly err, or abuse its discretion in instructing the jury. There was no evidence whatsoever that would have supported an entrapment-by-estoppel instruction and no basis for a mere-presence instruction in a case that was not about presence at all. The law supported the court's scope-ruling and conspiracy instructions, and any error in those instructions was not prejudicial.

*Fourth*, the district court neither abused its discretion nor plainly erred in its evidentiary rulings. All of the evidence defendants challenge (some of which was admitted without objection) constituted

co-coconspirator statements or business records, and none of that evidence was material to the verdict anyway.

*Fifth*, the jury rationally found defendants guilty of wire and customs fraud. Viewed in the light most favorable to the government, the evidence was overwhelming that defendants participated in a massive international conspiracy. Their contrary claims are nothing but a series of undeveloped and baseless attempts to transform the record and the law.

*Sixth*, nothing about the government's proof at trial plainly, or even remotely, resembled a constructive amendment or fatal variance from the indictment. The government advanced the exact same theory in the indictment and at trial: defendants' "pallets" did not qualify for the "finished merchandise" exclusion because they were merely tack-welded aluminum extrusions with no commercial use or market. The fact that the pallets were made entirely of aluminum merely added to the proof that they were fake products created only to evade duties.

*Seventh*, the restitution award was correct. The MVRA requires defendants to pay restitution in fraud cases, there was uncontroverted

evidence that the restitution amount exceeded $1.83 billion, and all defendants were convicted of conspiracy to commit customs fraud.

Accordingly, this Court should affirm defendants' convictions and restitution amount.

***

On cross-appeal, however, the district court committed both procedural and substantive errors in ordering a nominal restitution payment schedule. The court failed to address disputes regarding the value of defendants' warehouses, whether defendants qualified as criminal purpose organizations, and the propriety of requiring the sale of assets to satisfy the restitution award. The court then imposed a restitution payment schedule that defendants never even proposed instead of holding the evidentiary hearing they requested to determine an appropriate payment schedule. In so doing, the court violated the MVRA by failing to hold defendants to their burden of demonstrating an inability to pay and clearly erred in finding that the Warehouse defendants could afford only nominal restitution payments when, in fact, they each owned enormously valuable assets. Those errors

effectively erased the only punishment these defendants sustained for their massive fraud.

Accordingly, this Court should vacate the restitution payment schedule for the Warehouse defendants and order a limited remand for the district court to assess the value of their assets before determining what amount of restitution should be paid immediately.

## V

## ARGUMENT

### A.  The District Court Did Not Err in Denying Defendants' Motion to Dismiss

#### 1.  *Standard of review*

The denial of a pretrial motion to dismiss is reviewed de novo, *United States v. Linehan*, 56 F.4th 693, 698 (9th Cir. 2022), and this Court may affirm on any ground supported by the record, *United States v. Nichols*, 464 F.3d 1117, 1122 (9th Cir. 2006).

#### 2.  *The wire fraud counts were domestic applications of the statute*

The indictment properly charged nine substantive counts of wire fraud: Counts 2-10.

Although there is a presumption that statutes do not apply extraterritorially, *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325,

335 (2016), there is no need to determine whether that presumption has
been overcome if the statutory application alleged is domestic in nature,
*United States v. Hussain*, 972 F.3d 1138, 1142-43 (9th Cir. 2020).  Here,
each wire fraud count charged a wiring into or out of the Central
District of California: Counts 2 and 8 were premised on emails to and
from a co-defendant in the Central District, and Counts 3, 4, 5, 6, 7, 9,
and 10 were premised on transfers of millions of dollars from two bank
accounts in the Central District.  (6-ER-1379-80; *see also* 6-ER-1341
(noting that the two bank accounts were opened at Cathay Bank in the
City of Industry, California within the Central District).

That begins and ends the analysis.  "Since each count of wire
fraud involved the use of a domestic wire, each conviction is a domestic
application of the statute."  *Hussain*, 972 F.3d at 1145.

### a.    *It makes no difference whether the wires were merely incidental*

Defendants claim that the charged domestic wires were merely
"incidental" to the overall scheme (AFB-24-26), but that is irrelevant.
Again, a count need only *involve* the use of a domestic wire.  *Hussain*,
972 F.3d at 1145.  That simple rule is founded on simple logic: (1) a
domestic application occurs when the conduct relevant to the statute's

focus occurred in the United States; and (2) the focus of the wire fraud statute is the misuse of the wires. *Id.* at 1143-45.

Defendants incorrectly claim that *Hussain* endorsed a "merely incidental" test (AFB-24). In a footnote, this Court stated that the Second Circuit requires that the use of the wires be "'a core component of the scheme to defraud'" *Hussain*, 972 F.3d at 1144 n.2 (quoting *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019)), which, in turn, the First Circuit interpreted to necessitate a "'merely incidental'" analysis where "'a foreign defendant is alleged to have committed wire fraud against a foreign victim,'" *Hussain*, 972 F.3d at 1144 n.2 (quoting *United States v. McLellan*, 959 F.3d 442, 470 n.7 (1st Cir. 2020)). But this Court did not adopt any such test, holding instead that where a wire fraud count "involved the use of a domestic wire," the count "is a domestic application of the statute." *Hussain*, 972 F.3d at 1145. And *Hussain* had no occasion to consider any exception because "Hussain defrauded a domestic victim." *Id.* at 1144 n.2.

In any event, even if a merely-incidental exception might apply where a "foreign defendant committed wire fraud against a foreign victim" (AFB-24), this is no such case. Defendants themselves are *not*

*foreign*; all six of them were formed in the United States and operated in California. (6-ER-1340-43; Presentence Reports 10 ¶¶ 31-37.) On top of that, the scheme defrauded the *United States* (6-ER-1346-48, 1357-59), not merely foreign victims, and there were American victim-investors too, as the district court knew when it ruled on the motion to dismiss (3-ER-427; 1-SER-32-39). Because this fraud involved both domestic defendants and domestic victims, there is no need to consider a merely-incidental exception to the wire fraud statute.

### b.    *The wires were central to the fraud scheme*

Assuming counterfactually that a merely-incidental test exists and applies, it was satisfied here because the charged wires were "a core component of the scheme to defraud." *Hussain*, 972 F.3d at 1144 n.2. Specifically, Counts 2–10 related to payments and financial support from CZW and its surrogates to the Perfectus defendants. (6-ER-1379-80.) CZW used such payments to fraudulently inflate its revenue and hid the fact that they were related-party transactions. (6-ER-1380.) That was the very nature of the scheme.

Those circumstances were a far cry from the only (out-of-circuit, district court) case defendants cite involving an impermissibly

extraterritorial application of the wire fraud statute: *United States v. Prevezon Holdings, Ltd.*, 122 F. Supp. 3d 57 (S.D.N.Y. 2015) (AFB-26). In *Prevezon*, the government "pleaded only one domestic contact by the perpetrators of the larger fraud"—a single wire transfer between accounts held in foreign countries that was routed through New York. 122 F. Supp. 3d at 71-72. Here, these U.S.-based defendants participated in a scheme that entailed fraudulent imports to the United States. Both the scheme and the charged wires were amply domestic.

### 3. *The indictment properly alleged customs fraud*

Counts 11 through 17 of the Indictment alleged that defendants passed false and fraudulent papers through a customhouse, in violation of 18 U.S.C. § 545, by falsely claiming that AD/CVD duties were not owed on their aluminum extrusions welded into pallets. (6-ER-1381-82.) There was nothing deficient about those charges.

An indictment must allege "the elements of the offense charged." *United States v. Lazarenko*, 564 F.3d 1026, 1033 (9th Cir. 2009); *see also* Fed. R. Crim. P. 7(c)(1) (requiring a "plain, concise, and definite written statement of the essential facts constituting the offense charged"). Section 545, as charged here, has four elements: (1) the defendant

knowingly passed a Form 7501 through a U.S. customhouse; (2) the defendant knew that the Form 7501 was false, forged, or fraudulent; (3) the defendant acted willfully with intent to defraud the United States; and (4) the Form 7501 had a natural tendency to influence, or was capable of influencing, action by the United States. Ninth Circuit Model Jury Instruction No. 21.3. Defendants do not dispute that the indictment alleged those elements, nor do they dispute that the government proved them at trial.

Instead, defendants improperly attempt to add an extra element to the statute. *See United States v. Davis*, 597 F.2d 1237, 1238-39 (9th Cir. 1979) (rejecting attempt to add an element to Section 545). They claim that the indictment had to allege that they sold their smuggled aluminum in the United States. (AFB-27-28.) Not so. Defendants' position has no basis in the text of the statute, and, in fact, this Court rejected the claim almost 50 years ago, holding that Section 545 is *not* limited to prosecutions in which the defendant smuggled merchandise "for resale or other commercial purposes." *United States v. Hall*, 559 F.2d 1160, 1165 (9th Cir. 1977). "There is nothing in the legislative

history, or in any case, which supports this claim," and it is foreclosed by "the expansive language of the statute itself." *Id.*

Defendants cite two Federal Circuit cases enumerating the purpose of antidumping laws (AFB-28), but the harm intended to be addressed by AD/CVD Orders is *not* an element of Section 545. Indeed, as defendants' brief later acknowledges, "[t]he offense of passing false papers through a customshouse is complete at the time of importation." (AFB-59.) They and their co-conspirators violated Section 545 by "the submission of false, forged or fraudulent invoices." *United States v. Robinson*, 147 F.3d 851, 853 (9th Cir. 1998). Nothing more was required.

## B. The District Court Permissibly Exercised Its Discretion in Conducting Voir Dire

### 1. *Procedural and factual background*

Before trial, the parties filed 23 joint proposed voir dire questions. (5-ER-990-94.) Defendants added another 38 proposed questions, including several with multiple subparts. (5-ER-995-98.) Defendants' additional proposed questions were wide-ranging, including questions about COVID-19, prior jury service, language barriers, jurors' investment strategies and business experience, the burden of proof, the

43

presumption of innocence, and prejudice against China, Chinese

nationals, or corporations generally. (*Id.*) Many of those proposed

questions were argumentative, and defendants did not state any basis

for any of them. (*See id.*)

After the district court conducted its initial voir dire and solicited

challenges for cause, defense counsel did not request any other specific

questions or explain why any additional questions might be warranted.

(7-ER-1417-1462.) Counsel stated only that "[t]here were a number of

questions that we requested that the Court consider." (7-ER-1462.)

