Case Nos.22-50080, 22-50081, 22-50082, and 22-50103

# United States Court of Appeals
# for the Ninth Circuit

UNITED STATES OF AMERICA,
*Plaintiff/Appellee/Cross-Appellant*,

v.

SCUDERIA DEVELOPMENT, LLC, 1001 DOUBLEDAY, LLC, VON-KARMAN - MAIN STREET, LLC, 10681 PRODUCTION AVENUE, LLC,
*Defendants/Appellants/Cross-Appellees,* and

PERFECTUS ALUMINIUM, INC., and PERFECTUS ALUMINUM ACQUISITIONS, LLC
*Defendants/Appellants*.

From The United States Court,
Central District of California,
Case No. 2:19-cr-00282-RGK (5) (6) (7) (8) (9) (10),
Honorable R. Gary Klausner

## APPELLANTS' CONSOLIDATED REPLY AND ANSWERING BRIEF

**LARSON LLP**
Stephen G. Larson
*slarson@larsonllp.com*
Hilary Potashner
*hpotashner@larsonllp.com*
A. Alexander Lowder
*alowder@larsonllp.com*
555 South Flower Street
30th Floor
Los Angeles, California 90071
Telephone: (213) 436-4888
Facsimile: (213) 623-2000

**LARSON LLP**
Robert F. Ruyak
*rruyak@larsonllp.com*
900 17th Street NW, Suite 320
Washington, DC 20006
Telephone: (202) 795-4900
Facsimile: (202) 795-4888

*Attorneys for Defendants/Appellants/Cross-Appellees SCUDERIA DEVELOPMENT, LLC, 1001 DOUBLEDAY, LLC, VON-KARMAN-MAINSTREET, LLC and 10681 PRODUCTION AVENUE, LLC and Defendants and Appellants PERFECTUS ALUMINIUM, INC. and PERFECTUS ALUMINUM ACQUISITIONS, LLC*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................iii

INTRODUCTION ........................................................................1

ARGUMENT ..............................................................................7

I.     THE COURT'S VOIR DIRE DEPRIVED APPELLANTS OF A FAIR TRIAL BECAUSE IT REFUSED TO ASK QUESTIONS ON ASIAN AND CHINESE BIAS ....................................................7

II.    THE DISTRICT COURT'S JURY INSTRUCTIONS WERE PREJUDICIALLY ERRONEOUS ............................................14

    A.    Appellants Were Entitled To An Entrapment-By-Estoppel Defense Instruction.............................................................14

    B.    The Warehouse Appellants Were Entitled To A Mere-Presence Instruction.............................................................17

        1.    This Argument is Reviewed *De Novo* ......................17

        2.    The Mere-Presence Instruction Was Warranted......................18

    C.    The Instruction Containing The 2017 Scope Order Was Misleading .................................................................19

III.    THE INDICTMENT FAILED TO ADEQUATELY CHARGE CUSTOMS FRAUD............................................................22

IV.    THE INDICTMENT FAILED TO ADEQUATELY CHARGE WIRE FRAUD.......................................................................24

V.    THE GOVERNMENT FAILED TO SHOW THE HEARSAY WAS ADMISSIBLE ............................................................27

    A.    The Hearsay Evidence Was Inadmissible Under The Co-Conspirator Exception.........................................................29

    B.    The Hearsay Evidence Was Inadmissible Under The Business Records Exception.........................................................31

    C.    The Government's Reliance On The Agency Exception Is Misplaced .................................................................34

VI.    THE CUSTOMS AND WIRE FRAUD CHARGES WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE............................................37

    A.    There Was Insufficient Evidence Of Customs Fraud ........................37

B.     There Was Insufficient Evidence Proving Wire Fraud ....................... 39

C.     There Was Insufficient Evidence Proving Conspiracy ...................... 42

D.     The Money Laundering Convictions Must Be Set Aside .................. 44

VII.    THE GOVERNMENT'S PROOF AT TRIAL CONSTITUTED A FATAL VARIANCE AND A CONSTRUCTIVE AMENDMENT ........... 46

A.     Appellants Did Not Waive The Variance And Constructive Amendment Arguments ...................................................... 46

B.     The Government's Evidence Offered At Trial Constituted A Constructive Amendment And A Fatal Variance ............................... 47

VIII.  THE DISTRICT COURT DID NOT ERR IN SETTING A RESTITUTION PAYMENT SCHEDULE .................................................... 48

IX.    THE RESTITUTION ORDER WAS CONSTITUTIONALLY IMPROPER ......................................................................................... 53

A.     The MVRA Does Not Authorize Restitution Because The Government Did Not Suffer Any Property Loss ............................... 53

B.     The Restitution Order Is Based On Erroneous Findings Of Fact ....... 56

C.     The District Court Abused Its Discretion In Making The Warehouse Defendants Equally Liable For The Restitution Amount ................................................................................... 58

CONCLUSION .......................................................................................... 60

CERTIFICATE OF COMPLIANCE ........................................................ 62

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Cast Iron Pipe Co. v. United States*,
    399 F. Supp. 3d 1362 (Ct. Int'l Trade 2019) .......................................................15

*Bascunan v. Elsaca*,
    927 F.3d 108 (2d Cir. 2019) ................................................................................24

*Beecham v. Roseville City Sch. Dist.*,
    No. 215CV01022KJMEFB, 2018 WL 7051157
    (E.D. Cal. Sept. 24, 2018) ..................................................................................37

*Berger v. United States*,
    295 U.S. 78 (1935)..............................................................................................11

*Cambra v. Chevron Int'l Expl. & Prod.*,
    318 F. App'x 488 (9th Cir. 2008) ......................................................................33

*Cambridge Elecs. Corp. v. MGA Elecs., Inc.*,
    227 F.R.D. 313 (C.D. Cal. 2004)........................................................................37

*Griffin v. United States*,
    502 U.S. 46 (1991)....................................................................................39, 45, 47

*Guangdong Wireking Housewares & Hardware Co. v. United States*,
    745 F.3d 1194 (Fed. Cir. 2014) .........................................................................20

*Kaiser v. Lockyer*,
    2003 WL 21667153 (N.D. Cal. July 14, 2003) .................................................21

*Kerr v. U.S. Dist. Court for N. Dist. Of California*,
    426 U.S. 394 (1976)............................................................................................17

*Mays v. United Ass'n Loc. 290 Apprenticeship & Journeymen
    Training Tr. Fund*,
    407 F. Supp. 3d 1121 (D. Or. 2019) ............................................................33, 34

*Monotype Corp. v. Int'l Typeface Corp.*,
    43 F.3d 443 (9th Cir. 1994) ...............................................................................33

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010) ........................................................ 24

*Musacchio v. United States*,
    577 U.S. 237 (2016) ........................................................ 39

*Nestle USA, Inc. v. Doe*,
    141 S. Ct. 1931 (2021) .................................................... 25

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) .................................................. 55, 56

*Pena-Rodriguez v. Colorado*,
    580 U.S. 206 (2017) ........................................................ 10

*Perfectus Aluminum, Inc. v. United States*,
    391 F. Supp. 3d 1341 (Ct. Int'l Trade 2019),
    *aff'd*, 836 F. App'x 883 (Fed. Cir. 2020) ................ 16, 55, 56

*Ristaino v. Ross*,
    424 U.S. 589 (1976) .......................................................... 9

*Rosales-Lopez v. United States*,
    451 U.S. 182 (1981) .......................................................... 9

*Sacramento Suburban Fruit Lands Co. v. Miller*,
    36 F.2d 922 (9th Cir. 1929) ............................................. 28

*Sea-Land Serv., Inc. v. Lozen Int'l, LLC*,
    295 F.3d 808 (9th Cir. 2002) ........................................... 36

*United States v. Adamson*,
    291 F.3d 606 (9th Cir. 2002) ........................................... 47

*United States v. Aegis Sec., Inc.*,
    422 F. Supp. 3d 1328 (C.I.T. 2019) ................................. 55

*United States v. Anekwu*,
    695 F.3d 967 (9th Cir. 2012) ............................................. 9

*United States v. Anzalone*,
    886 F.2d 229 (9th Cir. 1989) ................................. 13, 19, 29

iv

*United States v. Basurto*,
  497 F.2d 781 (9th Cir. 1974) ..................................................42

*United States v. Blinkinsop*,
  606 F.3d 1110 (9th Cir. 2010) ................................................51

*United States v. Blosvern*,
  514 F.2d 387 (9th Cir. 1975) ..................................................11

*United States v. Boggus*,
  411 F.2d 110 (9th Cir. 1969) ..................................................22

*United States v. Bonds*,
  2009 WL 416445 (N.D. Cal. Feb. 19, 2009),
  *aff'd* 608 F.3d 495 (9th Cir. 2010) ....................................32, 33

*United States v. Cazares*,
  788 F.3d 956 (9th Cir. 2015) ..................................................13

*United States v. Chi Mak*,
  683 F.3d 1126 (9th Cir. 2012) ................................................18

*United States v. Choy*,
  309 F.3d 602 (9th Cir. 2002) ..................................................47

*United States v. Dakota*,
  197 F.3d 821 (6th Cir. 1999) ............................................32, 34

*United States v. Davis*,
  597 F.2d 1237 (9th Cir. 1979) ................................................23

*United States v. Denny*,
  939 F.2d 1449 (10th Cir. 1991) ..............................................21

*United States v. Dipentino*,
  242 F.3d 1090 (9th Cir. 2001) ................................................46

*United States v. Escobar de Bright*,
  742 F.2d 1196 (9th Cir. 1984) ................................................14

*United States v. Eshkol*,
  108 F.3d 1025 (9th Cir. 1997) ................................................17

*United States v. Fix*,
   4 F. App'x 324 (9th Cir. 2001) ...........................................................50

*United States v. Frega*,
   179 F.3d 793 (9th Cir. 1999) .............................................................20

*United States v. Fuchs*,
   218 F.3d 957 (9th Cir. 2000) .............................................................44

*United States v. Galecki*,
   No. 20-10288, 2023 WL 8903137 (9th Cir. Dec. 27, 2023) .................42, 45, 60

*United States v. Gamma Tech Indus., Inc.*,
   265 F.3d 917 (9th Cir. 2001) .............................................................57

*United States v. Gomez*,
   No. 19-50313, 2021 WL 3204461 (9th Cir. July 28, 2021) ...............................11

*United States v. Gonzalez*,
   906 F.3d 784 (9th Cir. 2018) .............................................................45

*United States v. Gurolla*,
   333 F.3d 944 (9th Cir. 2003) .............................................................17

*United States v. Hall*,
   559 F.2d 1160 (9th Cir. 1977) ...........................................................23

*United States v. Hofus*,
   598 F.3d 1171 (9th Cir. 2010) ...........................................................18

*United States v. Holmes*,
   2020 WL 666563 (N.D. Cal. Feb. 11, 2020) .....................................40

*United States v. Hugs*,
   384 F.3d 762 (9th Cir. 2004) .............................................................46

*United States v. Hussain*,
   972 F.3d 1138 (9th Cir. 2020) ...........................................................24

*United States v. Inouye*,
   821 F.3d 1152 (9th Cir. 2016), *as amended* (May 31, 2016) ...........................50

vi

*United States v. Johnson*,
   459 F.3d 990 (9th Cir. 2006) ................................................................. 14

*United States v. Jones*,
   722 F.2d 528 (9th Cir. 1983) ................................................................... 9

*United States v. Kayser*,
   488 F.3d 1070 (9th Cir. 2007) ............................................................... 16

*United States v. Liquidators of Eur. Fed. Credit Bank*,
   630 F.3d 1139 (9th Cir. 2011) ............................................................... 55

*United States v. Luis*,
   765 F.3d 1061 (9th Cir. 2014) ............................................................... 54