The district court responded, "[t]o the extent I covered them if

appropriate," and counsel replied: "Thank you." (*Id.*) Jury selection

proceeded and replacement jurors were questioned without any further

comment or objection by the defense regarding the scope of voir dire. (7-

ER-1462-1511.)

All selected jurors swore to return a verdict according to the

evidence and instructions of the court. (7-ER-1483, 1497-98.) Before

opening statements, the district court instructed jurors that, "[y]ou

must decide this case solely on the evidence and the law before you and

must not be influenced by any personal likes or dislikes, opinions,

prejudices or sympathy." (7-ER-1502.) The court gave the same sort of instruction after closing arguments, adding that jurors must "also not be influenced about any person's race, national ancestry, or economic circumstances." (12-ER-3117-18.)

Although defendants now claim that their trial was infused with anti-Chinese bias, they did not object to any of the arguments, demonstratives, or testimony they now cast as "xenophobic." (AFB-21; *see* 7-ER-1513, 1626; 8-ER-1697; 12-ER-3020.)

### 2. *Standard of review*

The sufficiency of the district court's voir dire questions is ordinarily reviewed for abuse of discretion. *United States v. Anekwu*, 695 F.3d 967, 978 (9th Cir. 2012). But where defendants fail to state any reasons for their proposed voir dire questions, plain error review is warranted. *See United States v. Gomez*, 2021 WL 3204461, at *1 (9th Cir. 2021) (unpublished); *United States v. Blosvern*, 514 F.2d 387, 389 (9th Cir. 1975). Unpreserved objections to argument or evidence are also reviewed for plain error. *Anekwu*, 695 F.3d at 973, 985.

### 3. *The district court was not required to ask additional voir dire questions*

"The district court has considerable discretion in determining the manner and scope of voir dire," *United States v. Toomey*, 764 F.2d 678, 682 (9th Cir. 1985), and to ensure that voir dire is conducted "with reasonable expedition," *United States v. Jones*, 722 F.2d 528, 529 (9th Cir. 1983). This "considerable discretion" extends to the district court's decision "to accept or reject proposed voir dire questions and, as long as it conducts an adequate voir dire, its rejection of specific questions is not error." *United States v. Medina Casteneda*, 511 F.3d 1246, 1250 (9th Cir. 2008).

"While it is an abuse of discretion to fail to ask questions reasonably sufficient to test jurors for bias or partiality, the trial court may refuse questions which are tied to prejudice only speculatively." *Anekwu*, 695 F.3d at 978 (quotation marks omitted). Here, defendants' claim that the district court was required to test for anti-Chinese bias (AFB-18-20) is rooted in nothing but speculation and generalities. The fact that anti-Chinese bias exists in the world or was exacerbated by the pandemic does not mean that every trial involving China or Chinese nationals necessitated supplementary voir dire. Defendants fail to

46

show that there was a constitutionally "significant likelihood that racial prejudice might infect" this trial. *Ristaino v. Ross*, 424 U.S. 589, 598 (1976); *see id.* at 590, 597-98 (specific voir dire questions regarding racial bias not required in murder trial involving white victim and Black defendants). Their argument about prejudices that exist in the world would reduce to "a requirement of universal applicability," which the Supreme Court has rejected. *Id.* at 596.

The circumstances of this specific trial were in fact less likely to trigger a biased verdict. No member of the Chinese government, foreign agent of China, or any Chinese state-run entity was a defendant or a witness. There was not even a Chinese *person* on trial. The only defendants were six U.S. corporations that operated in California. And though certain co-conspirators were of Chinese origin, so were many of the government's key witnesses. (*See, e.g.*, 8-ER-1750-51 (Suk Luo); 8-ER-1886-87 (Mark Li) ; 9-ER-2140-41 (Po-Chi Eric Shen); 10-ER-2340-41 (George Wang).) At no point did the evidence plausibly stoke bias against Chinese nationals, nothing in the record suggests that any of the jurors actually were biased, and, needless to say, nobody ever referred to this case as "*United States v. China*" (AFB-21). Defendants'

47

empty aspersions and baseless speculation do not establish reversible error. *Anekwu*, 695 F.3d at 978.

Defendants' failure even to articulate their theory of bias before the completion of voir dire further undermines their claim on appeal. "If there are particular questions that counsel deems essential, and such that refusal to put them may be reversible error, counsel must tell the court so, and state his reasons, before the examination of the jurors is completed." *Blosvern*, 514 F.2d at 389. Here, by submitting a very lengthy list of questions without stating any reasons or highlighting any questions believed to be essential, defendants laid "a trap" for the district judge, denying "him a fair chance to avoid error." *Id.* Especially on plain-error review, the claim fails.

Nor can defendants premise their challenge to the voir dire on snippets of the trial record to which they never objected. (*See* AFB-21.) Although defendants claim that Liu was described as an "emperor," in fact, it was Liu who characterized *himself* using that title, demanding that a Perfectus sales manager "think of him as the emperor and the [sales manager] as a servant." (7-ER-1556, 1586.) There was nothing wrong with describing Liu using a term he used to describe himself,

and, in any event, the mere fact that a word may have tangential historical or cultural salience is far too thin a reed to support the claim that the jury might have "render[ed] a verdict against the country of China" (AFB-21).

Words like "royalty" and "entourage"—which were apparently uttered once by one witness (AFB-21 (citing 8-ER-1697))—are an even thinner basis upon which to allege bias. Nothing about those words remotely reflects anti-Chinese sentiment. Nor was there anything wrong with using an image of the map of China with the color and stars of the Chinese flag on slides depicting the movement of aluminum and funds between China and the United States. (*See, e.g.*, 2-ER-219.) Defendants did not object to that pictorgram at trial, and their belated attempt to imbue it with prejudicial meaning is not well taken. *Cf. Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) (courts do not lightly infer that prosecutors intend the most damaging meaning one can attribute to an ambiguous remark). And, again, speculative prejudice does not necessitate supplementary voir dire.

Finally, the district court took steps to safeguard against prejudice. Before voir dire, the court informed prospective jurors that

(1) the indictment charged defendants with fraudulently inflating the value of a Chinese company's stock and defrauding U.S. customs, (2) the jury would be tasked with determining the facts "from and only from the evidence that's received in the trial," and (3) jurors would be required to "follow the law." (7-ER-1420-21, 1426-29.) During voir dire, the court questioned prospective jurors to ensure they could be fair and impartial, asking numerous venirepersons to affirm that they could listen to both sides and decide the case solely based on the facts and the law as instructed. (*See* 7-ER-1430-62, 1467-79, 1484-1496.) After voir dire, the court instructed the jury—both at the beginning and end of trial—not to be influenced by personal likes, dislikes, or prejudices. (7-ER-1502; 12-ER-3117-18.) Altogether, the court's questions and instructions adequately protected against bias. *See Medina Casteneda*, 511 F.3d at 1250 (district court adequately safeguarded against a verdict based on propensity evidence "by asking a more general question regarding the juror's ability to follow the law in accordance with the judge's instruction"). The district court did not abuse its broad discretion or plainly err in conducting voir dire.

**C.    The District Court Did Not Err, Plainly Err, or Abuse Its Discretion In Instructing the Jury**

### 1.    *Standard of review*

Ordinarily, a district court's formulation of jury instructions is reviewed for abuse of discretion, and whether the instructions adequately covered defense theories is reviewed de novo.  *United States v. Flucas*, 22 F.4th 1149, 1154 (9th Cir. 2022).  However, plain-error review applies where a party failed to preserve its instructional challenge, *United States v. Backman*, 817 F.3d 662, 665 (9th Cir. 2016), or failed to comply with Federal Rule of Criminal Procedure 30, *see United States v. Hofus*, 598 F.3d 1171, 1175 (9th Cir. 2010).

### 2.    *The district court did not err in declining an "entrapment-by-estoppel" instruction*

Entrapment by estoppel is an affirmative defense for which a defendant "must show that (1) an authorized government official, empowered to render the claimed erroneous advice, (2) who has been made aware of all the relevant historical facts, (3) affirmatively told the defendant the proscribed conduct was permissible, (4) that the defendant relied on the false information, and (5) that the reliance was reasonable." *United States v. Schafer*, 625 F.3d 629, 637 (9th Cir. 2010) (cleaned up).  Defendants are not entitled to an entrapment-by-estoppel

51

instruction and may not present that defense to the jury unless they present "prima facie evidence" to satisfy the elements. *Id.* at 638.

The district court here correctly rejected an entrapment-by-estoppel instruction. This case involved no "affirmative misleading" by a government official who had "authority to bind the federal government to an erroneous interpretation of federal law." *United States v. Brebner*, 951 F.2d 1017, 1025-26 (9th Cir. 1991). No federal official, let alone an official from Commerce—the sole agency authorized to determine the scope of duties (AFB-39; 9-ER-159; 10-ER-2637)—told defendants that their pallets were outside the scope of the AD/CVD Orders before defendants violated those orders by importing 2.2 million pallets without paying duties. Defendants could have requested a scope ruling (9-ER-2023) but did not.

Nor was there any evidence that defendants "relied on" any such purported advice. *Schafer*, 625 F.3d at 637. Shen, the CEO of all four Warehouse defendants until 2013, testified that he did not believe the pallets were finished merchandise. (9-ER-2223-24.) And any contrary belief would not have been "reasonable," *Schafer*, 625 F.3d at 637, because the AD/CVD Orders listed examples of finished merchandise,

all of which were marketable products that contained parts other than aluminum extrusions. As such, defendants "clearly" should have been on notice that any purported authorization to violate the AD/CVD Orders "was incorrect, or at least demanded further inquiry." *United States v. Lynch*, 903 F.3d 1061, 1077 (9th Cir. 2018). Defendants made no further inquiry because their goal was to break the law, not comply with it. "[R]easonable reliance occurs if a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries." *Lynch*, 903 F.3d at 1077 (quotation marks omitted). This case does not remotely fit the bill.

*United States v. Pennsylvania Indus. Chemical Corp.* (*PICCO*), 411 U.S. 655 (1973), is not at all on point, let alone "squarely" so (AFB-39). In that case, "the responsible administrative agency," the Army Corps of Engineers, issued unambiguous published regulations that construed a statutory ban on discharging pollutants into navigable waters to proscribe only discharges that "affected navigation." *Id.* at 672-74. That regulatory construction squarely conflicted with judicial decisions construing the statute to impose "a flat ban," "regardless of

the effect on navigation." *Id.* at 671. In those circumstances, the defendant should have been permitted to present evidence that its reliance on the erroneous regulations "was reasonable under the circumstances." *Id.* at 674-75. The upshot is that where erroneous regulations clearly purport to permit conduct that a statute prohibits, a defendant may advance reliance as a defense.