*United States v. McLellan*,
   959 F.3d 442 (1st Cir. 2020) ................................................................. 24

*United States v. Meyer*,
   432 F.2d 1000 (9th Cir. 1970) ............................................................... 43

*United States v. Molina*,
   443 F.3d 824 (11th Cir. 2006) ............................................................... 18

*United States v. Nash*,
   115 F.3d 1431 (9th Cir. 1997) ............................................................... 52

*United States v. Nevils*,
   598 F.3d 1158 (9th Cir. 2010) ............................................................... 41

*United States v. Novak*,
   476 F.3d 1041 (9th Cir. 2007) ............................................................... 53

*United States v. Ordonez*,
   737 F.2d 793 (9th Cir. 1983) ................................................................. 32

*United States v. Philip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) ............................................................. 41

*United States v. Robinson*,
   147 F.3d 851 (9th Cir. 1998) ................................................................. 22

*United States v. Schurman*,
   634 F. Supp. 3d 704 (N.D. Cal. 2022) ...............................................53

*United States v. Silverman*,
   861 F.2d 571 (9th Cir. 1988) ......................................................29, 31

*United States v. Snow*,
   521 F.2d 730 (9th Cir. 1975) ..............................................................29

*United States v. Thomas*,
   612 F.3d 233 (6th Cir. 1979) ..............................................................19

*United States v. Thomsen*,
   830 F.3d 1049 (9th Cir. 2016) ............................................................58

*United States v. Vandewater Int'l Inc.*,
   2020 WL 4372115 (C.D. Cal. June 23, 2023) ...................................55

*United States v. Visman*,
   919 F.2d 1390 (9th Cir. 1990) ............................................................50

*United States v. Wilbur*,
   674 F.3d 1160 (9th Cir. 2012) ............................................................47

*United States v. Williams*,
   41 F.3d 496 (9th Cir. 1994) ..........................................................51, 59

*United States v. Woods*,
   335 F.3d 993 (9th Cir. 2003) ..............................................................40

*Walgreen Co. v. United States*,
   620 F.3d 1350 (Fed. Cir. 2010) ..........................................................21

*Weil v. Citizens Telecom Servs. Co., LLC*,
   922 F.3d 993 (9th Cir. 2019) ........................................................35, 36

**Federal Statutes**

18 U.S.C.A.
    § 3664(f)(3)........................................................................................49

18 U.S.C.
    § 545..................................................................22, 23, 37, 56
    § 3663A(c)(1)....................................................................53
    § 3664(f)(2)........................................................................50
    § 3664(h)............................................................................58

P.L. 117-13, May 20, 2021, 135 Stat. 265 ........................................8, 10

U.S.S.G. 8C1.1 ..............................................................................51

**Other Authorities**

Fed. R. Crim. P. 12.1-12.3 ...........................................................17

Fed. R. Crim. P. 32(i)(3)(A) .........................................................50

Fed. R. Crim. P. 52(b)....................................................................46

Fed. Rules Evid. 801(d)(2)............................................................36

Fed. Rules Evid. 801(d)(2)(D) ...............................................34, 36

## <u>INTRODUCTION</u>

The Government's Brief ("GB") is filled with bombastic language that does nothing to hide its unsupported arguments. Throughout its brief, the government misrepresents the record, ignores key evidence, and relies on inapposite cases.

At the outset, the government wrongly asserts that Appellants waived many of their key contested issues:

- Appellants did not waive their voir dire argument. They expressly requested that the district court ask questions intended to root out anti-Asian and Chinese bias while the COVID-19 pandemic was raging through the country during voir dire, and objected to the court's refusal to do so, only to be interrupted and overruled by the court at sidebar (*infra*, at 10-11);

- Appellants did not waive their mere-presence instruction argument. They submitted this instruction *in camera*, as they were constitutionally entitled to do (*infra*, at 17-18);

- Appellants did not waive their hearsay arguments. They consistently raised hearsay objections in pretrial filings, in numerous continuing objections throughout trial, and in a motion to strike inadmissible hearsay filed after the government rested its case (*infra*, at 26-29); and

- Appellants did not waive their constructive amendment and variance arguments. Those arguments were appropriately preserved through Appellants' Rule 33 motion (*infra*, at 45-46).

Remarkably, after a litany of false waiver accusations, the government then advances a single argument on cross-appeal—that it was entitled to an evidentiary hearing on restitution—which the government *expressly waived* at sentencing: "We don't believe a restitution hearing is needed for the Customs fraud counts." 1-ER-81:12-14.

1

The substance of the government's arguments fares no better. First, this case must be reversed for the district court's failure and refusal to properly voir dire the jury to secure a fundamentally fair trial. The government ignores the rampant anti-Asian discrimination running through the nation during this trial. This discrimination, tied to rumors surrounding the COVID-19 pandemic's origin, was so widespread that Congress enacted legislation to combat the issue. Many in the United States, including influential political leaders, publicly characterized this scourge as the "Chinese Virus" in asserting blame and culpability. Nearly every person living in the United States knew someone who was severely ill or died from COVID-19, including, in many cases, close family members. Undeniably, anti-Chinese hatred was running rampant, causing many xenophobic episodes resulting in physical violence against Asian-Americans.

It was therefore necessary to ensure that the jury members' personal biases as a result of the pandemic did not bleed into their decisions during deliberations. Appellants' requested questions were clearly intended to solicit from the venire any anti-Chinese bias that may exist, which was no immaterial inquiry. It was mandatory under the trial's unique circumstances—being conducted during the onslaught of the COVID-19 pandemic—and the indisputable emotions surrounding it. So substantial was the potential bias that the district court had a duty to perform such inquiry "sua sponte"; yet, not only did it fail to do so, but it rejected

Appellants' written and oral requests for this critical line of questioning.

There is no reasonable explanation for such a failure. Appellants were deprived of their fundamental right to a fair trial by an unbiased jury—our justice system's very foundation. The district court's outright refusal to address this threshold issue of fairness rendered the result in this trial unconscionably flawed. To refuse to attempt to uncover such biases among the venire under these circumstances was reversible error.

Making matters even worse, the government exploited that same anti-Asian sentiment in its trial presentation. Left without any legitimate response in defense of its own conduct in trial, the government now resorts to revisionist history. According to the government, Appellants sought voir dire bias questions solely based on "[t]he fact that anti-Chinese bias exists in the world or was exacerbated by the pandemic." GB 46. The government blithely attempts to recast the COVID-19 pandemic—an unprecedented global phenomenon spawning a historic spike in anti-Asian hate crimes—as nothing more than a blip on the historical radar.

Second, all convictions associated with an intent to criminally violate the AD/CVD Orders and customs laws must be reversed for multiple reasons. Indisputably, the government failed to prove that Appellants imported temporarily welded "aluminum extrusions in the form of pallets," let alone with a criminal intent to evade the AD/CVD Orders by later disassembling those pallets and

selling their parts as extrusions in the United States. There was not a shred of evidence that any of the pallets were—or could be—disassembled and sold as extrusions. In fact, the government admitted here on appeal that its only proof at trial is that Appellants imported these pallets with the intent to use them as feed stock—scrap or raw material—and melt them down in the United States for the manufacture of other aluminum products. GB 78.

Such evidence cannot serve as proof of a criminal intent to evade customs laws. It was neither illegal nor a violation of the AD/CVD Orders to import aluminum in any form as feed stock. And, the importation of aluminum as scrap or raw material bore no import duty whatsoever at the time the pallets were imported. Since the criminal violation of customs laws is a specific intent crime, and such intent is an essential element of the claimed offense, no violation has or could occur under the government's own admitted proof at trial. The government's admission is, de facto, an admission of its failure of proof. On this basis alone, the convictions must be reversed.

Third, the government has no meaningful response regarding the jury instructions the district court wrongly rejected. All the customs law-related convictions must be reversed because the court erroneously instructed, and refused to provide additional necessary jury instructions, on critical elements pertaining to the alleged customs law violations. The 2017 Scope Order instruction omitted the

4

date of that order and ignored that the 2017 Scope Order was an *advisory opinion*—not actual law—interpreting the 2011 AD/CVD Orders. The jury instruction consequentially implied an improper retroactive effect on the importations at issue here, even though they occurred years before the 2017 Scope Order was handed down. The government improperly seized on this to falsely establish a critical element of its convictions—Appellants' purported knowledge of the breadth and scope of the AD/CVD Orders at the time of the importations.

Similarly, the district court's failure to provide the requested entrapment-by-estoppel defense instruction requires reversal. The uncontested evidence at trial is that CBP agents, who presented themselves as federal agents, physically inspected selected shipments and approved all the pallet shipments at issue without ever assessing duties under the 2011 AD/CVD Orders. The government even conducted a post-importation reinspection of the pallets and verified in writing that they were not subject to the AD/CVD Orders, providing further circumstantial evidence that it was reasonable for Appellants to believe the pallets were not subject to the AD/CVD Orders at the time of importation. Indeed, the government first definitively took the position that the pallets were subject to the AD/CVD Orders in the 2017 Scope Order—a ruling that spawned years of litigation and two nuanced federal judicial opinions grappling with how to interpret the AD/CVD Orders. Simply put, the AD/CVD Orders were anything but clear, and the

government's conduct lulled Appellants into a sense of security that the pallets were not subject to the AD/CVD Orders. On these basic facts, the entrapment-by-estoppel defense instruction was mandatory.

The district court's failure to give a requested mere-presence instruction also requires reversal of the Warehouse Appellants' convictions. The government ignores significant evidence justifying the mere-presence instruction. Mere presence is a viable defense when a defendant's only connection to an offense is the act of storing goods. There was no evidence at trial that any Warehouse Appellant was present for the actual importations or passed false papers through a customshouse. Therefore, the district court erred by denying the mere-presence instruction.

Fourth, even before trial, the government's case was deficient, as the Indictment failed to adequately charge wire fraud and customs fraud. As to wire fraud, the government desperately clings to a few, scattered payments to save an alleged scheme that impermissibly reached far beyond this country's shores. As to customs fraud, the government improperly alleged a violation of customs laws based on importation of material that the government agrees was essentially scrap metal, a product that does not trigger any duties or violate any customs laws.

Throughout the trial, the jury's verdict was tainted by the veritable mountain of inadmissible hearsay evidence relied upon by the government in proving its

case. The government failed to prove a conspiracy to allow evidence of coconspirator statements and also failed to prove the minimal requirements for the business records and agency exceptions to the hearsay rule. At the conclusion of trial, the government had not proved its case as to wire fraud, customs fraud, or conspiracy.

Finally, the restitution order was legally erroneous because it was based on the presumption that the scrap metal was subject to duties, when it was not.

Accordingly, for the myriad reasons delineated in Appellants' First Brief on Cross Appeal, and contained herein, this Court should grant Appellants' requested relief, and deny the government's new request for an evidentiary hearing.

## **ARGUMENT**

## I. **THE COURT'S VOIR DIRE DEPRIVED APPELLANTS OF A FAIR TRIAL BECAUSE IT REFUSED TO ASK QUESTIONS ON ASIAN AND CHINESE BIAS**

The trial in this case took place against a backdrop of historic anti-Chinese sentiment, fueled by many Americans' belief that the "coronavirus leaked from a laboratory in China"[1] and that China was "a competitor or enemy."[2] The specter of COVID-19, and the hateful anti-Asian rhetoric spreading along with the virus, were inescapable. A mere three months before trial began in this case, Congress

---

[1] *See* Request for Judicial Notice ("RJN") Ex. 1.

[2] *See* RJN Ex. 2.

passed the COVID-19 Hate Crimes Act, lamenting that "[f]ollowing the spread of COVID-19 in 2020, there has been a dramatic increase in hate crimes and violence against Asian-Americans." P.L. 117-13, May 20, 2021, 135 Stat. 265. Indeed, the district court acknowledged "the COVID problem that we have right now." 10-ER-2509:25-2510:1.