Here, by contrast, there was no regulation (let alone an erroneous one) that clearly permitted defendants' crimes. In fact, both Commerce and the Court of International Trade had no difficulty concluding that defendants' aluminum was covered by the plain meaning of the unambiguous AD/CVD Orders and that their pallets did not qualify for the finished merchandise exclusion. (9-ER-2100-01; 17-ER-4521-52; 1-SER-177-203); *Perfectus*, 391 F. Supp. 3d at 1358. Defendants were prosecuted and convicted because they fraudulently manipulated their aluminum into fake products to capitalize on the inapplicable exclusion and to avoid paying duties. This case, unlike *PICCO*, involved no question of reliance on erroneous regulations but rather a scheme to circumvent accurate regulations. Defendants did not break the law because they were misadvised; they simply broke the law.

Defendants' claim that "additional government actions" supported an estoppel defense (AFB-41) is also inaccurate. The fact that CBP did not catch defendants sooner (*see* AFB-41 (citing CBP's "opportunities to inspect the pallets")) is a far cry from "affirmative misleading," *see Brebner*, 951 F.2d at 1026. Nor could an estoppel defense be premised on an "audit" conducted "*after* [defendants] stopped the imports" (AFB-41 (emphasis added)); one cannot reasonably rely on an audit before it occurs. Besides, the post-crime audit defendants reference was not performed by Commerce, and there was ample evidence that the auditor was lied to and deliberately misled during the course of the audit. (*See* 11-ER-2628-40; 19-ER-4926-44; 1-SER-215-20.) There was thus no basis for an estoppel defense or instruction.

### 3. The district court did not plainly err in declining a "mere-presence" instruction

The Warehouse defendants argue that the district court erred by not giving a "mere presence" instruction. (AFB-42-43.) That claim is reviewed for plain error only because defendants defied Federal Rule of Criminal Procedure 30 by filing their proposed mere-presence instruction *in camera* with the district court. (*See* 20-ER-5144-45); *Hofus*, 598 F.3d at 1175 (reviewing for plain error where defendant

failed to satisfy Rule 30).  A party "must furnish a copy" of any requested jury instruction "to every other party."  Fed. R. Crim. P. 30(a).  By violating that requirement, defendants prevented the government from responding to their proposed instruction below.

There was no error, plain or otherwise.  A mere-presence instruction is designed for circumstances "where the government's case rested primarily on the defendant's presence, and no more than just presence."  *United States v. Medrano*, 5 F.3d 1214, 1218 (9th Cir. 1993) (cleaned up).  This case had nothing to do with presence.  The Warehouse defendants were indicted and convicted because their owners and agents created and used them to facilitate the illegal importation and stockpiling of aluminum extrusions in the form of pallets.  There was thus no basis for a mere-presence instruction.

But even if "presence" could be stretched beyond physical presence—and defendants cite no Ninth Circuit precedent endorsing such a construction—a mere-presence instruction is "unnecessary" if "the government's case is based on more than just a defendant's presence, and the jury is properly instructed on all elements of the crime."  *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1282 (9th

Cir. 1992). Here, the case against the Warehouse defendants was based on their role in the conspiracy, not mere presence. And though their "quantity of assistance" is irrelevant, *Rosemond v. United States*, 572 U.S. 65, 73 (2014), their role was key: the Warehouse defendants collectively owned some two million square feet of space used to store 2.2 million smuggled pallets. Beyond that, the district court instructed the jury on all of the elements (12-ER-3126-38), directed jurors to consider the evidence against each defendant separately (12-ER-3122), and specifically instructed that a defendant "does not become a conspirator [] merely by association with one of the persons who are conspirators" (12-ER-3129). To the extent there was any foundation for a "mere presence" defense (and there was not), the instructions covered it, such that any error had no effect on defendants' substantial rights.

### 4. *The district court did not err or abuse its discretion in instructing on the scope of the AD/CVD Orders*

The district court instructed the jury that certain aluminum extrusions exported from China and welded into pallets were included within the scope of the AD/CVD Orders and did not qualify for the finished merchandise exclusion. (1-ER-154.) That was an accurate statement of the law based on the AD/CVD Orders themselves (17-ER-

4518-20), Commerce's 2017 scope rulings (17-ER-4521-52; 1-SER-177-203), and multiple cases in which defendants had litigated the issue and lost, *see Perfectus*, 391 F. Supp. 3d at 1353-55; *Perfectus Aluminum Inc. v. U.S. Aluminum Extrusions Fair Trade Comm.*, 836 F. App'x 883, 887-88 (Fed. Cir. 2020). The district court did not err by correctly instructing the jury on the law.

Defendants claim that the district court should have supplemented its instruction by requiring proof that they "specifically knew at the time of the actual importations that the aluminum pallets were subject to AD/CVD Duties" and that they "willfully and intentionally defrauded the United States by refusing to pay those duties." (AFB-45.) But defendants requested no such language below (*see* 5-ER-1092-97 (defendants objected to scope instruction but did not propose any alternative or additional language)), and the district court did not plainly err by failing to add it. The court instructed that the government was required to prove knowledge, willfulness, and intent (12-ER-3134), and the instruction that aluminum extrusions fell within the scope of the AD/CVD Orders said nothing about defendants' intent

to submit false documents to customs or their knowledge regarding the scope of the AD/CVD Orders.

Defendants also fault the district court for failing to instruct that the scope ruling was issued in 2017, after defendants illegally imported pallets from 2011 through 2014 (AFB-45), but that claim misconstrues the basic nature of a scope ruling. The legal rules regarding anti-dumping and countervailing duties arise from Commerce's AD/CVD Orders themselves—in this case, the 2010 and 2011 orders that were in effect through the entire period for which defendants were prosecuted (17-ER-4518-20). The scope "ruling" (17-ER-4521) was not an "Order" (AFB-44-46) that imposes legal liabilities but rather an advisory opinion interpreting the AD/CVD Orders. *See Walgreen Co. v. United States*, 620 F.3d 1350, 1354 (Fed. Cir. 2010). "Commerce cannot 'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." *Id.* Thus, in 2017, Commerce was merely opining that its AD/CVD Orders encompassed pallets throughout the period of defendants' scheme. (*See* 9-ER-2041 (expert witness testified that scope ruling means that pallets

59

at issue "were *always* subject [to the AD/CVD Orders] and duties were always due" (emphasis added).)

Furthermore, any error in failing to remind the jury that the scope ruling was issued in 2017 was harmless. The date of the ruling was listed on its face, admitted into evidence, and testified to repeatedly. (9-ER-2037-39, 2075-76, 2079, 2092-93, 2106-07; 17-ER-4521-52.) It did not need to be repeated as a jury instruction.

Defendants' claim that the instruction usurped the jury's fact-finding role fares no better. "[T]he judge is the arbiter of the law" and "must be permitted to instruct the jury on the law and to insist that the jury follow his instructions." *United States v. Amparo*, 68 F.3d 1222, 1224 (9th Cir. 1995); *see also United States v. Smith*, 282 F.3d 758, 767 (9th Cir. 2002) (affirming jury instruction regarding existence of federal jurisdiction over geographic area as a matter of law where jury would then determine facts as to whether offense occurred in that geographic area). Equipped with the court's instruction, the jurors were required to make several factual findings before determining that defendants' pallets were within the scope of the AD/CVD Orders, including that the pallets were: (1) made from aluminum extrusions; (2) from the People's

Republic of China; (3) made of series 6xxx aluminum alloy; (4) cut-to-length; and (5) welded together in the form of a pallet. Moreover, after determining that defendants' pallets were subject to duties under the AD/CVD Orders, jurors still had to decide whether defendants knowingly and willfully violated those orders. The jury performed its factfinding role. And, again, because the district court's instruction was correct, any alleged error in giving it was harmless. Had they been forced to interpret the law themselves, jurors would have reached the same conclusion that "the plain meaning of the unambiguous language" of the AD/CVD Orders encompassed defendants' pallets. *See Perfectus*, 391 F. Supp. at 1358.

### 5. *The district court did not abuse its discretion in its conspiracy instructions*

The indictment alleged a single conspiracy with three objects: (1) wire fraud, (2) customs fraud, and (3) money laundering. (6-ER-1346.) Defendants claim that jury unanimity was required as to at least one object of the conspiracy (AFB-47), but, in fact, the district court's instructions required just that: "You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular

crime which the conspirators agreed to commit." (5-ER-893; 12-ER-3128.) That instruction was superfluous—"a unanimity instruction as to the particular objects of a charged conspiracy" is only necessary where there is "a genuine possibility of juror confusion," *United States v. Castro*, 887 F.2d 988, 993 (9th Cir. 1989), and "[t]here was no communication or other indication from the jury suggesting that it was in any way confused," *United States v. Anguiano*, 873 F.2d 1314, 1319 (9th Cir. 1989). But, in any event, the instruction matched defendants' proposal verbatim (5-ER-1035), affording them no basis to complain.

Defendants also argue (without legal support) that the district court erred by not using a special verdict form. (AFB-47-49 & nn.20, 21.) "[S]pecial verdicts in criminal trials are not favored," *United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998), and a special verdict form was not necessary here, where the jury instructions correctly set forth the elements of each offense and the jury expressed no confusion. Moreover, defendants' convictions on all of the other counts—wire fraud (Counts 2–10), customs fraud (Counts 11–17), and money laundering (Counts 18–24)— confirm that jurors unanimously agreed on all three objects of the conspiracy. Beyond that, defendants' claim that any

particular object of the conspiracy was legally inadequate (AFB-47-48) merely rehashes the meritless arguments from other portions of their brief. There is no basis for reversal.

## D. The District Court Did Not Abuse its Discretion or Plainly Err in Admitting Co-Conspirator Statements

### 1. *Standard of review*

This Court ordinarily "review[s] a decision to admit co-conspirator statements for abuse of discretion, and the factual determination that statements were made in furtherance of a conspiracy for clear error." *United States v. Bowman*, 215 F.3d 951, 960 (9th Cir. 2000). Whether a defendant had a "slight connection with the conspiracy" sufficient to trigger the co-conspirator exception to the hearsay rule should be reviewed for clear error but has sometimes been reviewed de novo. *See United States v. Castaneda*, 16 F.3d 1504, 1507 (9th Cir. 1994) (citing cases). However, unpreserved evidentiary objections are reviewed for plain error only, *United States v. Banks*, 514 F.3d 959, 975-76 (9th Cir. 2008), this Court may affirm on any basis supported by the record, *Nichols*, 464 F.3d at 1122, and reversal is not warranted if any error likely did not affect the verdict, *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1099 (9th Cir. 2005).