Given the unprecedented rise in anti-Chinese rhetoric and hate crimes, Appellants submitted numerous voir dire questions designed to root out anti-Chinese bias among the venire because the lead defendant in this case—a Chinese national—was the controlling owner of one of the largest companies in China, and the government's case would feature Chinese alleged co-conspirators, cooperators, and witnesses.[3] For instance, Appellants proposed that the district court ask: "Do you believe that the Chinese government is responsible for the Covid-19 pandemic or otherwise blame China for the Covid-19 pandemic?" and "Do you blame China and/or its citizens for the lockdowns that took place in response to the Covid-19 pandemic?" 5-ER-995:4-8.[4]

---

[3] The district court explained that it would "conduct[] the entire voir dire itself" and would "incorporate any questions that [the parties] have asked … to the extent [the court] feel[s] it is appropriate." 7-ER-1399:3-6.

[4] Additional questions that were requested include: "Are there any stereotypes you have heard about people of Chinese descent that you believe are correct or have a grain of truth to them?"; "Do you believe that Chinese people are more likely to commit crimes?"; "Do you have strong feelings about immigration and/or

The district court, which has a duty to stand as a bulwark against trials infused with racial animus, declined to ask any specific questions aimed at eliminating racial bias, failing in its "obligation to impanel an impartial jury." *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981). Where, as here, a case carries racial overtones creating "a real possibility of prejudice," the district court must ask "specific voir dire question[s]" to ferret out any racial or ethnic prejudice. *United States v. Jones*, 722 F.2d 528, 529 (9th Cir. 1983). Voir dire regarding racial prejudice is constitutionally required where the circumstances of a case "suggest a significant likelihood that racial prejudice might infect [the defendant's] trial." *Ristaino v. Ross,* 424 U.S. 589, 598 (1976); *United States v. Anekwu*, 695 F.3d 967, 978 (9th Cir. 2012) (trial courts have a "constitutional obligation to inquire into racial or ethnic prejudice" when "racial or ethnic issues are inextricably bound up with the conduct of the trial").

There is no question that this trial carried racial overtones and suggested a significant likelihood that racial prejudice might infect the jury. The shadow cast by COVID-19, and the insidious, xenophobic impulses it unleashed, permeated the entire country. The trial involved Chinese-Americans, Chinese nationals, and Chinese companies importing products into the United States to allegedly undercut

---

immigrants from China?"; and "Do you believe that China poses a threat to the United States?" 5-ER 997:22-26, 998:3-4, 998:6-7.

the American aluminum industry. The government's response to the question of bias is absurd. According to the government, "The fact that anti-Chinese bias exists in the world or was exacerbated by the pandemic does not mean that every trial involving China or Chinese nationals necessitated supplementary voir dire." GB 46. The government's revisionist history asserts that the COVID-19 era involved nothing more than a few isolated incidents of anti-Asian hate. Not so. The COVID-19 pandemic presented one of the most challenging—and dangerous—times for Asians and Asian-Americans in this country's history. The situation was so grave that Congress passed the COVID-19 Hate Crimes Act, decrying the "*dramatic increase in hate crimes and violence against Asian-Americans*." P.L. 117-13, May 20, 2021, 135 Stat. 265 (emphasis added).[5]

The government also incorrectly argues that Appellants waived their voir dire argument by failing to object. When the district court concluded its initial voir dire questioning, Appellants objected and attempted to point out that "there were a number of [voir dire] questions that [Appellants] requested." 7-ER-1462:4-6. Before Appellants could finish, the court interjected and stated, "I covered them if

---

[5] The government's suggestion that the district court's general bias voir dire questions were sufficient in this case flies in the face of existing law. Such generic questions are not sufficient to ensure a fair trial because they "may not expose specific attitudes or biases that can poison jury deliberations." *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 224 (2017).

appropriate." 7-ER-1462:7-8. The government faults Appellants for not pressing the issue further and explaining specifically which voir dire questions they wanted the court to ask. However, the government is well aware that the court made clear it would not allow argument on objections.[6] Regardless, the proposed voir dire questions aimed at anti-Chinese prejudice were obvious on their face and needed no further explanation.[7]

Compounding matters further, the government, which has a duty to protect the fundamental fairness of judicial proceedings, not only refused to join Appellants' request for specific questions probing into racial bias, but also exploited anti-Chinese sentiment throughout trial. "[W]hile [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty *to refrain from improper methods calculated to produce a wrongful conviction* as it is to use every legitimate means to bring about a just one." *Berger v. United States*,

---

[6] "When you make the objection, you state what it is, like hearsay or whatever it is, but we don't argue.… I'll make a call on it.… But we will proceed.… We do not come to the bench to argue anything. If I will make the call on it and it's wrong or you think that some explanation has to be made, we all make mistakes. Even me. We all make mistakes." 7-ER-1402:8-22.

[7] The government's two waiver cases are inapposite. In *United States v. Blosvern*, "[counsel] never asked the judge to put any of the questions on his list that the judge left out." 514 F.2d 387, 389 (9th Cir. 1975). In *United States v. Gomez*, the "proposed questions were not 'reasonably calculated to discover an actual and likely source of prejudice.'" No. 19-50313, 2021 WL 3204461, at *1 (9th Cir. July 28, 2021).

295 U.S. 78, 88 (1935) (emphasis added). In its trial presentation and demonstrative slides, the government trotted out a series of racist Chinese tropes seemingly calculated to incite the jury. Repeatedly during trial, the government described Zhongtian Liu as an "emperor" who was treated like "royalty" and would travel with "an entourage." *See, e.g.*, 7-ER-1513:2-3, 1626:9-10; 8-ER-1697:18, 23-24; 12-ER-3020:10-14. The government bookended the trial with demonstrative slides depicting China—color-blocked in bright red and emblazoned with the PRC flag design—physically opposite from the United States—depicted in white and guarded with a protective barrier:



2-ER-220.



2-ER-225.

Even if this Court finds that Appellants waived their voir dire argument—they did not—plain error requires reversal. Reversal is mandated under the plain error standard "when it is necessary to prevent a clear miscarriage of justice or to preserve the integrity of the judicial process." *United States v. Anzalone*, 886 F.2d 229, 234 (9th Cir. 1989). The district court here committed plain error in refusing to ask any questions intended to root out ethnic, racial, or political bias against China, and the government aggravated the issue by stoking fear and animosity against China throughout the trial. Appellants were denied the opportunity to exercise their "right to be tried by a jury free from ethnic, racial, or political prejudice," warranting reversal. *United States v. Cazares*, 788 F.3d 956, 968 (9th

13

Cir. 2015).

## II.   THE DISTRICT COURT'S JURY INSTRUCTIONS WERE PREJUDICIALLY ERRONEOUS

Failure to give a required jury instruction is structural error requiring automatic reversal. *United States v. Escobar de Bright*, 742 F.2d 1196, 1998 (9th Cir. 1984) (when a party meets the purposefully low evidentiary threshold to support a jury instruction, "[t]he right to have the jury instructed as to the defendant's theory of the case is one of those rights 'so basic to a fair trial' that failure to instruct … can *never* be considered harmless error"). A criminal defendant has a constitutional right to have the jury instructed according to his theory if he shows that "there is evidence upon which the jury could rationally find for the defendants." *United States v. Johnson*, 459 F.3d 990, 993 (9th Cir. 2006) (quoting *United States v. Morton*, 999 F.2d 435, 437 (9th Cir. 1993)).

### A.   Appellants Were Entitled To An Entrapment-By-Estoppel Defense Instruction

The government attacks each prong of Appellants' entrapment-by-estoppel argument, and is wrong as to each prong.

First, the government argues that "[n]o federal official ... told defendants that their pallets were outside the scope of the AD/CVD Orders" and that "no regulation ... permitted defendants' [importations]." GB 52, 54. This argument lacks merit. The Department of Commerce ("DOC"), *which is a federal agency*,

issued a 2010 preliminary ruling "exclud[ing] finished merchandise" from the

scope of the AD/CVD Orders. 19-ER-4969-5002. The DOC re-affirmed the

finished merchandise exception in the 2011 AD/CVD Orders. 17-ER-4513.

Moreover, CBP agents presented themselves to Appellants as federal agents with

authority on customs duties, and Appellants relied on those agents' representations

that the pallets were not subject to the duties. 10-ER-2364:22-2365:13; 11-ER

2602:8-2607:12, 2623:5-2624:10; 2659:4-18:14; *see, e.g.*, *Am. Cast Iron Pipe Co.*

*v. United States*, 399 F. Supp. 3d 1362, 1366-67 (Ct. Int'l Trade 2019) (CBP acts at

the direct instruction of the DOC in assessing and enforcing customs duties and

acts as the DOC's authorized agent to determine whether an imported item is

subject to those duties).

Next, the government maintains that Appellants did not actually rely on the

DOC's 2010 preliminary ruling and 2011 AD/CVD Orders. This argument ignores

the evidence presented at trial, which established that Appellants stopped

importing aluminum extrusions and began importing aluminum pallets in 2011

because of the law governing "taxation of aluminum [extrusions]." 8-ER-1844:13-

1845:1. The government argues that Eric Shen testified he did not believe the

pallets were finished merchandise (GB 52), but this counter-evidence does not

negate the availability of the entrapment-by-estoppel instruction. This Court has

"repeatedly stated that the defendant is entitled to [its] proposed instruction even if

[its] evidence is *weak, insufficient, inconsistent, or of doubtful credibility*" as long as a jury "could rationally sustain the defense." *United States v. Kayser*, 488 F.3d 1070, 1076 (9th Cir. 2007) (emphasis added).

Finally, the government contends that it was unreasonable for Appellants to believe that the pallets fell outside the 2011 AD/CVD Orders because those Orders "clearly" established that Appellants' pallets were not finished merchandise. But the language of the Orders and the complicated procedural history of the legal matters associated with these importations belie that argument. For instance, it was not until 2017 that the DOC first issued a scope ruling retroactively determining that the aluminum pallets were subject to the 2011 AD/CVD Orders. The DOC reached this conclusion by interpreting the exemption to require that "finished merchandise" must include non-extruded aluminum parts—an interpretation that was anything but clear on the face of the AD/CVD Orders. 17-ER-4521.

Moreover, multiple rounds of briefing were required for the Court of International Trade and the Federal Circuit to each issue a substantive, nuanced opinion on the question of whether the aluminum pallets qualified as finished merchandise. *See Perfectus Aluminum, Inc. v. United States*, 391 F. Supp. 3d 1341, 1357 (Ct. Int'l Trade 2019), *aff'd*, 836 F. App'x 883 (Fed. Cir. 2020). To argue, then, that the AD/CVD Orders were clear or that "Commerce and the Court of International Trade had no difficulty" grappling with how to interpret the AD/CVD

16

Orders is nonsense. GB 54.

**B.** **The Warehouse Appellants Were Entitled To A Mere-Presence Instruction**

1. This Argument is Reviewed *De Novo*

The government contends that Appellants waived the mere-presence instruction argument by failing to provide a copy of the instruction to the government. Not so. Appellants filed the mere-presence instruction *in camera* with the court, as they were entitled to do. The Supreme Court has long held that *in camera* review is an appropriate and useful means of dealing with arguably privileged and confidential information. *Kerr v. U.S. Dist. Court for N. Dist. Of California*, 426 U.S. 394, 406 (1976). Likewise, the Ninth Circuit has recognized that documents reflecting the nature of a defense may be, and sometimes should be, filed *in camera*. *See, e.g.*, *United States v. Gurolla*, 333 F.3d 944, 951-53 & n.11 (9th Cir. 2003) (denying the government's motion to unseal on appeal submission regarding entrapment defense that defendant filed *in camera* in district court); *United States v. Eshkol*, 108 F.3d 1025, 1028 (9th Cir. 1997) (suggesting that defense counsel should have made *in camera* proffer to prevent the government from learning defense theory). The only defenses that require advance notice to the government are: alibi, insanity, and public authority—mere presence is not among these. Fed. R. Crim. P. 12.1-12.3.