63

### 2. *Defendants did not preserve many of their hearsay objections*

Defendants vaguely contend that "[m]ost of the government's evidence at trial was hearsay" (AFB-49) and claim that "35 exhibits and [unspecified] days of testimony" were admitted "all pursuant to the coconspirator exception to hearsay" (AFB-50). Those sorts of bare assertions are inadequate to advance claims on appeal. *See United States v. Torres*, 911 F.3d 1253, 1257 n.3 (9th Cir. 2019).

Moreover, defendants did not preserve many of their hearsay objections at trial. When the defense challenged the co-conspirator exception before trial, the district court stated: "This is something I can rule about when it comes into evidence. And I will rule at that time." (7-ER-1606-09.) Although defendants now list dozens of exhibits in footnotes, they do not indicate where in the trial record they preserved objections to those exhibits (*see* AFB-50-51 nn.22-23), and it appears that a number of exhibits were admitted without objection (*see, e.g.*, 10-ER-2376 (admitting Exhibit 135 (15-ER-3914-4051)); 8-ER-1798 (admitting Exhibit 215 (19-ER-4920-23)); 8-ER-1913 (admitting Exhibit

379 (19-ER-5009-11))).[5]  Defendants also did not object to the tidbits of

testimony they now challenge.  (*See* AFB-55; 9-ER-2162, 2217.)  Any

hearsay objections that were not preserved are reviewed for plain error

only.  *See Banks*, 514 F.3d at 975-76.

### 3. *The district court correctly admitted evidence under the co-conspirator hearsay exclusion*

Statements are "not hearsay" if offered against an opposing party

and made by the party's co-conspirator during and in furtherance of the

conspiracy.  Fed. R. Evid. 801(d)(2).  The co-conspirator exclusion

applies "if the government shows by a preponderance of the evidence

that a conspiracy existed at the time the statement was made; the

defendant had knowledge of, and participated in, the conspiracy; and

the statement was made in furtherance of the conspiracy." *Bowman*,

215 F.3d at 960-61.  "Once a conspiracy is shown, the prosecution need

only present slight evidence connecting the defendant to the

---

[5] Defendants' motion to strike exhibits after trial (5-ER-913-36) was inadequate.  Objections must be made "during trial," *Banks*, 514 F.3d at 976, and the district court's statement that it might "later" grant "remedies" (5-ER-1608) did not excuse defendants from making specific objections at trial, *see United States v. Crawford*, 239 F.3d 1086, 1091 (9th Cir. 2001).

conspiracy." *United States v. Crespo de Llano*, 838 F.2d 1006, 1017 (9th Cir. 1987). The trial court is also permitted to "vary the order of proof" by allowing the government to introduce co-conspirator statements before establishing the conspiracy and the defendant's connection to it. *United States v. Loya*, 807 F.2d 1483, 1490 (9th Cir. 1987).

Here, ample evidence established the conspiracy and defendants' connection to it, and, on their face, the exhibits defendants challenge were made in furtherance of the conspiracy. The district court correctly found that the conspiracy was established (12-ER-3010), and reasonably exercised its discretion to allow the exhibits defendants now challenge.

### a. *The evidence established defendants' conspiracy*

At trial, and as described above, the government provided overwhelming evidence of the conspiracy and defendants' role in it. (*See* Part III.B.1.) Contrary to defendants' claim (AFB-50), there was also ample evidence of Shen's, Shao's, Wang's, and Zuopeng Liu's roles in the conspiracy.

- <u>Eric Shen</u>: Shen communicated directly with Liu and facilitated the conspiracy through his role as CEO of Scuderia

and all four Warehouse defendants. (*See, e.g.*, ER-1650-51, 1654; 9-ER-2113-16, 2130-35, 2142-79.)

- <u>Johnson Shao</u>: Shao was Perfectus' first CEO and facilitated the fake orders of pallets from CZW to Perfectus, Perfectus' bogus "loans" funded by CZW, and the money Perfectus sent back to CZW as "payments." (8-ER-1696, 1738-39, 1894-95, 1963.)

- <u>Zhijie Wang</u>: Wang accompanied Liu to the warehouses, harassed Shen into completing the fake $200 million loan to CZW, served as Scuderia's CEO, eventually became CEO of all four Warehouse defendants, ordered employees to shred documents and withhold information from the government, and submitted false declarations in support of civil forfeiture actions involving the warehouses. (9-ER-2156, 2169-70; 11-ER-2863-64, 2868-73; 13-ER-3282-86; 1-SER-225-40.)

- <u>Zuopeng Liu</u>: Zuopeng Liu convinced Shen to execute the fake $200 million loan to CZW, tendered a fake "resignation" letter to distance himself from Scuderia, managed Perfectus and Liu's aluminum facility in Mexico, helped with audits of the

warehouses, and was part of a small group that discussed

circumventing the AD/CVD Orders with Liu. (7-ER-1658-59;

8-ER-1718, 1730-31, 1890-91; 9-ER-2159-76, 2197-98,

2216-17.)

That evidence established the requisite "slight connection" linking each

co-conspirator to the scheme.[6]

### b. *The challenged evidence was part of the conspiracy*

All of the documents defendants cite—in many cases with

virtually no analysis—were plainly part of the conspiracy.

First, defendants cite CZW's 2012 and 2014 annual reports (14-

ER-3653-3774; 15-ER-3914-4051), which were admitted at trial as

---

[6] Defendants' passing and unpreserved claim that Shen's testimony "should be disregarded under the 'adverse interest exception'" (AFB-56) seriously mischaracterizes the law. Not only do defendants fail to identify any authority suggesting that the hearsay exclusion for co-conspirator statements is subject to an exception where a corporate agent acts adversely to the corporation, but the civil case defendants cite holds that there is no adverse interest exception when an innocent third party relies on the agent's apparent authority. *In re ChinaCast Educ. Corp. Secs. Litig.*, 809 F.3d 471, 476-77 (9th Cir. 2015). Here, Shen participated in the fraud against CBP, an innocent third party, and the proposition that he acted solely for his own interest is nonsense anyway—Shen, like all of the players in the scheme, operated at the direction of Liu, the conspiracy's mastermind.

Exhibits 133 and 135 without objection (*see* 10-ER-2376-77 (objecting to "clarification reports" but not annual reports)). Those exhibits were part of the conspiracy. They contained the material false statements that CZW published to its shareholders regarding the company's purported arms-length sales of aluminum pallets to the United States. (*See* 10-ER-2413-17, 2392-94, 2402-07.) That investor fraud was one of the core components of the conspiracy. (*See* 6-ER-1338-40, 1347-57.)

Second, defendants cite CBP requests for information (19-ER-4920-35), which were admitted at trial as Exhibits 215 and 216; the defense did not object to Exhibit 215 and only challenged Exhibit 216 on business-records and relevancy grounds. (8-ER-1798; 8-ER-1802-06.) Those exhibits were also connected to the conspiracy. They were found and seized when executing a search warrant at Perfectus, and they contained false representations, including that pallets were finished products that had been sold in arms-length transactions. (*See* 8-ER-1798-1802, 1805-08; 19-ER-4922-23, 4925-28, 4933-35.)

Third, defendants cite a series of emails between CZW and Shao. (19-ER-5003-47.) Those emails directly facilitated the fraud schemes by, *inter alia*: supplying instructions on how to place fake orders for

aluminum pallets from CZW's "International Business Department" (19-ER-5014, 5021); arranging and placing fake orders (19-ER-5013, 5019, 5022, 5024, 5027-29); confirming and invoicing fake orders (19-ER-5004, 5026, 5032-34, 5038-41, 5044); and arranging and supplying payments for fake orders and reimbursements (19-ER-5006-08). Those sorts of bogus sales and purchases of aluminum pallets were at the heart of the scheme to evade customs duties.

Fourth, defendants obliquely refer to "Shen's testimony" regarding Liu's actions but cite principally to the government's closing argument (AFB-55-56 (citing 12-ER-3022, 3026, 3047, 3049-50)), only identifying two short portions of actual testimony to which they made no objection below (AFB-55 (citing 9-ER-2162, 2217-19)). Defendants do not explain how that testimony was hearsay at all, let alone plainly so. It was not. Hearsay entails testimony about statements, not actions, *see* Fed. R. Evid. 801(c), Liu was the mastermind behind the conspiracy, and any testimony disclosing statements Liu made in furtherance of the conspiracy fell firmly within the co-conspirator exclusion.

70

### c. Defendants' proposed limitations on the co-conspirator exclusion do not exist

Defendants cite no precedent requiring the government "to prove a defined set of individuals" involved in the conspiracy in order to invoke the co-conspirator exclusion. (AFB-51.) The emails that form the bulk of defendants' hearsay claims pertained to the conspiracy and involved indicted co-defendant Shao, who served as Perfectus' CEO. (8-ER-1738-39.) Those emails also involved CZW's agents or employees on matters within the scope of that relationship. They identified the senders as from CZW—"Zhongwang"—using the domain name "@zhongwang.com." (*See, e.g.*, 19-ER-5003, 5006, 5008-09, 5013, 5022, 5026, 5028.) Those indicia were more than adequate to establish admissibility under Fed. R. Evid. 801(d)(2)(D) or (E). *See Sea-Land Serv., Inc. v. Lozen Int'l, LLC*, 285 F.3d 808, 821 (9th Cir. 2002) (district court abused its discretion in excluding email that contained email signature indicating employee worked for plaintiff's company). Beyond that, there was also testimony that Perfectus would wire funds after "receiv[ing] an e-mail from Zhongwang International" with "instructions as to the specific amount and which invoices need to be paid." (8-ER-1898.) Many of the emails defendants now challenge were exactly those sorts of

71

communications—emails that actively facilitated the conspiracy by orchestrating fake orders for aluminum or payments in return. Those are prototypical co-conspirator communications.