The government's authority supporting a waiver, *United States v. Hofus*, 598 F.3d 1171, 1175 (9th Cir. 2010) (GB 55-56), is inapposite. In *Hofus*, this Court reviewed the defendant's proposed unanimity instruction argument under a plain error standard because, *inter alia*, the defendant "*did not* specifically request a unanimity instruction below[.]" 598 F.3d at 1175 (emphasis added). In contrast, here, the Warehouse Appellants *did* specifically request a mere-presence instruction. 20-ER-5144. Accordingly, Appellants' argument is appropriately reviewed *de novo* by this Court. *See United States v. Chi Mak*, 683 F.3d 1126, 1133 (9th Cir. 2012).

### 2. The Mere-Presence Instruction Was Warranted

The government argues that a mere-presence instruction was not appropriate here because Appellants "created and used [the warehouses] to facilitate the illegal importation and stockpiling of aluminum extrusions in the form of pallets." GB 56. But the evidence at trial proved otherwise. Mere presence is a viable defense when a defendant's only connection to an offense is the act of storing goods. *See United States v. Molina*, 443 F.3d 824, 827 (11th Cir. 2006). There was no evidence that any of the Warehouse Appellants was present for the actual importations or passed false papers through a customshouse. At best, the evidence showed only that the warehouses were used for the purpose of storing pallets, which are neither contraband nor prohibited from entry into the United States. AOB 69-70. Further,

all of the Warehouse Appellants were formed before Shen purportedly gave Liu the idea to import finished goods in *late 2010*. *See* 9-ER-2184:16-21, 2190:1-4, 2193:19-2195:7, 2216:21-2217:11.[8]

Thus, a mere-presence instruction was required here because there was direct evidence supporting this defense and the instruction was supported by law. Moreover, because no other jury instruction adequately covered the defense theory of mere presence, reversal is *required. See United States v. Thomas*, 612 F.3d 233, 234 (6th Cir. 1979). Even assuming Appellants waived the mere-presence instruction argument (they did not), plain error requires reversal because "it is necessary to prevent a clear miscarriage of justice or to preserve the integrity of the judicial process." *Anzalone*, 886 F.2d at 234. Here, there was strong evidence that Warehouse Appellants' only connection to the charged crimes was holding title to the warehouses storing goods *after* the challenged importations.

## C. The Instruction Containing The 2017 Scope Order Was Misleading

The government's argument that the jury was properly instructed on the 2017 scope ruling fares no better. GB 57-61. The 2017 scope ruling did not exist at

---

[8] Shen indicated that he incorporated Appellant Scuderia Development, LLC around October 22, 2007 (9-ER-2156:11-12), Appellant 1001 Doubleday, LLC toward the end of 2008 (9-ER-2184:19-2185:19), Appellant Von Karman – Main Street, LLC around March 6, 2009 (9-ER-2189:17-2190:34), and Appellant 10681 Production Avenue, LLC around September 11, 2009 (9-ER-2196:4-8).

the time Appellants imported pallets from 2011 to 2014. By including the 2017 scope ruling that pallets were subject to the AD/CVD Orders—and by omitting the date of the ruling—the district court effectively instructed the jury that the AD/CVD Orders were unambiguous at that time of importations. That is incorrect. The AD/CVD Orders were ambiguous, rendering the 2017 scope ruling necessary to clarify the items covered by the AD/CVD Orders. Accordingly, this instruction deprived Appellants the opportunity to defend this case by arguing their lack of knowledge about the AD/CVD Orders' scope was entirely reasonable in light of the unclear law. *See United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) ("[T]he relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation.").

Crucially, while the government's position and testimony at trial was that the DOC considers scope orders to have retroactive effect, this is true *only* in a civil context, and cannot be applied here where the charges allege criminal conduct. *See Guangdong Wireking Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1202 (Fed. Cir. 2014) (citing *Weaver v. Graham*, 450 U.S. 24, 28 (1981)) (customs laws with retroactive application can run afoul of the Ex Post Facto Clause, which "forbids the government from punishing individuals for actions that were lawful at the time of their execution").

By instructing the jury to apply the 2017 Scope Ruling to the importations between 2011 to 2014, the district court violated "the elementary criminal law principle that, for most crimes, the mens rea and actus reus must exist together." *Kaiser v. Lockyer*, 2003 WL 21667153, at *3 (N.D. Cal. July 14, 2003). Here, the actus reus (importing the pallets) occurred between 2011 and 2014—*three years prior* to the 2017 Scope Order purportedly establishing mens rea (knowledge that the pallets were subject to AD/CVD Orders).

The government's effort to defend the 2017 Scope Ruling instruction suffers from an even more fundamental problem—the 2017 scope ruling is not "law" at all. *See United States v. Denny*, 939 F.2d 1449, 1454 (10th Cir. 1991) (jury instructions must "fairly, adequately, and correctly state the governing law"). The government admits that the 2017 scope ruling does not "impose[] legal liabilities but rather [is] an *advisory opinion* interpreting the AD/CVD Orders." GB 59 (emphasis added); *see Walgreen Co. v. United States*, 620 F.3d 1350, 1354 (Fed. Cir. 2010) (the DOC's Scope Orders are only "grant[ed] deference"). Thus, it was error for the district court to instruct the jury that the pallets were subject to the 2011 AD/CVD Orders as a matter of law, because the 2017 Scope Order "merely opin[ed] that [the] AD/CVD Orders encompassed pallets." GB 59.

21

### III.   THE INDICTMENT FAILED TO ADEQUATELY CHARGE CUSTOMS FRAUD

The government contends that Appellants "improperly attempt to add an extra element to" 18 U.S.C. § 545. GB 42. Not so. Intent is a critical element of proof in a criminal customs fraud case as alleged here. This Court has repeatedly explained that "intent to defraud," in the context of 18 U.S.C. § 545, means "intent to avoid and defeat the United States customs laws." *United States v. Robinson*, 147 F.3d 851, 853 (9th Cir. 1998).

Appellants are not arguing that the Indictment is inadequate because it fails to allege that Appellants sold any extrusions in the United States market. Rather, Appellants correctly contend that the Indictment fails as a matter of law because it fails to allege that the pallets were ever intended to be broken down into extrusions that would be sold in the United States. Instead, the Indictment alleges that the aluminum pallets were being imported to be used as raw materials or scrap metal and melted down to be "reconfigure[d] [] into a form with commercial value." 6-ER-1359. At the time of importation between 2011 and 2014, aluminum raw material and scrap were subject to *zero* duties. *See* 6-ER-1359.

The Indictment does not—and cannot—claim that the AD/CVD Orders "would have prevented [Appellants] from bringing [scrap metal] into the United States," which is required to show that Appellants "intended to avoid the customs laws." *United States v. Boggus*, 411 F.2d 110, 113 (9th Cir. 1969).

22

The government's reliance on *United States v. Davis* is misplaced. 597 F.2d 1237, 1238 (9th Cir. 1979). The defendant in *Davis* admitted that he knowingly imported contraband but argued that the government had to prove he imported contraband "knowingly *and with specific intent to defraud*" the United States. *Id*. at 1239 (emphasis added). This Court rejected the defendant's argument and explained that customs fraud "does not require proof of both a knowing and fraudulent element." *Id*. The ruling in *Davis*, then, is that a defendant may commit customs fraud either "knowingly" or with "intent to defraud." Because the defendant in *Davis* conceded the "knowing" prong, this Court held that his argument failed. Appellants here have not made any such concession.

The government's citation to *United States v. Hall* is also inapposite. 559 F.2d 1160 (9th Cir. 1977). In *Hall,* the defendant argued that the contraband he imported was "for personal use and consequently not covered by" 18 U.S.C. § 545; this Court disagreed and explained that § 545 was "written to proscribe all smuggling, be it for personal use or commercial use." *Id*. at 1165. Unlike *Hall*, Appellants are not arguing that they imported the pallets for personal use; rather, that the Indictment does not allege an intent to defeat or avoid the customs laws by the importation of the specific items at issue here, which was not at issue in *Hall*.

## IV.  THE INDICTMENT FAILED TO ADEQUATELY CHARGE WIRE FRAUD

As the government acknowledges, this Court has "had no occasion to consider" whether to adopt the merely-incidental test to analyze the use of domestic wires in a foreign wire fraud scheme. GB 39.[9]  This Court should join its sister circuits and adopt the merely-incidental test. In *Bascunan v. Elsaca*, the Second Circuit ruled that in order for the government to allege a permissible domestic application of the wire fraud statute, "the use of the [] wires must be essential, rather than merely incidental, to the scheme to defraud." 927 F.3d 108, 122 (2d Cir. 2019). Likewise, in *United States v. McLellan*, the Third Circuit ruled that "where a foreign defendant is alleged to have committed wire fraud against a foreign victim, and the use of domestic wires was merely 'incidental' to the overall scheme, additional inquiry may be necessary to ensure a domestic application of the statute." 959 F.3d 442, 470 (1st Cir. 2020). Both circuits have adopted the merely-incidental test because they recognize, as has the Supreme Court, that "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266 (2010).

---

[9]  In *United States v. Hussain*, 972 F.3d 1138, 1144 n.2 (9th Cir. 2020), this Court was presented with—but did not decide—the issue of whether to adopt the merely-incidental test; rather, the Court ruled that there was a permissible domestic

The government argues that this Court need not determine whether to adopt the merely-incidental test because the charged wire fraud scheme here involves domestic defendants and domestic victims. However, that some defendants are United States corporations does not change the foreign nature of the scheme. To justify an extraterritorial application, the government must allege domestic conduct that is more than "general corporate activity," which the government has failed to do. *See Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1937 (2021). Moreover, the government has not identified a single domestic victim. Indeed, the district court noted at the sentencing hearing that, as to the wire fraud counts, "the Government have not really met their burden of showing who the victim is and how much is due to each victim[.]" 1-ER-85:9-11.

Next, the government argues that even if the Court adopts the merely-incidental test, the charged wires are central to the scheme because "CZW used [the wired] payments to fraudulently inflate its revenue and hid the fact that they were related-party transactions." GB 40. The payments referenced by the government had no measurable effect on a foreign scheme that spanned over a decade and involved a successful Chinese corporation having sales revenue of 97,826,000,000 yuan (approximately $14 billion), from 2009 to 2016 alone. 6-ER-

---

application of the wire fraud statute "because [the defendant] defrauded a domestic victim." That is not the case here.

1379-80. The remaining wires—which amount to two emails—made no misrepresentations, had no purpose of influencing any victim, and had a *de minimis*, if any, effect on the scheme. 6-ER-1379-80. So tangential were these two emails that the government, in its Brief, does not even mention them, let alone explain how they were a core component of the fraud.

As a last resort, the government contends that "the scheme defrauded the United States." GB 40. Yet this argument runs counter to everything the government alleged in the Indictment and presented at trial. Throughout the trial, the government kept the two schemes—the customs fraud and the wire fraud— distinct. The government explained, repeatedly, that "the wire fraud … part of this case" is based on "CZW l[ying] to its shareholders" and making "false statements … to its investors." 7-ER-1420:14-20, 1514:2-7; 12-ER-3019:11-16, 3021:11-13. There were no allegations, and certainly no evidence, that the United States was a victim of wire fraud. Now, recognizing that its charged wires are nowhere near sufficient to establish a domestic nexus, the government conflates the wire fraud and customs fraud schemes. In sum, the alleged wire fraud scheme is a purely foreign scheme targeting foreign investors, and the government has not alleged a permissible domestic application.