There is also no merit to defendants' claim that the time period of the emails fell outside the scope of the conspiracy. (AFB-51-52.) The conspiracy was not limited to 2011 through 2014. That was when defendants fraudulently evaded the AD/CVD duties, but as alleged in the indictment and proven at trial, the conspiracy began years earlier—in or about July 2008—and continued at least until the date of the indictment—May 2019. (6-ER-1346.) Defendants simply ignore the investor-fraud and money-laundering components of the conspiracy and the nearly 100 overt acts spanning July 2008 through December 2017. (6-ER-1346, 1359-77.) The emails defendants challenge range from approximately December 2010 through June 2014 (19-ER-5003-47), all of which were well within the timeframe of the conspiracy.

### 4. *Alternatively, the challenged emails were admissible as business records*

The approximately 28 emails defendants challenge (AFB-50-54 nn.22, 23, 25) were alternatively admissible as business records under Federal Rule of Evidence 803(6). (*See* 8-ER-1802-04 (suggesting that

72

challenged exhibit was admissible as a business record).) A district court may admit business records that are: (1) made or based on information transmitted by a person with knowledge at or near the time of the transaction; (2) made in the ordinary course of business; and (3) trustworthy, with neither the source of information nor method or circumstances of preparation indicating a lack of trustworthiness. *United States v. Catabran*, 836 F.2d 453, 457 (9th Cir. 1988). "The district court has 'wide discretion' in determining whether a business record meets the trustworthiness standard" under Rule 803(6). *United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999). And this Court has concluded that business emails may qualify under that exception. *See, e.g.*, *United States v. Lischewski*, 860 F. App'x 512, 516 (9th Cir. 2021); *United States v. Lindell*, 766 F. App'x 525, 530 n.4 (9th Cir. 2019).

The emails defendants challenge reflected CZW and Shao placing and processing (fake) orders for aluminum and transferring funds into and out of bank accounts to fund those purchases. Those communications were a component of defendants' fraud scheme but were made in the course of business activity at or near the time of the event by knowledgeable persons. Nothing in them indicated a lack of

trustworthiness regarding the source of information or the method or circumstances of preparation. Defendants do not dispute any of those elements. (*See* AFB-53-54.)

Defendants argue only that there was no official "custodian of records" to authenticate these emails (*id.*), but an official "custodian of records" is not required to authenticate documents as business records, *see ABS Ent., Inc. v. CBS Corp.*, 908 F.3d 405, 426 (9th Cir. 2018); *United States v. Miller*, 771 F.2d 1219, 1237 (9th Cir. 1985). The "business records exception only requires 'someone with knowledge' about the record-keeping, not necessarily an employee of the business or someone with knowledge of how the reports were made or maintained." *ABS*, 908 F.3d at 426.

Here, the evidence was supported by testimony of "someone with knowledge" about the record keeping. Perfectus' CEO testified about his use of email in the course of business, and he authenticated multiple email addresses, including his own, Shao's, Perfectus employee Jannie Zhong's, CZW employee Steve Fung's, and CZW employee Wendy Li's. (8-ER-1899-1902, 1912, 1916.) Separate testimony authenticated Shao's and Mark Li's Perfectus email addresses, confirmed that CZW

74

would send emails to Perfectus regarding payments, and confirmed that Perfectus would email fake purchase orders to CZW. (7-ER-1574-75; 8-ER-1849-50; 8-ER-1899-1900.) A customer service representative also authenticated Shao's email address and his handwriting. (8-ER-1850-56.) The emails were adequately authenticated.

The trustworthiness of the emails was also supported by the testimony of Homeland Security Investigations Special Agent Panuchai Praditbatuga. Praditbatuga testified that the documents were seized directly from the Doubleday premises, which was owned by Perfectus, and the seized documents were then maintained in a locked evidence room in advance of trial. (8-ER-1794-96, 1816-29; 19-ER-4924-35, 5014-19, 5021-22; 1-SER-209-12.) They were thus alternatively admissible as business records.

### 5. *Any alleged error was harmless*

Even if the district court abused its discretion in admitting the evidence defendants challenge, any error was harmless because it did not "materially affect the verdict." *Gonzalez-Flores*, 418 F.3d at 1099.

The purported hearsay was only a sliver of the government's case. Defendants' fraud scheme was established by overwhelming evidence,

including emails they never challenged below and do not challenge now.

(*See, e.g.*, 8-ER-1900 (no objection to Exhibit 357 (2-SER-308-12),

reflecting a wire transfer and communication from CZW); 8-ER-1987

(no objection to Exhibit 324 (2-SER-363-64), an email to Shao from area

sales manager regarding pricing of pallets).)  The government also

introduced the Perfectus defendants' own financial statements without

any objection.  (8-ER-1944-47; 2-SER-331-32.)  These financial

statements were powerful evidence of the fraud scheme: by 2015,

Perfectus had a total inventory of nearly $1.5 billion (unsold aluminum

from CZW), only $51,000 in accounts receivable (no real customers), and

$1.28 billion in loans (cash received from Hong Kong shell companies to

pay CZW for the bogus pallet orders).  (2-SER-331.)  Beyond that, the

extensive evidence detailed above proved that Liu controlled the

Perfectus and Warehouse defendants and used them to defraud CZW

shareholders, circumvent AD/CVD duties, and launder money around

the world.  (*See* Part III.B.1.)  The admission of the challenged evidence

had no effect on the verdict.

**E.    There Was Sufficient Evidence to Support the Customs and Wire Fraud Convictions**

### 1.    *Standard of review*

This Court reviews the sufficiency of the evidence de novo, *United States v. Kimbrew*, 944 F.3d 810, 813 (9th Cir. 2019), but in a manner that is "highly deferential" to the jury's verdict.  *United States v. Rubio-Villareal*, 967 F.2d 294, 296 (9th Cir. 1992) (en banc).  A sufficiency claim fails if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc).

### 2.    *There was sufficient evidence of customs fraud*

There was sufficient (and, in fact, overwhelming) evidence as to each element of customs fraud in violation of 18 U.S.C. § 545.

At trial, there was direct evidence of defendants' knowledge and intent:  Shen (the CEO of all four Warehouse defendants)[7] admitted that he never believed the aluminum pallets were finished

---

[7] Shen purchased three warehouses on behalf of Liu and served as CEO of Scuderia Development, LLC, the entity that purchased the fourth warehouse in Riverside.  (1-ER-285, 9-ER-2153-54, 10-ER-2443.)

merchandise, and he told Liu that the pallets were not finished merchandise, but Liu nevertheless directed the importation of pallets and use of test shipments to determine whether the pallets falsely designated as "finished merchandise" could avoid the collection of AD/CVD duties by CBP. (*See* Part III.B.1.b; 9-ER-2216-19.)

There was also overwhelming circumstantial evidence that defendants never believed the pallets were finished merchandise. *See United States v. Richardson*, 588 F.2d 1235, 1240 (9th Cir. 1978) (noting circumstantial evidence sufficient to establish elements of 18 U.S.C. § 545, including knowledge). This evidence included that the pallets were commercially useless because they were too expensive, built to odd dimensions, and far too heavy for real use. (*See* Part III.B.1.) The evidence demonstrated that defendants planned to melt the pallets and repurpose the raw aluminum into useable products. (*See id.*) Consistent with that plan, Liu acquired and attempted to construct melting facilities, namely, at Aluminum Shapes (where 100,000 pounds in pallets were melted) and in Barstow. (*See id.*)

Defendants' knowledge and intent were also demonstrated by their lies and concealment. In 2013, Shao sent a CBP Request for

Information to Aluminum Shapes, falsely claiming that there were buyers for the pallets, even though not a single one had been sold. (7-ER-1565; 1-SER-209-12, 292-95.) Then, when CBP conducted its audit in 2015, defendants falsely claimed that the pallets had the "lowest tare weight" and 100% sealed welds, omitting that the pallets were 170 pounds. (1-SER-215-20.) Similarly, the documents submitted to CBP said that Aluminum Shapes relied on their customs brokers in complying with the AD/CVD Orders when, in fact, it was Shao who directed Perfectus' broker how to fill out the Forms 7501. (10-ER-2355-58; 1-SER-215-20.) As their scheme unraveled, Shao prohibited taking pictures of pallets; the co-conspirators began a mass export of pallets; and Wang lied in declarations while instructing others to shred documents and lie too. (11-ER-2601-02; 11-ER-2848; 11-ER-2862-63; 11-ER-2867-74; 12-ER-2929-42; 13-ER-3181-84; 1-SER-225-40.)

Based on all of that evidence, the jury rationally found that each defendant either committed customs fraud itself, aided and abetted customs fraud, or was liable for customs fraud as a reasonably foreseeable act in furtherance of the conspiracy. Instead of contending

with that evidence or any of those theories of liability, defendants advance a series of meritless claims.

First, defendants claim that the government "chose to base their case on the 2017 Scope [Ruling]" (AFB-58), but that is not true. The government did not use the 2017 Scope Ruling to argue intent at all but only to point out that defendants' pallets did not actually qualify for the finished-merchandise exception.

Second, although there was no need to prove that defendants attempted to conceal the pallets (AFB-58)—the pallets were *themselves the disguise* by which defendants concealed their importation of aluminum extrusions—there was in fact evidence that defendants attempted to conceal the pallets too. Such evidence included that: an employee was fired after he failed to obtain a permit fast enough to stack the pallets inside the Fontana warehouse when the pallets were stored outside (7-ER-1641-42; 10-ER-2560); inventory was moved around to block the pallets from view (7-ER-203); following the 2015 allegations that the Warehouse defendants were stockpiling pallets, many pallets were packed up and shipped to Vietnam (7-ER-1587-88);

and Shao told a witness not to "take any pictures" of the Fontana warehouse and the pallets stored therein (11-ER-2848).

Third, the fact that the government did not prove that defendants "attempted to dissemble the aluminum pallets and sell them as extrusions" is also not an element and simply irrelevant. (AFB-58.)

Fourth, this was not a case of mere possession by the Warehouse defendants (AFB-59-60), but one in which defendants agreed to criminally evade the AD/CVD Orders by affirmatively lying and concealing before, during, and after the pallets were imported. The Warehouse defendants played an integral role in the customs fraud scheme by storing millions of aluminum pallets, and there was more than sufficient evidence of their guilt.