26

## V.   THE GOVERNMENT FAILED TO SHOW THE HEARSAY WAS ADMISSIBLE

The government's case was built on a plethora of inadmissible hearsay. In an attempt to avoid this issue, the government contends that Appellants "did not preserve many of their hearsay objections." GB 64. Not so. Prior to jury selection, Appellants explained that they anticipated "a lot of hearsay issues in this case" based on the government's proffered justification of the co-conspirator statement exception. 7-ER-1413:17-18. Appellants argued that "before bringing [in] those statements, [the government] would need to prove sufficiently that there was a conspiracy; that the hearsay declarant was a member of that conspiracy, and that hearsay statement is coming in because it demonstrates furtherance of that conspiracy." 7-ER-1414:1-6. Moreover, the hearsay objections were properly preserved during trial through numerous objections[10], which the district court acknowledged several times as continuing objections.

---

[10] *See, e.g.,* 7-ER-1606:3-1607:1, 1609:11-1610:9 (request for proffer of evidence proving conspiracy), 1650:13-14, 1660:10-11, 1662:17, 1669:24-25, 1670:8-12, 1670:18-19; 8-ER-1693:11-12, 1696:23-1697:2, 1712:19-21, 1713:10-11, 1755:2-1756:18 (sidebar discussion regarding objections to coconspirator statements and employee statements), 1767:7-9, 1769:7-8, 1779:20-23, 1781:8-11, 1802:5-6; 1802:24-1805:10, 1806:9-10, 1809:8-9, 1810:22-23, 1812:5-9 ("I'm going to be treating is as a continuing objection.… I will always treat it as a continuing objection on these"), 1816:1, 1845:18-1846:2 (continuing objection); 1870:12-16 ("Counsel, again, for the record, I want to make sure that we're treating this as a continuing objection and will in the future"); 1902:9-11 (continuing objection), 1923:10-25, 1925:10-13 ("I know I have a standing objection"), 1986:13-14; 9-

---

Further, in the context of a conspiracy charge, the proper method of challenging testimony that does not "connect up" the conspiracy is to move to strike that testimony. *Sacramento Suburban Fruit Lands Co. v. Miller*, 36 F.2d 922, 922 (9th Cir. 1929) ("If this testimony did not sufficiently connect up the testimony objected to, appellants should have taken advantage of that fact by motion to strike out the testimony objected to"). Appellants timely renewed their pre-trial and trial hearsay objections via a motion to strike inadmissible hearsay at the close of the government's case-in-chief and at the close of the evidence. 5-ER-913. In fact, the trial court invited this procedure, as it indicated it would wait to rule on whether the co-conspirator exception applied to the proffered hearsay evidence at the close of the government's case. 5-ER-913; 12-ER-3010:7-17 ("[T]here was one thing that the Court in particular was reserving, which was whether or not the government laid a foundation as to co-conspirator").

Accordingly, the hearsay objections were properly preserved, and the government's position that Appellants' hearsay arguments should be reviewed for

---

ER-2112:21-2113:3, 2114:18-2115:12, 2123:16-20 (continuing objection), 2128:13-14, 2154:19-20, 2159:6-12 ("I'm treating this as a continuing objection to statements between this witness and Mr. Liu … [a]nd others as well"), 2166:7-8, 2167:3-4, 2172:8-11 (continuing objection), 2175:23-2176:6 (continuing objection), 2192:22-24; 10-ER-2356:20-2358:1, 2376:20-2377:1, 2431:19-21, 2432:16-18, 2436:16-21, 2557:25-2558:1; 11-ER-2598:7-9, 2636:18-20, 2637:6-8, 2705:15-16, 2848:25-2849:1, 2849:23-25, 2858:13-15, 2864:9-15, 2871:18-23.

plain error is meritless.[11]  But even assuming Appellants waived the hearsay

argument (they did not), plain error requires reversal. As explained below, the

independent evidence needed to establish the conspiracy and trigger the co-

conspirator exception was virtually non-existent. As a result, reversal is mandated

"to prevent a clear miscarriage of justice or to preserve the integrity of the judicial

process." *Anzalone*, 886 F.2d at 234.

**A.**    **The Hearsay Evidence Was Inadmissible Under The Co-Conspirator Exception**

Hearsay statements between co-conspirators are inadmissible unless "there

is independent proof of the existence of the conspiracy and of the connection of the

declarant and the defendant to it." *United States v. Snow*, 521 F.2d 730, 733 (9th

Cir. 1975). Because a coconspirator statement is presumptively unreliable, the

statement must be "corroborated by fairly incriminating evidence." *United States v.

Silverman*, 861 F.2d 571, 578 (9th Cir. 1988).

---

[11]  The government's argument that the admission of this evidence, if inadmissible, is harmless error because the "admission of the challenged evidence had no effect on the verdict" (GB 76) is plainly incorrect because the government's own brief acknowledges that it relied heavily on the hearsay evidence to make its case. *See, e.g.,* GB 69 (documents admitted through SA Praditbatuga "contained false representations, including that the pallets were finished products"; *id.* (the challenged emails "directly facilitated the fraud schemes" and went to "the heart of the scheme to evade customs duties"); GB 70 ("any testimony disclosing statements Liu made in furtherance of the conspiracy fell firmly within the co-conspirator exception"). The government cannot make these arguments and later assert that evidence was irrelevant.

The government argues that there was "overwhelming" evidence of the alleged conspiracy and Appellants' roles' in it, (GB 66-68), but the government only points to largely hearsay evidence. Put differently, the government's argument is circular. In an effort to show the existence of a conspiracy to admit co-conspirator statements, the government relies on *co-conspirator statements* that are only admissible after the necessary showing of a conspiracy has been made. *See, e.g.,* 7-ER-1650:18-1651:1 ("Q. What *did they say* they wanted to build? A. They wanted to build an aluminum casting facility. (emphasis added)), 1654:5-7 ("*I was told* on many occasions that Mr. Liu was the person who Eric primarily answered to" (emphasis added)); 8-ER-1697:4-6 ("Q. Did you have an understanding *through Johnson Shao* who the owner of Pengcheng Aluminum was? A. Yes." (emphasis added)), 1894:21-24 ("Q. *What direction, if any, would Johnson Shao provide you* regarding incoming wires and how to classify them? A. It was categorized as a loan." (emphasis added)), 1963:22-24 ("Q. But I thought you said in your direct testimony, *Mr. Liu told you* to increase the sales staff. A. Yes, after I was appointed. (emphasis added)"); 9-ER-2113:4-2116:7 ("*Mr. Shen indicated* he had some fairly extensive experience in the aluminum production industry and that he felt he could deliver this project if the city would be a willing partner." (emphasis added)), 2159:4-17 ("Q. *Did Mr. Liu and the Liu family ask you* to use Scuderia Capital for a particular purpose? … A. *Z.P. approached me one day and*

*asked me* if I could do a favor for his family and his father." (emphases added)),

2169:17-19 (Q. *Mrs. Liu was literally calling me every hour asking me where I*

*was*, questioning I wasn't in southern California, and why I did not send the funds

back" (emphasis added)).

None of these hearsay statements provide "independent proof" of the

conspiracy. Once these inadmissible hearsay statements are stripped away, all that

remains is a bevy of "wholly innocuous conduct," such as meetings with city

officials and tours of aluminum facilities, which "do[] little, if anything, to enhance

the reliability of the co-conspirator's statement." *Silverman*, 861 F.2d at 578

("Evidence of wholly innocuous conduct or statements by the defendant will rarely

be sufficiently corroborative of the co-conspirator's statement to constitute proof,

by a preponderance of the evidence, that the defendant knew of and participated in

the conspiracy.").

### B. The Hearsay Evidence Was Inadmissible Under The Business Records Exception

Moreover, the government's argument and relied-upon authority that the

exhibits were alternatively admissible under the business records exception (GB

72-75) omits a critical fact—that the records admitted through the testimony of SA

31

Praditbatuga[12] and SA Huang[13] were seized pursuant to a search warrant. In this circumstance, proposed admissions of business records have repeatedly been rejected on the basis that the evidence is lacking an appropriate custodian of records. *See United States v. Dakota*, 197 F.3d 821, 827 (6th Cir. 1999) (government agent who seized business records did not have knowledge of the record-keeping procedures of business and was not custodian of records; therefore, records were not admissible as business records); *United States v. Ordonez*, 737 F.2d 793, 805 (9th Cir. 1983) (entries in ledger seized pursuant to a search warrant were not admissible under business records exception where, *inter alia*, government did not produce custodian of records as a witness and no evidence was presented to demonstrate that persons who made the entries were truthful and had clear recollection of facts); *United States v. Bonds*, 2009 WL 416445, at *6-7 (N.D. Cal. Feb. 19, 2009), *aff'd* 608 F.3d 495 (9th Cir. 2010) (where documents were seized under a search warrant but no government witness could lay foundation about the circumstances under which the documents were prepared, the

---

[12] *See* Appellants' Objections to Testimony of SA Praditbatuga. 8-ER-1802:5-6; 1802:24-1805:10, 1806:9-10, 1809:8-9; 1810:22-23; 1812:5-9 (continuing objection); 1816:1.

[13] *See* Appellants' Objections to Testimony of SA Huang. 10-ER-2376:20-2377:1; 2382:24-2383:4; 2431:19-20; 2432:16-17; 2433:19-20; 2434:10-12; 2435:7-13; 2436:16-21. The government does not appear to contest in its Brief that the evidence admitted through SA Huang was inadmissible. *See* GB 63-76.

documents were not admissible as business records); *see also id.*, 608 F.3d 495

(further finding that the documents were inadmissible as business records where

the only other supporting testimony was hearsay).

The government's sweeping assertion that everything admitted through SA

Praditbatuga was admissible under the business records exception is further

undermined by the fact that at least one of those exhibits—Exhibit 584, a purchase

order and email—contained annotations with no indication of who authored the

annotations or when they were made. *See Cambra v. Chevron Int'l Expl. & Prod.*,

318 F. App'x 488, 491 (9th Cir. 2008) (handwritten note on applicant's age

inadmissible for lack of foundation and because there was no indication such notes

were kept in the course of regularly conducted business).

Further, the government's position flies in the face of the added caution

when admitting emails into evidence as business records. *See Monotype Corp. v.*

*Int'l Typeface Corp.*, 43 F.3d 443, 450 (9th Cir. 1994) (emails are not

automatically admissible as business records because emails are less "systemic

business activity than computer-generated business records"); *Mays v. United*

*Ass'n Loc. 290 Apprenticeship & Journeymen Training Tr. Fund*, 407 F. Supp. 3d

1121, 1141 (D. Or. 2019) ("That a work email address is connected to a particular

conversation does not transform the otherwise non-business content into a business

record"). An email is admissible only if: (1) it was contemporaneously sent or

received with the event(s) described in the email; (2) it was sent by someone with knowledge of the event(s) documented in the email; (3) it was sent or received in the course of a regularly conducted business activity; (4) it is the producing defendant's regular practice to send or receive emails that record the type of event(s) documented in the email; and (5) a custodian or qualified witness attests that these conditions have been fulfilled. *Mays*, 407 F. Supp.3d at 1142. The government laid no such foundation here, rendering the evidence inadmissible.

Thus, the admission of the exhibits through SAs Praditbatuga and Huang, who were not proper custodians of records or qualified witnesses[14] was clear error.

### C.   The Government's Reliance On The Agency Exception Is Misplaced

Finally, the government's implied assertion that the contested emails were admissible because they "involved CZW's agents or employees on matters within the scope of that relationship" (GB 71) also fails.