### 3. *There was sufficient evidence of wire fraud*

There was also amply sufficient evidence of wire fraud. The evidence proved that CZW made numerous materially false statements to, and omitted material facts from, its investors regarding its revenue, U.S. exports, related-party transactions, financing of its own purchases, connection to the Perfectus defendants, and the demand for aluminum "pallets." (*See* Part III.B.1.) That investor fraud was orchestrated with

defendants in the United States, and each charged count was premised on a domestic wiring. (*See* Part V.A.3)

Defendants once again ignore key parts of the record. They argue that omissions cannot support a wire fraud charge absent a duty to report, but the scheme here was not premised on mere "nondisclosures." (AFB-60-61.) There were multiple affirmative lies, including CZW's false claims that it had no related-party transactions in 2009 through 2012 and only $3.5 million in related-party transactions in 2013 and 2014. (1-SER-140; 13-ER-3300-3479; 14-ER-3480-3652.) Those were false representations, not omissions.

In any event, CZW's non-disclosures were also a permissible basis to support the wire fraud counts. Material non-disclosures can support wire fraud charges so long as there is "a relationship creating a duty to disclose." *United States v. Shields*, 844 F.3d 819, 823 (9th Cir. 2016). "[T]he relationship creating a duty to disclose may be a formal fiduciary relationship, or an informal, trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." *Id.* (quotation marks omitted). The jury was so instructed here (5-ER-896-

82

97; 12-ER-3132-33), consistent with defendants' own proposed instruction (5-ER-1062), and this Court has recognized that omitting information "to convince investors to trust defendants with their money" can form the requisite trust relationship supporting wire fraud convictions, *see Shields*, 844 F.3d at 824. To the extent it relied on CZW's non-disclosures to convict defendants of wire fraud, the jury did precisely what the law allows.

Defendants' unpreserved assertion that the government was required to identify a fiduciary duty explicitly enumerated by foreign law (AFB-61) is also wrong. The trust relationship can be "informal," *Shields*, 844 F.3d at 824, as defendants agreed below (5-ER-1062), and is thus not limited to explicit statutory duties, as defendants now claim. And if it actually was necessary to identify an express legal disclosure duty—which China presumably does impose on publicly-traded companies—on plain-error review, defendants, rather than the government, pay the price for any inadequacy in the record. *United States v. Gonzalez-Aguilar*, 718 F.3d 1185, 1189 (9th Cir. 2013). Sufficient evidence supported the wire fraud convictions.

**F.     There Was No Plain Constructive Amendment or Fatal Variance Between the Indictment and the Trial Evidence**

### 1.     *Standard of review*

This Court ordinarily reviews constructive amendment and variance claims de novo, *United States v. Bhagat*, 436 F.3d 1140, 1145 (9th Cir. 2006), but "review[s] a variance or constructive amendment to an indictment that is not objected to at trial for plain error," *United States v. Hugs*, 384 F.3d 762, 766 (9th Cir. 2004).

As with the bulk of their claims, defendants fail to identify where or how they preserved a constructive amendment or variance claim, thus running afoul of Federal Rule of Appellate Procedure 28(a)(8)(A) and leaving the government and Court to guess.  The only time during or before trial when defendants appear to have preserved constructive amendment or variance claims was in objecting to (1) a jury instruction on *Pinkerton* liability (5-ER-1090) and (2) the scope instruction "on the ground that the Indictment fails allege [sic] facts speaking to scope determinations, and the government's attempt to admit such facts through the proposed jury instruction amounts to an impermissible constructive amendment" (5-ER-1096-97).  Neither of those objections

84

preserved the constructive amendment or variance claims defendants now advance (AFB-29-36). Thus, plain error review applies.

### 2. *There was no constructive amendment or variance*

A constructive amendment "occurs when the defendant is charged with one crime but, in effect, is tried for another." *United States v. Pang*, 362 F.3d 1187, 1194 (9th Cir. 2004). A constructive amendment may be shown if "(1) there is a complex of facts presented at trial distinctly different from those set forth in the charging instrument, or (2) the crime charged in the indictment was substantially altered at trial." *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002) (cleaned up). This Court "reject[s] constructive amendment claims when the government does not introduce evidence at trial 'that would enable the jury to convict the defendant for conduct with which he was not charged.'" *United States v. Soto-Barraza*, 947 F.3d 1111, 1119 (9th Cir. 2020). An unpreserved constructive amendment claim fails unless the defense proves all the elements of plain error review, including an effect on substantial rights. *United States v. Mickey*, 897 F.3d 1173, 1183 (9th Cir. 2018).

"A variance, on the other hand, occurs when the evidence offered at trial proves facts materially different from those alleged in the indictment." *Adamson*, 291 F.3d at 614 (cleaned up). A variance never requires reversal unless it affects substantial rights, (*id.*), and, on plain-error review, defendants bear the burden to prove prejudice, *United States v. Hartz*, 458 F.3d 1011, 1022 (9th Cir. 2006).

Defendants' constructive amendment and variance claims are meritless.

The indictment charged defendants with customs fraud for submitting Forms 7501 that falsely claimed the pallets were not subject to AD/CVD duties. (6-ER-1357-58, 1363-70.) The theory was simple: defendants tack-welded the pallets to fraudulently "circumvent AD/CVD duties" and falsely documented them as "purported finished merchandise" "when, in truth and in fact, and as defendants [Liu, CZW, Chen, and Shao] then well knew, the aluminum extrusions in the form of pallets were not finished merchandise." (6-ER-1357-58.) The indictment also delineated the finished merchandise exclusion as applying to "products that were fully and permanently assembled and completed at the time of entry," and the indictment included specific

examples of finished merchandise: "finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels." (6-ER-1344-45.) That exactly matched the final 2011 AD/CVD Orders. (17-ER-4514, 4519.)

The allegations of the indictment also exactly matched the government's theory at trial. Far from taking the position that the pallets *were* finished merchandise (AFB-32), the government's entire trial theme was that the pallets were *not* finished merchandise.

That theme began in opening statement: "[T]he evidence will show[] that these aluminum pallets were *not* actually finished merchandise. The evidence will show that the defendants knew these aluminum pallets were *not* finished merchandise." (7-ER-1522 (emphases added).) At other points in opening, the prosecutor described the pallets as "commercially useless" (7-ER-1514), never sold (7-ER-1523), "just a disguise" (7-ER-1515, 1522), intended to be "melt[ed] down" (7-ER-1515, 1523), not "genuinely finished merchandise" (7-ER-1521), designed to "criminally exploit the finished merchandise exception" (7-ER-1521), and "falsely and fraudulently" represented to be "finished merchandise" (7-ER-1522). The government used slides to

contrast actual finished merchandise, like glass windows, picture frames, or solar panels (2-ER-221), with images of defendants' useless pallets (2-ER-222, 224). The whole point, just as alleged in the indictment, was that "these aluminum pallets were not actually finished merchandise." (7-ER-1523.)

The government reiterated the same point in closing. The pallets were not finished products but "[m]ass quantities of aluminum extrusions with no customers." (12-ER-3034, 3037.) The pallets did "*not* qualify for [the] finished merchandise exception" (12-ER-3047 (emphasis added), and Liu, the mastermind behind the conspiracy, knew that the pallets were "*not* finished merchandise" (2-ER-341 (emphasis added)). Nevertheless, defendants fraudulently exploited the finished merchandise exclusion by importing "2.2 million" "pallets with no customers." (2-ER-336; 12-ER-3025, 3041, 3048.) Those imports were aluminum extrusions merely tack-welded into "the form of pallets" (12-ER-3030, 3037)—"a product no one has ever seen" (2-ER-340; 12-ER-3030)—which were sold in fake sales with "fake orders" because there was "no actual demand" or "real customers" for items that were "[t]oo heavy," "too expensive," and sometimes hollowed out in a manner

conducive to housing "vermin" (2-ER-336, 343; 12-ER-3031, 3033, 3034, 3035, 3038, 3048-49). The prosecutor displayed photos reflecting how defendants warehoused their pallets in astonishing seas of useless metal. (2-ER-259, 286, 337; 12-ER-3037-38.) The government did not in any manner suggest that defendants' fake products were actually finished merchandise.

That record reveals that defendants' constructive amendment and variance claims are as hollow as their pallets. They cite nothing the government introduced or argued at trial (*see* AFB-29-36), apart from one single sentence of testimony in which a witness observed that the 2017 scope ruling "indicates that the merchandise subject to this request does not contain any non-extruded aluminum component." (9-ER-2040; *see* AFB-32.) That fragment of testimony did not change the government's case at all—to the extent it suggested that some of defendants' pallets were comprised entirely of aluminum extrusions, it simply confirmed that they were not creating finished merchandise but fraudulently circumventing AD/CVD duties. The only other testimony defendants cite was testimony they themselves elicited on cross-examination, which again merely recited language from the 2017 scope

89

ruling. (9-ER-2078-80; *see* AFB-32.) Lacking substance, defendants resort to rhetoric: "radical shift" (AFB-29) "dramatic variance" (AFB-36), "violently different" claims (*id.*), "last-minute pivot" (*id.*). Nothing of the sort occurred.

## G. There Was No Cumulative Error

Defendants have not demonstrated any trial error, much less cumulative error (AFB-72) because they have not established "multiple errors," *United States v. Macias*, 789 F.3d 1011, 1024 (9th Cir. 2015), which collectively were "so prejudicial as to require reversal," *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993). In addition, where, as here, there is "ample evidence of [a defendant's] guilt," this Court has not reversed for cumulative error. *United States v. Wilkes*, 662 F.3d 524, 543 (9th Cir. 2011).

## H. The District Court Did Not Err or Abuse Its Discretion in Imposing and Calculating Restitution

### 1. *Standard of review*

The legality of a restitution order is reviewed de novo, but if the order is within statutory bounds, the restitution amount is reviewed for abuse of discretion. *United States v. Anieze-Smith*, 923 F.3d 565, 570

(9th Cir. 2019). Factual findings supporting the order are reviewed for clear error. *Id.*

### 2. *The MVRA mandated restitution*

Under the MVRA, a court must order restitution for any "offense against property" under Title 18, "including any offense committed by fraud or deceit," in which a victim suffers "pecuniary loss." 18 U.S.C. § 3663A(c)(1)(A)(ii), (B). The statute extends to victims directly harmed by offenses involving as an element a "scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

Restitution was mandatory here either as to defendants' conspiracy conviction, 18 U.S.C. § 371, or their customs fraud conviction, 18 U.S.C. § 545. This Court has held that the MVRA . . . *does* apply [to] Section 371 conspiracy offenses," *United States v. Meredith*, 685 F.3d 814, 827 (9th Cir. 2012), and defendants' customs fraud convictions qualify because they were "committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii).