Under Federal Rules of Evidence 801(d)(2)(D), a statement is not hearsay and is admissible if it "was made by the party's agent or employee on a matter within the scope of that relationship while it existed." To qualify for the exception, "(1) the statement must be made by an agent or employee of the party against

---

[14]  Indeed, SA Praditbatuga explicitly testified through cross-examination that he could not say whether *any* of the exhibits introduced by the government through his testimony were kept in the ordinary course of business. 8-ER-1834:6-1838:25; *see Dakota*, 197 F.3d at 827.

whom the statement is being offered; (2) the statement must concern a matter within the scope of that employment relationship; and (3) the statement must be made while the declarant is yet employed by the party." *Weil v. Citizens Telecom Servs. Co., LLC*, 922 F.3d 993, 999 (9th Cir. 2019). This Court interprets the second element—whether the matter was within the scope of the employment relationship—to require that the declarant be "involved in [the] process leading up to a challenged decision." *Id.* "[A] matter may fall within the scope of the declarant's employment even though the declarant did not have final decision-making authority on that matter." *Id.* (citing *Steifel v. Bechtel Corp.*, 624 F.3d 1240, 1246 (9th Cir. 2010)).

Here, the government admitted wholesale email communications between ten individuals[15] at CZW and Shao without ever explaining: (1) if these individuals are agents or employees of any party; (2) whether the matters fell

---

[15] Those ten individuals are: Wendy Li, Yajuan Zhao, Harriet Lau, Steve Fung, Craig Wang, Yu Wang, Mike Fu, Richard Jen, Wen Peng, and Senlin Zhou. None were charged defendants or named as alleged co-conspirators in the Indictment. The government improperly admitted these communications through SA Praditbatuga (Exhibit nos. 501, 505, 511, 515, 523, 535, 541, 553, 541, 553, 571, and 584), SA Huang (Exhibit no. 133), Cristian Robles (Exhibit Nos. 554, 558, 559, 564, 572, 573, 580, and 581), and Mark Li (Exhibit Nos. 358, 379, and 382). *See* Appellants' Objections to Cristian Robles Testimony (8-ER-1845:18-1846:2 (continuing objection); 1870:12-16 (continuing objection); Appellants' Objections to Mark Li Testimony (8-ER-1902:9-10 (continuing objection); 1923:10-1924:5; 1924:19-21; 1925:10-13.)

within the scope of these individuals' employment relationship; and (3) that the statements were made while the declarants were still employed. *See Weil*, 922 F.3d at 999. Instead, the government now claims that the emails were admissible solely because "[t]hey identified the senders as from CZW—"Zhongwang"—using the domain name "@zhongwang.com," relying on *Sea-Land Serv., Inc. v. Lozen Int'l, LLC*, 295 F.3d 808, 821 (9th Cir. 2002) for the assertion that a domain name is "more than adequate to establish admissibility." GB 71. Yet *Sea-Land* does not support that assertion; indeed, the case does not even discuss domain names. Instead, in that case, the email was admissible as an admission by a party opponent because: (1) the email closed with an electronic signature indicating the sender's employ at the time the email was written; (2) there was an additional exhibit admitted into evidence confirming that the sender was an employee of Sea-Land; (3) the email clearly concerned a matter within the scope of the employee's employment; and (4) that email was forwarded by a second Sea-Land employee, adopting the contents of the original email. 285 F.3d at 821.

In any event, even if this Court finds that hearsay was properly admitted as an agent's statement, such hearsay is only admissible against the principal defendant, not any co-defendants. Federal Rule of Evidence 801(d)(2)(D) exempts statements "offered against *an opposing party* ... made by *the party's* agent or employee..." (emphasis added). "It is well established that under Rule 801(d)(2), 'a

party's statement is admissible as non-hearsay only if it is offered against that party.'" *Cambridge Elecs. Corp. v. MGA Elecs., Inc.*, 227 F.R.D. 313, 335 (C.D. Cal. 2004) (quoting *Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000)); *see also Beecham v. Roseville City Sch. Dist.*, No. 215CV01022KJMEFB, 2018 WL 7051157, at *4 (E.D. Cal. Sept. 24, 2018) (declining to admit an agent's statement against a non-principal co-defendant).

## VI.   THE CUSTOMS AND WIRE FRAUD CHARGES WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE

### A.   There Was Insufficient Evidence Of Customs Fraud

The government's attempt to save the customs fraud convictions hangs on a single premise: that Appellants knew the pallets were not finished merchandise. GB 77-78. This premise reveals a fundamental misunderstanding by the government about what it was required—and failed—to prove. Based on the allegations in the Indictment, the government was required to prove that Appellants imported extrusions disguised as tack-welded pallets, with the intent of circumventing the AD/CVD Orders and fraudulently avoiding the higher duties imposed on aluminum extrusions. 6-ER-1357-1359. Anything less would fall short of proving that Appellants had the requisite intent to violate 18 U.S.C. § 545. The government proved none of this at trial.

Instead, witness after witness *called by the government* testified the pallets were not designed to be easily broken and could not be disassembled into readily

sellable extrusions. The government's expert in package engineering and pallets, Dr. Laszlo Horvath, conceded the pallets were made of "permanent welding" and were not "designed to be easily broken." 10-ER-2583:2-16. Similarly, the former manager of Perfectus Aluminum conceded if the pallets were taken apart, the disassembled portions could not be sold as extrusions. 7-ER-1595:18-1596:1. A mechanical engineer hired by Appellants to oversee a melting facility admitted he was not aware "of any instance whatsoever in which one of these aluminum pallets was disassembled and the parts were sold as extrusions." 7-ER-1681:6-11. Likewise, a regional sales manager who spent over a decade at Perfectus Aluminum acknowledged that during her tenure at the company, she never saw or heard about "any aluminum pallet [] disassembled to be sold as extrusions." 9-ER-2000:24-2001:2. Reiterating this point, Eric Shen, the government's cooperating witness, conceded he was not aware "of any instance in which a pallet imported into this country was ever taken apart and sold for extrusions." 9-ER-2242:12-15.

Now, the government forthrightly admits that its sole proof at trial was that Appellants' "intent" was to import the pallets to be used as scrap or raw material feed stock. GB 78. The mechanical engineer hired by Appellants testified that Appellants' "fundamental purpose" was to sell the pallets as scrap. 7-ER-1680:19-21. Eric Shen, whom the government touted as the most knowledgeable witness regarding Appellants' scheme, explained that the pallets were a "consistent supply

38

of … raw material" to be used as "feed stock." 9-ER-2199:7-10, 2224:16-18.

Indeed, the government repeated these facts in its closing argument: "[D]efendants were trying to get as much aluminum into the country … so they could use it as feed stock to melt it down." 12-ER-3111:21-25. What the government did not repeat, of course, was that the duties on scrap metal were *zero percent*, a fact both Mr. Shen and a customs broker called by the government acknowledged. 9-ER-2242:22-24. With such admission, the AD/CVD Orders were simply inapplicable.

The government therefore convicted Appellants of innocent conduct—importing materials that were not subject to the AD/CVD Orders. Such convictions cannot stand. *See Griffin v. United States*, 502 U.S. 46, 59 (1991) (a conviction cannot stand where the defendant's conduct "fails to come within the statutory definition of the crime"); *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (it is a violation of the Due Process Clause to allow a conviction where there is insufficient evidence to support it).

### B. There Was Insufficient Evidence Proving Wire Fraud

The government did not prove wire fraud because there was insufficient evidence of materiality as to CZW's and Liu's statements regarding market demand and export revenue earned as a result of sales made in the United States. To obtain convictions for wire fraud, the government at trial was required to prove that each statement made in connection with the charged scheme to defraud

investors in CZW was material. *See United States v. Woods*, 335 F.3d 993, 1000 (9th Cir. 2003) ("All deceptive or misleading statements, false statements and half-truths … must be material to form the basis of mail or wire fraud charges.") (emphasis added); *United States v. Holmes*, 2020 WL 666563, at *13, n. 8 (N.D. Cal. Feb. 11, 2020) (interpreting Woods to require that materiality be shown as to each alleged misstatement); 5-ER-896 (instructing the jury that the second element of wire fraud requires the government to prove that "the statements made are false" and "material").

The government failed to adduce sufficient evidence to prove materiality beyond a reasonable doubt with respect to statements contained in the IPO prospectus. To prove materiality, the government relied exclusively on the testimony of its expert, Dr. Voetmann. Regarding the $200 million loan information contained in the IPO prospectus, Dr. Voetmann testified that "reading that prospectus as a potential investor and I see that they have a relationship with a bank, a U.S. bank, U.S. entity, that tells me that they are able to secure a loan, or the bank at least looked at their credibility, looked at their ability to pay back that loan. So as an investor, that's a good thing for me to look at." 11-ER-2799:6-13. The government, however, never introduced any evidence from the IPO Prospectus itself that demonstrated a relationship with a United States bank as Dr. Voetmann suggested. Instead, the admitted excerpt only substantiated that "Scuderia Capital

is a[] [private] entity established in the United States and is principally engaged in business ventures and real estate development projects." 13-ER-3299. Thus, Dr. Voetmann's testimony offers nothing more than "mere speculation, rather than reasonable inference" and is "insufficient to support a verdict" of wire fraud. *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010). Moreover, Dr. Voetmann's testimony lacked any foundation; there was no indication that Dr. Voetmann interviewed investors, conducted a survey, consulted case studies, or engaged in any other due diligence to arrive at his conclusion regarding what a reasonable investor would rely on.

The government's "proof" of materiality was further fundamentally unsound because Dr. Voetmann never actually testified about what information would be *material* to an investor. Instead, he repeatedly testified about what information would be *relevant* to an investor. 11-ER-2812:1-3 ("Q: Is the revenue of a company *relevant* to an investor?" A: Yes."); 11-ER-2815:18-20 ("Q. [W]ould a reasonable investor *want to know* if the sale of a product was non-arm's length? A. Absolutely."); 11-ER-2819:11-13 ("Q. So the change in revenue year to year, *is that something that's relevant* to investors? A. Yeah. Absolutely."). Mere relevance will not do. The "materiality requirement is met if the matter at issue is '*of importance* to a reasonable person in making a decision about a particular matter or transaction.'" *United States v. Philip Morris USA Inc.*, 566 F.3d 1095,

1122 (D.C. Cir. 2009) (emphasis added). Here, there was no testimony regarding the *importance* or *materiality* of the alleged misrepresentations to a reasonable investor purchasing CZW's shares. Accordingly, there was insufficient evidence to convict on Counts Two through Ten, and this Court should enter judgments of acquittal. *See United States v. Galecki*, No. 20-10288, 2023 WL 8903137, at *18 (9th Cir. Dec. 27, 2023) (judgment of acquittal on wire fraud counts where the government "presented no evidence at trial that the specific alleged misrepresentations were materially false to anyone who bought [defendant's] products").

### C.   There Was Insufficient Evidence Proving Conspiracy

"Conspiracy is 'a partnership in criminal purposes. The gist of the crime is the confederation or combination of minds.' The government has the obligation to establish not only the opportunity but also the actual meeting of minds. Mere association and activity with a conspirator does not meet the test." *United States v. Basurto*, 497 F.2d 781, 793 (9th Cir. 1974) (internal citation omitted).

Even putting aside the inadmissibility of the bulk of the evidence in this case, there was still insufficient evidence of a conspiracy. *See ante*, at 29-36. The government asserts in its Brief that it proved the Warehouse Appellants "agreed to criminally evade the AD/CVD Orders by affirmatively lying and concealing before, during, and after the pallets were imported" (GB 81) but cites no evidence

produced at trial to support that assertion. It cannot. Not only did it fail to prove that the Warehouse Appellants ever actually agreed to a specific object of a conspiracy, but the only admissible evidence presented was that the Warehouse Appellants merely held title to the warehouses in which the Perfectus Appellants chose to store the imported pallets after the importations were complete. *See, e.g.*, 9-ER-2196:16-21; *see United States v. Meyer*, 432 F.2d 1000, 1001-02 (9th Cir. 1970).