Furthermore, contrary to defendants' claim, their crimes were "offenses against property." (AFB-63-65.) Their scheme to evade more than $1.83 billion in duties owed under AD/CVD Orders deprived CBP

91

of its right to money owed. In *Pasquantino v. United States*, 544 U.S.
349 (2005), the defendants failed to declare liquor imported to Canada
and evaded paying Canada excise tax. *Id.* at 353. The Supreme Court
stated that "[t]he right to be paid money has long been thought to be a
species of property" and, as such, held that Canada's right to its
uncollected import tax was "money or property" for purposes of wire
fraud. *Id.* CBP's "entitlement to tax revenue is a straightforward
'economic' interest," and as in *Pasquantino*, "the [g]overnment alleged
and proved that [defendants'] scheme aimed at depriving [the
government] of money to which it was entitled by law." *Id.* at 357. The
right to collect money, such as in the form of taxes or duties, is
"property." *Id.* at 356.

Defendants' reliance on *Cleveland v. United States*, 531 U.S. 12
(2000) is misplaced. (AFB-63-64.) In *Cleveland*, the defendant
fraudulently obtained video poker licenses. *Id.* at 22. There was no
dispute that he paid Louisiana "its proper share of revenue," and thus,
the state suffered no economic loss. *Id.* That is the antithesis of this
case, where defendants did *not* pay more than $1.83 billion in duties

92

owed to CBP. Because CBP was deprived of pure money, unlike the state in *Cleveland*, restitution in this case was correctly ordered.

Other cases likewise have held that the right to unpaid taxes or property qualifies for restitution. *See United States v. Maddux*, 917 F.3d 437, 441 (6th Cir. 2019) (government had a property right to uncollected taxes on cigarette sales); *United States v. Bengis*, 631 F.3d 33, 40 (2d. Cir. 2011) (illegally harvesting lobsters deprived government of property under the MVRA); *United States v. Ali*, 620 F.3d 1062, 1065, 1067, 1073 n.10 (9th Cir. 2010) (scheme to defraud victim of right to full payment for software qualified as "money or property" under mail and wire fraud statutes, and district court properly awarded restitution). Consistent with those precedents, the district court correctly ruled that CBP was owed restitution.

### 3. CBP did not waive any right to unpaid duties

Defendants attempt to confuse the collection of unpaid duties through a civil process with restitution mandated by the MVRA after conviction in a criminal case. (AFB-64-66.) Defendants argue that because they successfully defrauded Commerce until it was too late to administratively assess and disburse customs duties (i.e., "liquidation"),

*see Perfectus*, 391 F. Supp. 3d at 1357-58 & n.18, they are entitled to retain the $1.83 billion they failed to pay.

Unsurprisingly, that is not the law. Customs regulations regarding liquidation in separate civil matters have no bearing on other remedies to collect unpaid duties. *See United States v. Aegis Sec., Inc. Co.*, 422 F. Supp. 3d 1328, 1344 (C.I.T. 2019) ("the finality of liquidation is not a bar to the Government's collection of unpaid duties, taxes, and fees"). Even if Commerce may not retroactively suspend liquidation and collect unpaid duties, the government may still bring fraud suits to collect. *See United States v. Vandewater Int'l Inc.*, 2020 WL 4372115, at *7 (C.D. Cal. June 23, 2023). Liquidation is "unconcerned with the intent of the importer" and thus "a different animal" from fraud. [8] *Id.* As made clear at trial, if importers deceive CBP into not collecting duties at the border, duties are still "absolutely" owed. (9-ER-2022-23.)

---

[8] The jury rejected defendants' attempts at trial to raise the concept of liquidation in separate civil matters regarding defendants' guilt, and the Court should do so here regarding restitution. (*See, e.g.*, 10-ER-2364-65; 11-ER-2665-66, 2667-68, 2678; 12-ER-2997-99; 12-ER-3087.)

Additionally, "[c]riminal restitution is mandatory under the MVRA and cannot be waived by a prior civil settlement" involving the same victims. *United States v. Edwards*, 595 F.3d 1004, 1014 (9th Cir. 2010); *see also United States v. Cloud*, 872 F.2d 846, 853 (9th Cir. 1989) (affirming criminal restitution order even though victim banks had settled with defendant prior to sentencing and waived "all direct rights or causes of action"). The MVRA mandated restitution to victims in this case, and the district court correctly ordered it.

Defendants' inadequately developed footnote regarding judicial estoppel is wildly off-base. (*See* AFB-66 n.27 (citing *United States v. Liquidators of Eur. Fed. Credit Bank*, 630 F.3d 1139, 1149 (9th Cir. 2011).) Even assuming that doctrine "is ever available against the government in a criminal case," *see United States v. Lehman*, 756 F.2d 725, 728 (9th Cir. 1985), it applies only when the same party (1) takes "clearly inconsistent" positions, (2) "persuaded the court of the earlier position," and (3) would "derive an unfair advantage" in the latter proceeding. *Liquidators*, 630 F.3d at 1148. Here, the government has sought to divest defendants of their stolen customs duties in all proceedings; did not persuade the Court of International Trade to

95

permit administrative recovery of those duties, *see Perfectus*, 391 F. Supp. 3d at 1357-58; and it is defendants, not the government, who are attempting to derive an unfair advantage.

### 4. *The district court did not abuse its discretion in calculating the amount of restitution*

The district court's calculation of restitution was fully supported by the evidence and entailed no abuse of discretion or clear error. Defendants' contrary claims are, once again, meritless.

First, defendants' argument that the fraudulently imported pallets by Aluminum Shapes should not count towards restitution ignores that the jury convicted all defendants of specific counts involving the importation of pallets by Aluminum Shapes. (6-ER-1381-82.) Further, Liu acquired and controlled Aluminum Shapes (Presentence Reports 146 n.4), and Shao instructed customs broker George Wang to falsely indicate that the pallets were not subject to the AD/CVD duties, including for the pallets imported by Aluminum Shapes (10-ER-2345, 2353-58, 2372-73). The Forms 7501 for the pallets imported by Aluminum Shapes were filled out by Wang's sister using the information provided by Shao and shell companies controlled by

Liu. (10-ER-2347-49, 2353-54.) There is no basis to exclude the losses to CBP for pallets fraudulently imported through Aluminum Shapes.

Second, defendants did not dispute below, and do not dispute now, that the government and Probation Office correctly calculated the amount of unpaid duties as $1,836,244,745, which was premised on the fraudulent Form 7501s (1-SER-25-27). (*See* AFB-67.) Defendants also do not dispute that their Count 1 conspiracy conviction has "conspiracy" as an element, 18 U.S.C. § 3663A(a)(2) (*see* AFB-67), which, of course, it does, *see* 18 U.S.C. § 371. Because restitution was properly ordered based on the conspiracy conviction, it extends to the entirety of the conspiracy. *See United States v. Reed*, 80 F.3d 1419, 1423 (9th Cir. 1996) ("[I]f someone is convicted of a conspiracy, the court can order restitution for damage resulting from any conduct that was part of the conspiracy[.]"). Defendants have waived any contrary arguments by failing to advance them in their opening brief, *United States v. Perez-Silvan*, 861 F.3d 935, 939 (9th Cir. 2017), and the district court's calculation of restitution was correct on this basis alone.

But even if conspiracy had not been charged, defendants are wrong to suggest that restitution is limited to the seven counts of

97

customs fraud charged in the indictment. (AFB-67.) Rather, this Court has "held that restitution orders can include losses caused by related conduct for which the defendant was not convicted." *Meredith*, 685 F.3d at 827. All of the customs fraud defendants committed was related to the exemplar counts for which they were convicted. The restitution calculation was correct on that basis too.

Defendants' argument that the restitution amount should be reduced because duties "could not apply" to pallets they "re-exported" out of the United States (AFB-68) is risible. When their scheme unraveled, they orchestrated a cover-up to export pallets to Vietnam (7-ER-1588), which they lied by calling a "business decision" (10-ER-2438). Suffice to say, defendants cite no authority for the proposition that customs duties are excused where a fraudster that failed to pay at the time of import later exports its products to cover up its crime. The district court correctly assessed restitution for all unpaid duties.

## 5. *The district court did not abuse its discretion in ordering defendants jointly liable*

The district court did not abuse its discretion in ordering defendants jointly liable for the entire amount of restitution. "The MVRA expressly permits the imposition of joint and several liability, 18

U.S.C. § 3664(h) . . . and [defendants] cite[] no authority that reversed as abuse of discretion a district court's imposition of joint and several liability in this context." *United States v. Gagarin*, 950 F.3d 596, 609 (9th Cir. 2020). Since the parties disputed the propriety of joint liability below (3-ER-423, 608; *see also* Presentence Reports ¶ 109; 20-ER-161), the court "knew it had the option to apportion the restitution award among the [d]efendants, but decided not to exercise it." *Gagarin*, 950 F.3d at 609 (cleaned up).

There is no basis "to second-guess the court's decision." *Id.* Defendants, including the Warehouse defendants, engaged in a massive conspiracy. The Warehouse defendants played an essential role by stockpiling millions of commercially useless aluminum pallets. *See United States v. Booth*, 309 F.3d 566, 576 (9th Cir. 2002) (no abuse of discretion in awarding restitution against defendant who characterized himself as a mere "errand boy" but played an "essential role in the fraudulent scheme"). Indeed, as the Warehouse defendants acknowledge, they were "formed for the sole purpose of holding title to the warehouses" (AFB-70 n.29) where the pallets were stored. In other words, they existed solely to carry out the conspiracy for which they

were convicted.  Holding them liable for the $1.83 billion in losses caused by that conspiracy was entirely appropriate.