The conspiracy convictions also fails because it is unclear what object of the conspiracy the jurors settled on. Appellants requested a special verdict form delineating the four proposed objects of the conspiracy and requiring the jury to specify the object to rectify the issue. 5-ER-988. The court denied the request and instead relied on the government's general verdict form. 1-ER-111. It is impossible to tell from the general verdict form whether the jury based its convictions on the legally deficient wire fraud and customs fraud objects.

Moreover, the Warehouse Appellants were not charged with—or convicted of—money laundering, so it cannot be assumed that the jury found that money laundering was the object of the conspiracy with respect to the Warehouse Appellants. If the wire fraud and customs fraud objects fail against the Warehouse Appellants, then the conspiracy count fails because it is unclear whether the jury unanimously found that either of the only remaining objects of the conspiracy were

proven beyond a reasonable doubt. The government's arguments are wrong. GB 62 (arguing that "defendants' convictions on all of the other counts—wire fraud (Counts 2–10), customs fraud (Counts 11–17), and money laundering (Counts 18–24)—confirm that jurors unanimously agreed on all three objects of the conspiracy").

### D. The Money Laundering Convictions Must Be Set Aside

The Perfectus Appellants, not the Warehouse Appellants, were convicted of seven counts of international promotional money laundering (Counts Eighteen through Twenty-Four). The money laundering convictions should be set aside because they are predicated on legally inadequate wire fraud and customs fraud convictions based on insufficient evidence proving those charges.

First, because the customs fraud and wire fraud counts are legally inadequate, the money laundering convictions cannot stand. The jury instructions permitted the jury to rely on the conduct underlying either customs fraud or wire fraud to convict on money laundering. 5-ER-905. The jury returned general verdicts of guilt on the money laundering charges, without specifying which predicate the jury had relied on in convicting. 1-ER-146-152. "[W]hen a general verdict may be based on a legally inadequate ground … the verdict should be set aside." *United States v. Fuchs*, 218 F.3d 957, 962 (9th Cir. 2000). This rule exists because when "jurors have been left the option of relying upon a legally inadequate

theory, there is no reason to think that their own intelligence and expertise will save them from that error." *Griffin*, 502 U.S. at 59. Here, there are legal errors afflicting both the customs fraud counts (the Indictment does not allege intent) and the wire fraud count (the Indictment alleges an impermissible, extraterritorial application). *See ante* at 21-26. If this Court concludes that either wire fraud or customs fraud was legally inadequate, it should set aside the money laundering convictions.

Second, because "the conduct charged by the government … did not 'come within the statutory definition of'" either the wire fraud or customs fraud statutes, the money laundering convictions should be set aside. *United States v. Gonzalez*, 906 F.3d 784, 791 (9th Cir. 2018). Put differently, "in some cases, a conclusion that the evidence was insufficient may actually rest more on a legal determination than a factual one—*i.e.*, it may rest on the conclusion that the *amply proved conduct* simply 'fails to come within the statutory definition of the crime,'" requiring reversal. *Galecki*, 2023 WL 8903137, at *20 (emphasis added). This is such a case. The conduct underlying the purported customs fraud—that Appellants imported pallets to be melted down as scrap metal—fails to satisfy the element of intent to evade or defeat any customs laws. Likewise, the conduct underlying wire fraud—that Appellants misrepresented arms-length transactions in their IPO prospectus—fails to satisfy the materiality element. The conduct that the

government proved, then, fails to come within the statutory definition of either customs fraud or wire fraud. Therefore, if this Court concludes that there was insufficient evidence as to either wire fraud or customs fraud, it should set aside the money laundering convictions.

## VII. THE GOVERNMENT'S PROOF AT TRIAL CONSTITUTED A FATAL VARIANCE AND A CONSTRUCTIVE AMENDMENT

### A. Appellants Did Not Waive The Variance And Constructive Amendment Arguments

Appellants did not waive their constructive amendment and fatal variance arguments because those arguments were timely raised in their motion for new trial. 4-ER-818. The government's authority for the supposed waiver, *United States v. Hugs*, 384 F.3d 762 (9th Cir. 2004), is irrelevant. In *Hugs*, the waiver occurred because counsel failed "to object to the reading of … Joint Instruction No. 6." 384 F.3d at 766. Here, Appellants do not hang their constructive amendment and fatal variance arguments on an erroneous jury instruction; instead, the argument is based on the government's entire case and was therefore appropriately raised in Appellants' Rule 33 motion.

Even assuming, *arguendo*, that Appellants waived this argument—they did not—Appellants respectfully request this Court "exercise [its] discretion under Federal Rule of Criminal Procedure 52(b) and reverse [the] convictions" (*United States v. Dipentino*, 242 F.3d 1090, 1096 (9th Cir. 2001)) because "[e]ven under

plain error review, if the constructive amendment prejudiced [Appellants], the conviction[s] must be reversed" (*United States v. Choy*, 309 F.3d 602, 607-08 (9th Cir. 2002). There is no greater prejudice than inviting a jury to render a criminal judgment based on evidence of non-criminal conduct that deviated materially from the Indictment. *See Griffin*, 502 U.S. at 46.[16]

## B. The Government's Evidence Offered At Trial Constituted A Constructive Amendment And A Fatal Variance

A constructive amendment occurs "where (1) 'there is a complex of facts [presented at trial] distinctly different from those set forth in the charging instrument,' or (2) 'the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved.'" *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002) (quoting *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984)). A variance "occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Wilbur*, 674 F.3d 1160, 1177-78 (9th Cir. 2012) (citation omitted).

---

[16] "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law.… When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error."

The government's proof at trial was both a constructive amendment of the indictment and a fatal variance from the allegations. The Indictment required the government to prove that the pallets were temporarily assembled, or "tack welded," rendering them ineligible for the finished merchandise exemption of the AD/CVD Orders. At trial, the government pivoted from the Indictment, arguing instead that the pallets were ineligible for the finished merchandise exemption because the 2017 Scope Ruling limited the exemption to products that contained both aluminum and non-aluminum materials. *See, e.g.*, 9-ER-2040:4-6 (government witness testifying that pallets "do[] not contain any non-extruded aluminum component"), 2078:16-2080:15.) The government did this because the evidence at trial undermined the Indictment's allegations by proving that the pallets were fully assembled and permanently welded at time of entry. *See ante* at 36-39. By advancing this novel theory for the first time at trial, the government's proof constituted both a fatal variance and a constructive amendment, violating the Fifth Amendment grand jury clause and Appellants' Sixth Amendment right to prepare a defense based on adequate notice of the government's accusations.

## VIII.  THE DISTRICT COURT DID NOT ERR IN SETTING A RESTITUTION PAYMENT SCHEDULE

"A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a

restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments." 18 U.S.C.A. § 3664(f)(3). The district court set a restitution payment schedule that required each Warehouse Appellant to make monthly payments equal to 10 percent of the Warehouse Appellants' gross revenue but not less than $100 a month.[17]  The court did not abuse its discretion in setting this payment schedule, as its decision was based on undisputed factual findings that the Warehouse Appellants did not have the ability to pay the restitution amount.

Prefatorily, the government faults the district court for not holding "an evidentiary hearing to determine a potential payment schedule." GB 107. At sentencing, however, the government failed to raise this issue or request an evidentiary hearing. Instead, the government *expressly disclaimed* the need for an evidentiary hearing on restitution: "We don't believe a restitution hearing is needed for the Customs fraud counts." 1-ER-81:12-14. The government has waived this argument.

The district court arrived at the payment schedule after considering "the financial resources," "projected earnings," and "financial obligations" of each

---

[17]  The government argues that the payment schedule was the district court's "sua sponte selection." GB 108. This is patently false. The Presentence Reports recommended a schedule of "10% of gross revenue, but not less than $100, per month." PSR-68, 89, 110, 131.

49

Warehouse Appellant. 18 U.S.C. § 3664(f)(2); *United States v. Inouye*, 821 F.3d 1152, 1156 (9th Cir. 2016), *as amended* (May 31, 2016) ("[A] sentencing court *must* consider the defendant's financial resources in setting a restitution payment schedule."). The Probation Office issued presentence investigation reports that found each Warehouse Appellant to be a "single-purpose entity" without "any bank accounts, or business activities generating income.…" PSR-68, 89, 109, 131. The presentence reports also found that the "only asset" each Warehouse Appellant owned was the warehouse at issue in this case. *Id*. The government did not object to these findings. The district court adopted these facts and found that the Warehouse Appellants had "established that they are unable to pay and not likely to become able to pay any fine in addition to restitution." 1-ER-94:6-8. In reaching this conclusion and setting a payment schedule, the court was entitled to rely on the undisputed facts in the presentence report. Fed. R. Crim. P. 32(i)(3)(A) (the district court "may accept any undisputed portion of the presentence report as a finding of fact"); *United States v. Fix*, 4 F. App'x 324, 327 (9th Cir. 2001) ("[T]he sentencing court may accept the presentence report as its findings of fact, unless there is some unresolved objection.").

On appeal, the government does not challenge the factual findings demonstrating the Warehouse Appellants' inability to pay. Nor can it. *United States v. Visman*, 919 F.2d 1390, 1393 (9th Cir. 1990) (failure to object to findings

in a presentence report constitutes waiver of that challenge on appeal). Instead, the government argues that the court failed to consider whether "the value of the warehouses ... could be applied to defendants' restitution obligation." GB 104. The government's request, however, would eviscerate the Warehouse Appellants by disposing of the "only asset" that each Warehouse Appellant owns. The only situation in which it is appropriate to "divest [an] organization of all its net assets" is when "the court determines that the organization operated primarily for a criminal purpose enterprise." U.S.S.G. 8C1.1. The district court, which presided over the trial and reviewed briefing on the issue, never made a finding that the Warehouse Appellants operated as criminal-purpose enterprises. The court was entitled to rely on the "record as a whole," which contains no evidence that the Warehouse Appellants operated as criminal-purpose enterprises.[18] *United States v. Blinkinsop*, 606 F.3d 1110, 1114 (9th Cir. 2010) (quoting *United States v. Carty*,

---

[18]  There is no evidence showing that the Warehouse Appellants (i) sought to conceal the pallets; (ii) held themselves out to be in a business other than storage of merchandise; or (iii) transmitted any wires or made any materially false statement in furtherance of the scheme to defraud investors in CZW. 3-ER-609-610. The timing of the offenses compared to when the warehouses were purchased further belies a finding that the Warehouse Defendants are "criminal purpose organizations." 3-ER-611-612. The district court also did not, and could not, adopt the presentence reports' conclusory statements that the Warehouse Appellants were criminal-purpose enterprises. *United States v. Williams*, 41 F.3d 496, 499 (9th Cir. 1994) ("[W]hile a district court may adopt the factual findings of the PSR, it may not 'adopt conclusory statements unsupported by facts or the Guidelines.'").

520 F.3d 984, 992 (9th Cir. 2008)) ("Adequate explanation not only derives from the judge's pronouncement of the sentence, but 'may also be inferred from the … record as a whole'"). The court, therefore, did not fail to consider the values of the warehouses—those values are simply irrelevant to the analysis.[19]

The government also argues that the district court "did not hold [Warehouse Appellants] to their burden of demonstrating an inability to pay." GB 107. This argument fails because a defendant can satisfy this burden by providing information to the Probation Office during the preparation of the presentence report. *United States v. Nash*, 115 F.3d 1431, 1442 (9th Cir. 1997) (holding defendant failed to meet his burden to prove inability to pay by failing to provide financial information "requested during the preparation of his presentencing report"). Warehouse Appellants, through their counsel, provided financial information demonstrating their inability to pay, *and the government did not object to that information.*

---

[19] In its Brief, the government defends joint and several liability by arguing that the district court knew it had the option to apportion liability, because "the parties disputed [the issue]," but the court chose not to. GB 99. In that same vein, the court knew it had the option to conclude that the Warehouse Appellants were criminal-purpose enterprises, because the parties disputed the issue, but it chose not to. By the government's own logic, this Court should uphold the court's decision to not find the Warehouse Appellants criminal-purpose enterprises.