Defendants' contrary claim misquotes and mischaracterizes precedent.  They cite *Paroline v. United States*, 572 U.S. 434, 445 (2014), for a quotation that appears nowhere in the Supreme Court's opinion: that the government must prove "'not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the [particular defendant's] conduct and the loss is not too attenuated (either factually or temporally).'"  (AFB-69-70 (alteration in defendants' brief).)  And although that quotation does appear in two Ninth Circuit opinions, *United States v. Swor*, 728 F.3d 971, 974 (9th Cir. 2013) (per curiam); *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001), defendants' alteration—adding the words "particular defendant's" before the word "conduct"—is not a fair characterization of the law.  Neither *Swor* nor *Gamma Tech* requires a causal nexus between a particular co-conspirator's conduct and the loss caused by the conspiracy.  *Swor* involved a single defendant, not a conspiracy at all, 728 F.3d at 972, and in finding an adequate nexus between the

conspiracy and the loss in *Gamma Tech*, this Court considered the link

between "the conduct underlying the offense of conviction"—not any

particular defendant's conduct—and the loss, 265 F.3d at 928.[9]

Defendants' framing of *United States v. Tyler*, 767 F.2d 1350 (9th

Cir. 1985), is also misleading. (AFB-70.) There, a defendant and his co-

conspirators were caught stealing timber, after which the government

retained the timber for over a year, while it declined in value. *Tyler*,

767 F.2d at 1351. Applying law that long predated the MVRA, this

Court held that the conspiracy had not caused the depreciation in value

(just over $3,000) during the period when the government held the

timber instead of selling it. *Id.* at 1351-52. That decision in no way

supports the Warehouse defendants' suggestion that the government

was required to trace its losses to their "storage" of aluminum (AFB-70);

---

[9] *Paroline*, like *Swor*, was a single-defendant case that did not involve a conspiracy, and, in accord with *Gamma Tech*, the Supreme Court noted in *Paroline* that restitution is typically "intended to compensate victims for losses caused by *the offense of conviction*." 572 U.S. at 445 (emphasis added).

it has always been the law that losses need only be connected to the "*offense*," *Tyler*, 767 F.2d at 1351 (emphasis added).[10]

Here, because defendants' conspiracy and customs fraud convictions caused losses to CBP, the district court had discretion to order all defendants jointly liable for restitution. And it fairly exercised that discretion to award joint liability against the criminal entities that have valuable assets from which restitution may be paid.

## I.   The District Court Procedurally and Substantively Erred in Imposing a Restitution Payment Schedule That Requires Only Nominal Payments

### 1.   *Standard of review*

A restitution payment schedule is reviewed for abuse of discretion, but a "district court necessarily abuses its discretion in setting a restitution schedule if it makes a legal error." *United States v. Holden,* 908 F.3d 395, 403 (9th Cir. 2018). A court also abuses its discretion if "the sentence was illogical, implausible, or without support in

---

[10] *Tyler* also does not support defendants' contention that the government could have avoided losses through reliquidation. (AFB-71.) Reliquidation allows the government to reassess duties within 90 days from the date of the original liquidation, which, as the Court of International Trade held, elapsed (long) before defendants' scheme came to light. *Perfectus*, 391 F. Supp. 3d at 1357 n.18.

inferences that may be drawn from the facts in the record." *United States v. Martinez-Lopez*, 864 F.3d 1034, 1043 (9th Cir. 2017) (en banc) (quotation marks omitted).

### 2. The district court procedurally erred by failing to rule on the parties' dispute regarding the Warehouse defendants' assets

After calculating the $1.83 billion restitution amount, the district court was required to determine the manner and schedule in which that amount would be paid. 18 U.S.C. § 3664(f)(2). As part of that determination, the court was required to consider "the financial resources and other assets of the defendant." *Id.*

Analysis of a defendant's assets is critical because the MVRA allows "the enforcement of criminal restitution orders against '*all* property or rights to property.'" *United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007) (en banc) (quoting 18 U.S.C. § 3613(a)). "By its use of the '*all* property or rights to property' language, Congress has made quite clear that the totality of defendants' assets will be subject to restitution orders." *Id.* (citation omitted). That is also why a restitution judgment may be enforced against all of a defendant's assets, *United States v. Berger,* 574 F.3d 1202, 1205 (9th Cir. 2009), and why a

restitution obligation "gives the government a lien 'on all property and rights to property,'" a defendant possesses, *United States v. Lillard*, 57 F.4th 729, 735 (9th Cir. 2023) (quoting 18 U.S.C. § 3613(c)).[11]

Here, the district court did not consider defendants' assets at all. (*See* 1-ER-92-93.)  The court never even commented on—much less evaluated—any defendant's assets, even though the government had not only pointed out that the warehouses were very valuable but had disputed the Probation Office's conservative valuation.  The court's failure to consider the Warehouse defendants' assets ran afoul of 18 U.S.C. § 3664(f)(2)(A).  Faced with a dispute regarding the value of the warehouses and whether they could be applied to defendants' restitution obligation, the district court was required to "set forth an explanation of its reasoning, supported by the record." *United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008).  The MVRA "requires both

---

[11] Though the Warehouse defendants existed exclusively for criminal purposes, no such finding was necessary to permit restitution against the entirety of their assets.  Although a criminal *fine* should be used to divest a "criminal purpose organization" of all its assets, U.S.S.G. § 8C1.1, restitution—which is prioritized over fines, 18 U.S.C. § 3572(b)—is available against the entirety of any defendant's assets, *see Novak*, 476 F.3d at 1046.

that a district court set forth its reasons in resolving a dispute over restitution and that a restitution award, if one issues, be adequately supported by evidence in the record." *United States v. Tsosie*, 639 F.3d 1213, 1222 (9th Cir. 2011). Here, there was neither reasoning nor support for the district court's restitution payment schedule.

The district court's perfunctory approach also violated sentencing procedure generally. The court was required to "rule on the dispute" regarding the Warehouse defendants' assets or "determine that a ruling [was] unnecessary." Fed. R. Crim. P. 32(i)(3)(B); *see United States v. Standard*, 207 F.3d 1136, 1142 (9th Cir. 2000) ("Rule 32 requires that the district court rule on any unresolved objections at the sentencing hearing." (emphasis omitted)).[12] The court violated "this court's mandate of 'strict' compliance" with that rule. *United States v. Doe,* 705 F.3d 1134, 1154 (9th Cir. 2013).

---

[12] If a criminal-purpose finding was necessary, the district court also failed to resolve that dispute.

### 3. *The district court procedurally erred by imposing a payment schedule without holding defendants to their burden at an evidentiary hearing*

The default presumption is that a defendant should pay full restitution immediately. 18 U.S.C. § 3572(d)(1). To overcome that presumption, the defendant bears the "burden to show his inability to pay restitution" by a preponderance of the evidence. *United States v. Nash*, 115 F.3d 1431, 1442 (9th Cir. 1997); 18 U.S.C. § 3664(e). The district court can order installment payments only if it finds "that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments." 18 U.S.C. § 3664(f)(3)(b). However, if the court orders anything other than immediate payment in full, "the length of time over which scheduled payments will be made . . . shall be the shortest time in which full payment can reasonably be made." 18 U.S.C. § 3572(d)(2). And, once again, "a sentencing court *must* consider the defendant's financial resources in setting a restitution payment schedule." *United States v. Inouye*, 821 F.3d 1152, 1156 (9th Cir. 2016).

The district court failed to comply with these requirements. The court did not hold defendants to their burden of demonstrating an inability to pay, *Nash*, 115 F.3d at 1442, and defendants never attempted to satisfy it. None of the Warehouse defendants submitted any evidence as to their net worth or the specifics of their income, aside from informing the Probation Office that they now have tenants renting the warehouses. (*See, e.g.* Presentence Reports 67 ¶ 75.) The government, for its part, provided two independent valuations that both estimated the warehouses to be worth approximately $1 billion. (3-ER-387-402.) Nothing in the record suggests that the district court considered the value of the warehouses before setting a restitution payment schedule requiring only nominal payments.

Moreover, the district court ignored defendants' own repeated request for an evidentiary hearing to determine a potential payment schedule. (3-ER-452, 584-85.) Such a hearing would have afforded defendants an opportunity to carry their burden to show an inability to pay and would have allowed the court to assess the value of the warehouses, as Probation suggested (Presentence Reports 242). A hearing also might have permitted the court to fashion a "reasonable

and periodic payment plan," which was all defendants sought. (3-ER-584-85.) Instead, the district court required "nominal" payments, which are only permissible when no "reasonable schedule of payments" is possible. 18 U.S.C. § 3664(f)(3)(B). That sua sponte selection of an even more lenient sanction was improper. Judges should "not manufacture arguments for [a party]," as the district court did here. *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).

### 4. *The district court clearly erred in finding that the Warehouse defendants could afford only nominal payments*

The district court's procedural errors yielded the clearly erroneous finding that the Warehouse defendants could make only nominal payments. (1-ER-93.) Nothing in the record supported that finding. *See United States v. Van Alstyne*, 584 F.3d 803, 820 (9th Cir. 2009) (district court plainly erred in ordering restitution payment schedule not supported by record). Indeed, the record disproved that finding. Two independent valuations estimated that the warehouses had a combined market value of approximately $1 billion. The Probation Office offered a "very low estimate" of over $161 million based only on tax assessments. (Presentence Reports 67-68, 89, 109-10, 131, 242.)

That was consistent with defendants' own 2014 tax return, which collectively valued the warehouses at just over $162 million. (Presentence Reports 67, 88, 109, 130.) Whatever the correct valuation, there is no question defendants have resources to make "payment of any amount of a restitution order," 18 U.S.C. § 3664(f)(3)(B), and the district court's contrary finding was clear error.

That clearly erroneous finding has dramatic implications. Based on collective restitution payments of $400 a month, it will take the four Warehouse defendants over 375,000 years to pay the full amount of restitution. That cannot possibly be "the shortest time in which full payment can reasonably be made," 18 U.S.C. § 3572(d)(2), and it effectively permits the Warehouse defendants to escape all punishment for their crimes. That unfair result requires vacatur of the restitution payment schedule.

# VI

# CONCLUSION

Defendants' convictions and restitution amount should be affirmed, but the district court's restitution payment schedule should be vacated and remanded.

DATED: August 4, 2023

Respectfully submitted,

E. Martin Estrada
United States Attorney

Mack E. Jenkins
Assistant United States Attorney
Chief, Criminal Division

Bram M. Alden
Assistant United States Attorney
Chief, Criminal Appeals Section

*/s/ Roger A. Hsieh*

Roger A. Hsieh
Assistant United States Attorney
Major Frauds Section

Patrick R. Fitzgerald
Assistant United States Attorney
Senior Trial Attorney, Criminal
Appeals Section

Attorneys for Plaintiff-Appellee/
Cross-Appellant
United States of America

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is unaware of any cases related to this appeal.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | Nos. 22-50080, 22-50081, 22-50082, 22-50103

I am the attorney or self-represented party.

**This brief contains** | 19,546 | **words,** including | 19,546 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

⦿ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Patrick R. Fitzgerald | **Date** | 8-4-23

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*