Finally, the government maintains that restitution can be satisfied by divesting an organization of all its assets even if that organization is not a criminal enterprise, relying on *United States v. Novak*, 476 F.3d 1041 (9th Cir. 2007). GB 104 n.11. *Novak* holds no such thing. In *Novak*, this Court explained that "the totality of defendants' assets *will be subject* to restitution orders." *Id*. at 1046. The *Novak* holding simply means that a broad range of asset classes (e.g., real property, bank accounts, pension funds) can be used to satisfy a restitution order, but it does not mean that the government can divest an organization of those assets *all at once* in a manner that eviscerates the organization. The *Novak* case is also inapposite because it involved an individual defendant, not an organization or enterprise; *Novak*, therefore, does not at all address the criminal-purpose enterprise analysis, which, unsurprisingly, applies only to *enterprises*. In sum, "restitution is compensatory, not punitive." *United States v. Schurman*, 634 F. Supp. 3d 704, 707 (N.D. Cal. 2022).

## IX.   THE RESTITUTION ORDER WAS CONSTITUTIONALLY IMPROPER

### A.   The MVRA Does Not Authorize Restitution Because The Government Did Not Suffer Any Property Loss

The MVRA is triggered only by "crimes of violence, crimes against property, and crimes related to tampering with consumer products." 18 U.S.C. § 3663A(c)(1). This Circuit has held that "against property" means "infringing on a

victim's property interest" in the specific property lost by a victim. *United States v. Luis*, 765 F.3d 1061, 1065 (9th Cir. 2014). The district court determined that CBP was entitled to $1.8 billion in restitution because "that is a loss to the government of property—money that they should have received if the crimes had not been committed." 1-ER-85:23-25. This conclusion is not supported by the evidence.

At the heart of the government's customs fraud theory is that Appellants attempted to violate the AD/CVD Orders, which prevented importation of aluminum extrusions. *See* 6-ER-1344. This theory presupposes that Appellants were importing extrusions. Anything other than extrusions would not trigger the duties set forth in the AD/CVD Orders and would not establish any loss to the government in the form of unpaid duties. The evidence at trial, however, showed that Appellants *were not* importing extrusions or even pallets that could be disassembled and sold as extrusions. 7-ER-1595:18-1596:1, 1681:6-11; 9-ER-2000:24-2001:2, 2242:12-15; 10-ER-2583:9-18. Instead, the government's position throughout the trial was that the pallets were imported to be melted down to scrap metal. 7-ER-1680:7-21; 9-ER-2199:7-24, 2224:16-18; 12-ER-3111:18-25. Therefore, the government's theory of restitution fails because the duties on scrap metal were zero. 9-ER-2242:22-25. Put differently, the evidence according to the government itself showed that Appellants imported scrap metal *subject to zero duties*, meaning that the government was not entitled to any duties. Therefore, the

government did not suffer a loss, and restitution is not appropriate on the customs fraud counts.

A second, independent reason that restitution is inappropriate is that the government is judicially estopped from arguing that it is entitled to unpaid duties. Judicial estoppel applies where the same party (1) takes "clearly inconsistent" positions, (2) "persuaded the court of the earlier position," and (3) would "derive an unfair advantage or impose an unfair detriment on the opposing party" in the latter proceeding. *United States v. Liquidators of Eur. Fed. Credit Bank*, 630 F.3d 1139, 1148 (9th Cir. 2011). These factors do not serve as "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel." *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001).

First, the government has taken "clearly inconsistent" positions regarding its entitlement to unpaid duties. In previous litigation before the Court of International Trade ("CIT"), the government conceded that the liquidations of the aluminum pallets were final and that duties could not be reassessed.[20]  *Perfectus*, 391 F. Supp.

---

[20]  The government cites to two cases for the proposition that liquidation in a separate civil matter does not bar subsequent criminal prosecution. *United States v. Aegis Sec., Inc.*, 422 F. Supp. 3d 1328, 1344 (C.I.T. 2019); *United States v. Vandewater Int'l Inc.*, 2020 WL 4372115, at *7 (C.D. Cal. June 23, 2023). Neither of these cases is binding on this Court. More fundamentally, the issue here is not simply whether liquidation is a bar to future criminal prosecution; rather, the issue is whether *the government's concession* regarding liquidation prevents the government from now taking the *exact opposition* position.

3d at 1357 ("The parties do not dispute that these liquidations are final."). Indeed, the government took this position despite the fact that its criminal investigation in this case was pending and even though the Indictment was returned while the CIT's decision was on appeal before the Federal Circuit. Now the government, in an about face, contends that it is entitled to unpaid duties in the form of restitution.

Second, the government persuaded the CIT of its earlier position, leading the CIT to hold, "The suspension of liquidation issue is moot, as it appears that Perfectus's entries were liquidated, without being subject to antidumping or countervailing duties." *Perfectus*, 391 F. Supp. 3d at 1357. By now taking the *exact opposite* position and requesting its unpaid duties from this Court, the government has introduced the "risk of inconsistent court determinations" and posed a "threat to the judiciary." *New Hampshire*, 532 U.S. at 750–51. Finally, the government's inconsistent positions have imposed an unfair detriment on Appellants, who are forced to litigate an issue that they believed was resolved based on the government's concession before the CIT.

**B.** **The Restitution Order Is Based On Erroneous Findings Of Fact**

Even assuming the MVRA applies to Appellants' convictions under Section 545, the district court's calculation of the restitution amount was based on erroneous findings of fact.

First, the district court should not have included alleged losses of $32,311,042.43, related to pallets imported by the entity Aluminum Shapes. The evidence at trial demonstrated that, at all relevant times, Aluminum Shapes was a *distinct entity* from the Perfectus and Warehouse Appellants. Between 2008 and December 2012, Aluminum Shapes was owned by HIG Capital. 11-ER-2592:9-14, 2619:16-2620:2. Aluminum Shapes was then purchased by Global Aluminum USA, Inc. ("Global") in December 2012. 11-ER-2620:9-2621:5. Notably, Global did not merge with the Perfectus Appellants until December 31, 2014. 6-ER-1341. Even then, Aluminum Shapes was simply a subsidiary that operated separate and apart from Global. 11-ER-2622:3-22, 2624:21-2627:6. In sum, Aluminum Shapes was neither a defendant nor an unindicted co-conspirator, and its importations did not form the basis of the convictions for the customs fraud counts.

Second, the customs fraud offense does not contain an element of a "scheme, conspiracy, or pattern of criminal activity," and, as explained, the customs fraud conspiracy was deficient. *See ante*, at 42-43. Because the conspiracy count fails, restitution is limited to the specific conduct that is the basis of Counts Eleven through Seventeen. *See United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 927 (9th Cir. 2001). The government argues that even without the conspiracy count, it is entitled to full restitution based on "related conduct." GB 98. The district court, however, never made the required factual finding that conduct not

57

charged as a substantive count was sufficiently related to the seven substantive customs fraud counts. *See United States v. Thomsen*, 830 F.3d 1049, 1069 (9th Cir. 2016) (holding that the sentencing court must find any non-charged conduct "was sufficiently 'related' to the conduct [underlying conviction] ... to warrant inclusion of losses [from non-charged conduct] in the order for restitution."

Third, the district court should not have counted the pallets that Appellants re-exported out of the United States in the restitution calculation. The government contends that Appellants re-exported these pallets as part of a cover-up, so the duties associated with the re-exported pallets should be included in the restitution amount. That argument misses the mark. The alleged harm to the United States is in the duties associated with pallets allegedly imported to be sold in the United States as usable extrusions. As to pallets that were imported and then re-exported without passing through the domestic stream of commerce, there is no harm to the United States. Therefore, the re-exported pallets should not be included in the restitution amount.

### C.    The District Court Abused Its Discretion In Making The Warehouse Defendants Equally Liable For The Restitution Amount

The government does not contest that the court "may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h). Even if the

convictions stand—they should not, given the Warehouse Appellants' lack of participation in the pallet importation—the district court abused its discretion by finding the Warehouse Defendants equally liable with the Perfectus Appellants for the restitution.

The record contains no evidence that the Warehouse Appellants had any involvement in the importation process. Instead, the evidence at trial showed that the Warehouse Appellants only held title to the warehouses used to store the aluminum pallets after they had cleared customs. There was no evidence that the Warehouse Appellants did anything to cause the evasion of any AD/CVD Orders. Even after Jasmine Wang took ownership of the Warehouse Appellants in or around September 2013 (PSR-17-19), the government presented no evidence showing Wang's involvement in the importation of pallets, meaning there was still no evidence that anybody acting on behalf of the Warehouse Appellants did anything to cause the evasion of the AD/CVD Orders.

In sum, the court should have apportioned liability to reflect the level of contribution to the government's loss based on each Appellant's relative culpability; without doing so, the court failed to ensure that "the punishment [] fit the offender and not merely the crime." *Williams*, 337 U.S. at 247.

## **CONCLUSION**

For the foregoing reasons and the reasons set out in their Opening Brief, Appellants respectfully ask this Court to vacate their convictions and order the district court "to enter a judgment of acquittal on those counts" for which there was insufficient evidence. *Galecki*, 2023 WL 8903137 at *21. In the event that the Court does not reverse on the basis of sufficiency, Appellants request that this Court vacate the convictions and remand with instructions to dismiss the Indictment based on the government's failure to allege wire fraud or customs fraud. Should the Court decline to direct entry of judgment of acquittal or dismissal as to all counts, Appellants ask that this Court vacate the convictions and remand for further proceedings based on the remaining arguments.

If, however, this Court determines that Appellants' convictions should stand, Appellants request that this Court modify or vacate the restitution orders. Otherwise, if this Court affirms the imposition of restitution, Appellants request that this Court deny the government's waived, meritless request for an evidentiary hearing on the restitution issue and deny the government's request to disturb the payment schedule.

Dated: January 4, 2024            Respectfully submitted,

                                  LARSON LLP


                                  By:  _/s/ Hilary Potashner_
                                       Stephen G. Larson
                                       Robert F. Ruyak
                                       Hilary Potashner
                                       A. Alexander Lowder

                                  Attorneys for Defendants/Appellants/Cross-
                                  Appellees SCUDERIA DEVELOPMENT,
                                  LLC, 1001 DOUBLEDAY, LLC, VON-
                                  KARMAN-MAINSTREET, LLC and 10681
                                  PRODUCTION AVENUE, LLC and
                                  Defendants and Appellants PERFECTUS
                                  ALUMINIUM, INC. and PERFECTUS
                                  ALUMINUM ACQUISITIONS, LLC

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 28.1 and Ninth Circuit Rule 28.1-1(b), I certify that the attached brief is proportionally spaced, has a typeface of 14 points and contains 13,890 words.

Dated: January 4, 2024   Respectfully submitted,

LARSON LLP

By:  */s/ Hilary Potashner*
   Stephen G. Larson
   Robert F. Ruyak
   Hilary Potashner
   A. Alexander Lowder

Attorneys for Defendants/Appellants/Cross-Appellees SCUDERIA DEVELOPMENT, LLC, 1001 DOUBLEDAY, LLC, VON-KARMAN-MAINSTREET, LLC and 10681 PRODUCTION AVENUE, LLC and Defendants and Appellants PERFECTUS ALUMINIUM, INC. and PERFECTUS ALUMINUM ACQUISITIONS, LLC